ORIGINA

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 0 6 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

---------------------------------------- x

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>SUNTRUST BANKS, INC., SUNTRUST BANK, JAMES M. WELLS III, WILLIAM H. ROGERS, JR. and MARK A. CHANCY,<br><br>                    Defendants. | Civil Action No.  **1 09-cv-0617**<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF **TWT** THE FEDERAL SECURITIES LAWS |

---------------------------------------- x   DEMAND FOR JURY TRIAL

## INTRODUCTION AND OVERVIEW

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of SunTrust Banks, Inc. ("SunTrust" or the "Company") publicly traded securities between July 22, 2008 and January 21, 2009 (the "Class Period"), and who were damaged thereby (the "Class").

2.      SunTrust is the holding company for SunTrust Bank, which provides various financial services to consumer and corporate customers in the United States.

3.      During the Class Period, defendants made false and misleading statements about SunTrust's financial results and conditions.   Specifically, the Company's publicly reported financial results and defendants' statements regarding the Company's business and capital position were materially false and/or misleading because they failed to disclose that:

(a)      Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

(b)      Defendants failed to properly record losses for impaired assets;

(c)      The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

(d)      SunTrust was not as well capitalized as represented, and, notwithstanding the $3.5 billion the Company received on November 17, 2008 from

the Troubled Asset Relief Program ("TARP"), the Company announced that it would have to raise an additional $1.4 billion in TARP funds just three weeks later.

4.      As SunTrust's true condition slowly came to light in a series of write-downs, reserve increases and capital-raising, SunTrust's stock price dropped from a Class Period high of over $59 per share to less than $14 per share. This decrease in SunTrust's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. SunTrust's headquarters are located in Atlanta, Georgia, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

6.      Plaintiff Waterford Township General Employees Retirement System purchased SunTrust publicly traded securities during the Class Period as set forth in the certification attached hereto as Exhibit A and was damaged thereby.

7.    Defendant SunTrust is a financial holding company with its headquarters located in Atlanta, Georgia.  SunTrust's stock is traded under the symbol STI on the New York Stock Exchange, which is an efficient market.

8.    Defendant SunTrust Bank is a subsidiary of SunTrust and offers retail and commercial banking services through 1,700 branches in the southern states.

9.    Defendant James M. Wells III ("Wells") was, at all relevant times, Chairman and Chief Executive Office ("CEO") of the Company.

10.    Defendant William H. Rogers, Jr. ("Rogers") was, at all relevant times, President of the Company.

11.    Defendant Mark A. Chancy ("Chancy") was, at all relevant times, Chief Financial Officer ("CFO") of the Company.

12.    The defendants named in ¶¶9-11 are referred to herein as the "Individual Defendants."

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

13.    On July 22, 2008, the Company issued a press release entitled "SunTrust Reports Second Quarter Earnings of $1.53 Per Share," which stated in part:

> SunTrust Banks, Inc. today reported net income available to common shareholders of $535.3 million for the second quarter of 2008, or $1.53 per average common diluted share, compared to $673.9 million, or $1.89 per average common diluted share, in the second quarter of 2007. . . .

The Company recently completed three separate transactions to optimize its long-term holdings of Coke common stock. . . .

"Our capital position solidified during the quarter as a result of the Coke stock-related transactions which make SunTrust even better prepared to address the challenges of the current environment, as well as strengthen our position for the long-term," said James M. Wells III, Chairman, President and Chief Executive Officer. "Against a backdrop of economic weakness, deteriorating market conditions, and industry-wide volatility, our second quarter results reflect the Company's intense focus on managing our core business, balance sheet, and credit risk through this difficult cycle."

*       *       *

Credit

The Company's net charge-offs and certain other key credit metrics continued to deteriorate in the second quarter, though at a slower place than the prior quarter. Overall, credit metrics remain elevated, principally as a result of loans secured by real estate. Net charge-offs increased 8.6% from the first quarter, which equated to an annualized 104 basis points of average loans. Provision expense declined from the first quarter of 2008, as the slowing pace of credit deterioration necessitated a smaller increase in the reserve. Total provision expense was $448.0 million, as compared to $560.0 million in the first quarter of 2008 and $104.7 million in the second quarter of 2007. The allowance for loan losses increased to $1,829.4 million, or 1.46% of total loans outstanding, which is up 41 basis points from the end of 2007 and 21 basis points from the first quarter of 2008.

*       *       *

Asset Quality

Annualized net charge-offs in the second quarter of 2008 were 1.04% of average loans, up from 0.30% in the second quarter of 2007 and 0.97% in the first quarter of 2008.  Net charge-offs were $323

million in the second quarter of 2008, as compared to $88 million in the second quarter of 2007. The increase in net charge-offs over the second quarter of 2007 reflects deterioration in consumer credit, particularly in residential real estate secured loans. The increase in net charge-offs in 2008 was most pronounced in home equity and residential mortgages.

Nonperforming loans were $2,789 million, or 2.22%, of total loans as of June 30, 2008, compared to $2,069 million, or 1.67%, of total loans as of March 31, 2008, and $765 million, or 0.64%, of total loans, as of June 30, 2007. The increase in nonperforming loans was mainly due to an increase in residential mortgage and real estate construction loans as the overall weakening of the housing markets and economy continued to increase delinquencies.

The allowance for loan and lease losses was $1,829 million as of June 30, 2008. The increase in the allowance for loan and lease losses was attributable to the deterioration in certain segments of the consumer and residential real estate market. The allowance for loan and lease losses as of June 30, 2008 represented 1.46% of period-end total loans as compared to 1.05 % as of December 31, 2007. The allowance for loan and lease losses as of June 30, 2008 represented 72% of period-end nonperforming loans, the majority of which were mortgages secured by residential real estate. Provision in excess of net charge-offs was $125 million, adding approximately ten basis points to the allowance, while the consolidation of GB&T accounted for the remaining increase.

The Company continued to record provision for loan losses at elevated levels in the second quarter of 2008, although it was down from the first quarter of 2008, as charge-offs increased less than expected and slowing deterioration in the portfolio necessitated a lower level of reserve building.

14.    Regarding these results, a July 24, 2008 JP Morgan analyst report on

SunTrust stated:

- **Loan loss reserves grew 21 bp qoq** to 1.46% of loans but fell to 66% of NPLs, among the lowest in our universe.

- 5 -

15.    On August 7, 2008, SunTrust filed a Form 10-Q with the SEC setting

forth the financial results described above.  The Form 10-Q was accompanied by

certifications signed by defendants Wells and Chancy, which stated:

I, [James M. Wells III/Mark A. Chancy], certify that:

(1)    I have reviewed this quarterly report on Form 10-Q of
SunTrust Banks, Inc.;

(2)    Based on my knowledge, this report does not contain any
untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect to
the period covered by this report;

(3)    Based on my knowledge, the financial statements, and other
financial information included in this report, fairly present in all material
respects the financial condition, results of operations and cash flows of
the registrant as of, and for, the periods presented in this report;

(4)    The registrant's other certifying officer and I are responsible
for establishing and maintaining disclosure controls and procedures (as
defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal
control over financial reporting (as defined in Exchange Act Rules 13a-
15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or
caused such disclosure controls and procedures to be designed
under our supervision, to ensure that material information relating
to the registrant, including its consolidated subsidiaries, is made
known to us by others within those entities, particularly during the
period in which this report is being prepared;

b.    Designed such internal control over financial
reporting, or caused such internal control over financial reporting
to be designed under our supervision, to provide reasonable

assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

16.     On September 10, 2008, at the Lehman Brothers Global Finance Services Conference, defendant Chancy made the following statements:

- 7 -

We believe that we have a very diversified franchise with a solid capital and liquidity position that provides a downside protection.

\*    \*    \*

There's a lot of focus on capital, as there should be in today's environment. And one of the things that we mentioned is that at the end of the second quarter we are continuing to evaluate our capital position. We believe that we have adequate capital, given our current views on the credit environment.

\*    \*    \*

Provision on a quarter-over-quarter basis declined. It was $448 million in the second quarter, down from $560 million in the first quarter. The reserve itself moved up to 1.46%.

\*    \*    \*

As it relates to the fourth quarter, we continue to believe that charge-offs will not be dramatically higher or lower, again, as you have both an increasing level of charge-offs in certain categories that I will talk about in a minute, as well as some that we anticipate will decline.

*And as it relates to the allowance, while we believe that it will continue to grow over the next few quarters, we believe it will grow at a more modest level than it has in the past couple of quarters*. So we are trying to give you some information to develop a view both on charge-offs, as well as provision expense and the allowance percentage.

We believe overall we're taking the right actions to mitigate our risk on these various portfolios, and as we add new production to mitigate our risk on the new levels of loans that we're bring [sic] into the balance sheet.

## THE TRUTH SLOWLY BEGINS TO COME TO LIGHT

17.    On October 23, 2008, the Company issued a press release entitled

"SunTrust Reports Third Quarter Earnings of $0.88 Per Share," which stated in part:

> SunTrust Banks, Inc. today reported net income available to common shareholders of $307.3 million for the third quarter of 2008, or $0.88 per average common diluted share, compared to $412.6 million, or $1.18 per average common diluted share, in the third quarter of 2007. . . .
>
> "SunTrust's continued profitability and improved capital position not only underscore our resiliency in a quarter marked by unprecedented industry turmoil, but also serve as a realistic basis for our confidence that we will continue to manage successfully – albeit not unscathed – through the challenges that our industry clearly will face in the period ahead," said James M. Wells III, Chairman, President and Chief Executive Officer. . . .
>
> Mr. Wells said the potential impact of economic weakness on credit quality remains "near-term concern number one" for SunTrust even though the Company has been seeing some "signs of slowing credit deterioration." Mr. Wells said charge-offs, which were in line with expectations in the third quarter, are likely to remain at elevated levels into 2009.
>
> . . . Mr. Wells noted that the Company's Board of Directors has authorized an application for the sale of preferred stock to the U.S. Treasury under the TARP program, and also that the Company continues to evaluate its capital structure and dividend policy. Mr. Wells said he expects the evaluation to be completed "in short order" with any decisions communicated promptly.
>
> *        *        *
>
> SunTrust's previously announced capital enhancing transactions were completed during the quarter and the results are reflected in the Company's capital ratios. Estimated Tier 1 capital at September 30, 2008

is a healthy 8.15%, up 68 basis points from 7.47% at June 30, 2008. The total capital ratio also increased and now exceeds 11%. In addition, the Company reported total average equity to total average assets of 10.34%, and a tangible equity to tangible asset ratio of 6.40% which is one of the highest ratios among large banks.

*    *    *

## Asset Quality

Nonaccrual loans were $3,289.5 million, or 2.60%, of total loans as of September 30, 2008, compared to $2,625.3 million, or 2.09%, of total loans as of June 30, 2008 and $974.8 million, or 0.81%, of total loans as of September 30, 2007. The increase in nonaccrual loans was mainly due to an increase in real estate construction loans and residential mortgages, as the overall weakening of the housing markets and economy continued to increase delinquencies. Other real estate owned also increased $52.5 million, or 15.7%, to $387.0 million, as the Company foreclosed on the collateral securing specific nonperforming loans. Restructured loans still accruing interest increased $217.7 million to $381.0 million as a result of actions the Company is proactively taking to mitigate further losses and enable borrowers to repay their loans under revised terms that in the long run preserve the value of the Company's interests.

Annualized quarterly net charge-offs in the third quarter of 2008 were 1.24% of average loans, up from 0.34% in the third quarter of 2007 and 1.04% in the second quarter of 2008. Net charge-offs were $392.1 million in the third quarter of 2008 compared to $322.7 million in the second quarter of 2008 and $103.7 million in the third quarter of 2007. The increase in net charge-offs over the third quarter of 2007 reflects the deterioration in consumer credit and home values, particularly in residential real estate secured loans. The increase in net charge-offs in 2008 has been most pronounced in home equity lines, residential mortgages, and construction loans as home values continued to fall. The provision for loan losses increased to $503.7 million compared to $448.0 million in the second quarter of 2008 and $147.0 million in the third quarter of 2007.

- 10 -

The allowance for loan and lease losses was $1,941.0 million as of September 30, 2008 and represented 1.54% of period-end loans. Since year-end 2007, the allowance for loans outstanding has increased 49 basis points, as the deterioration in certain segments of the consumer and residential real estate market continued. The allowance for loan and lease losses as of September 30, 2008 represented 1.24 times annualized net charge-offs in the quarter and 62.1% of period-end nonperforming loans.

18.     On October 23, 2008, on the Company's third quarter 2008 earnings conference call, defendant Wells made the following statements:

This morning we reported earnings per share of $0.88 for the third quarter which maintained our track record of profitability.

*     *     *

Now, moving on to some credit matters.  Net charge-offs increased to 1.24% of loans, while NPA's increased 24% to $3.7 billion in the quarter. Both of these outcomes were at the high end of the ranges we had anticipated.  On the other hand, early stage delinquencies remained stable in the 1.5% range again this quarter. Additionally, the forward view of lost content in the existing portfolio increased less than in the past few quarters. The reserve growth of $112 million was lower than prior quarters and raised the loss reserve by 8 basis points to 154 basis points.

*     *     *

We said during our earnings call last quarter that while we didn't think we needed significant additional capital, we would continue to evaluate the capital markets to determine if regulatory capital could be raised in a cost effective manner. The public markets were not conducive to raising capital during the majority of the Third Quarter and so we did not access the market.

As you all know, the Treasury announced it will be making direct investments in selected institutions in the form of preferred securities.

- 11 -

Given the progress we've made in increasing regulatory capital we are in a position of strength and do not have a deep need for this capital; however, given the level of economic uncertainty it may be prudent to pursue this option particularly since the preferred stock is attractively priced. . . .

As we enter 2009 we are evaluating our capital structure including our current regulatory and tangible capital levels and the potential issuance of preferred securities under the TARP program. Our Board of Directors authorized an application to sell preferred stock to the US Treasury under that program and the potential range for SunTrust under the program is between $1.6 billion to $4.9 billion. . . . We expected additional decisions related to our overall capital structure and dividend policy will be resolved and communicated properly.

19.    On the same call, defendant Chancy stated:

Net charge-offs increased to $392 million or 1.24% of loans which was in line with the high end of our expectations. $112 million of provision was recorded in excess of net charge-offs and this excess provision increased the allowance ratio to 1.54%.

*       *       *

As expected we recorded another $48 million in reserves for expected losses related to our Twin Rivers mortgage reinsurance Company; however mortgage application fraud is the real story. The run rate cost of fraud loss is effectively doubled versus last year and last quarter. Further, we established a $40 million reserve during the quarter for expected future fraud related losses.

20.    Tom Freeman ("Freeman"), SunTrust's Chief Credit and Risk Officer,

also participated on the call, stating:

The overall credit picture is that deterioration in the third quarter continued at a pace consistent with our expectations and market conditions. Net charge-offs increased to $392 million or 124 basis points

- 12 -

annualized. The increase in net charge-offs this quarter equates to just over 20% which is at the high end of the outlook we provided in July and consistent with the expectations in early September. You will recall that our Second Quarter charge-offs came in at the low end of our expectations. Provision expense increased in the quarter to $504 million, up from $448 million. The allowance ended the quarter at $1.9 billion or 154 basis points of loans outstanding. This is an increase of $112 million and an 8 basis point increase in reserve ratio. The rate of growth in the allowance is lower than in prior quarters. . . .

*. . . We remain comfortable with our allowance relative to non-performers in part due to significant charge-offs we have already recognized on the real estate secured NPLs and our specific reserve process.*

\*     \*     \*

Next I'll update you on losses recognized on loss severity in the mortgage portfolio . . . .

. . . Loss severities have not increased meaningfully since last quarter. The last point on this slide is that the $444 million of non-accruals have not yet been written down. This will be the primary pool of mortgages which will have writedowns during the Fourth Quarter. The balance is up from the Second Quarter and while most of the increases in the core portfolio with lower loss severity, *the increased balance suggests charge-offs in the Fourth Quarter will be consistent with the third quarter.*

\*     \*     \*

The subset of portfolios under significant stress comprises just 12% of our total loan book, and we've been taking aggressive actions to mitigate the risk. In residential mortgages, we eliminated Alt A portfolio lending in mid 2006. We have significantly tightened underwriting guidelines across all of our products, and have augmented our default management capabilities with people, enhanced processes, and tools. . . .

> . . . Credit deterioration was consistent with market conditions and our expectations during the third quarter. Early stage delinquencies remain stable. . . .
>
> ***I'll conclude my remarks with an outlook for charge-offs. The current internal forecast shows net charge-offs in the Fourth Quarter up approximately 20% driven by continued weakness in the consumer sectors.***

21.    As a result of these disclosures, SunTrust's stock price dropped $3.93, a 10% decline, in one day. This decrease in SunTrust's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price. The Company's stock continued to trade at artificially inflated levels, however, because defendants failed to fully disclose the adverse information set forth in ¶¶34-35, *infra*.

22.    On October 23, 2008, a Deutsche Bank analyst report on SunTrust stated:

**3Q08 falls short**

SunTrust reported 3Q08 EPS of $0.88, core EPS per press release items of 49 cents (consensus = $0.59) . . . . Results reflected higher end expectations for credit losses, lack of revenue growth, and negative operating leverage. mitigated by slightly higher capital ratios. We are lowering our 2009 est. due to our expectation for higher loan loss levels, reserves and expenses and establishing a 2010 est of $3.25, but maintain our Hold rating as the long term positioning of the bank remains strong.

**Credit continues to get worse**

Credit quality got worse, including charge-offs (from 1.04% to 1.24%), problem assets (up 1/4th), and trends in other areas, such as

- 14 -

commercial which had higher losses in small business (to 1.6% – not too bad) and publishing.

23.    On October 27, 2008, the Company issued a press release entitled "SunTrust Plans Sale of $3.5 Billion in Preferred Stock to U.S. Treasury; Company Separately Announces 30% Dividend Reduction."  The release stated in part:

> SunTrust Banks, Inc. said today that it has received preliminary approval from the U.S. Treasury for the sale of $3.5 billion in preferred stock and related warrants to the U.S. Treasury under the Capital Purchase Program of the Emergency Economic Stabilization Act of 2008.  The approval is subject to certain conditions and the execution of definitive agreements.
>
> "Our participation in the Capital Purchase Program enhances SunTrust's already solid capital position and will permit us to further expand our business and take advantage of growth opportunities," said James M. Wells III, Chairman, President and CEO. "In addition, we are pleased to support the Treasury in its ongoing effort to address dislocations in financial markets and spur the market stabilization that is in the public interest."

24.    On October 29, 2008, a JP Morgan analyst report on SunTrust stated:

> What was different about SunTrust's (STI) announcement as regards the capital investment under TARP is that, unlike most regional banks, STI chose to take less than the maximum allowed – STI took little over 2% of risk-weighted assets in capital because of its concerns about the dilution from the capital due to difficulties in levering it materially.

25.    On November 7, 2008, SunTrust filed a Form 10-Q with the SEC, which included the third quarter 2008 financial results set forth above.  The Form 10-Q was

accompanied by certifications signed by defendants Wells and Chancy substantially identical to those quoted above.

26.    On November 9, 2008, a Ladenburg Thalman analyst report on SunTrust stated:

> SunTrust's reserves are low relative to its non-performing assets and non-performing assets are growing rapidly. This means that the loan loss provision will continue to rise. Management is arguing that the rate of growth is about to slow, however.

27.    On November 13, 2008, at the Merrill Lynch Banking & Financial Services Conference, defendant Chancy made the following statements:

> Despite the difficult operating environment that we are all challenged with right now, we believe that we are well positioned to work through this period and come out a stronger Company, to be even more competitive on a go-forward basis.
>
> \*       \*       \*
>
> As many of you know, we announced our intent and were ultimately approved to participate in the capital purchase program. We applied for and received approval for $3.5 billion worth of preferred stock, which is a little bit more than the 2% allocation. That is the level that we requested.
>
> We went through, as you might expect, a pretty thorough review, looking at our own capital position as we exited the third quarter. We did some sensitivity analysis around our credit metrics and our capital position, which we feel very good about. We felt that the incremental capital would allow us to work ourselves through the current credit environment, and further extend certain loan categories, and grow our loan book in a prudent fashion.

\*    \*    \*

I wanted to . . . give you some perspective on how long we have actually been working at both improving the liquidity and the capital position of the Company.

We started back in early 2007, well before the market disruption that affected the market starting in August of 2007. These steps along the path – I'm not going to review each of them. You have them in your materials. But they have substantially improved both our liquidity and our capital positions.

\*    \*    \*

So, we believe that we have taken, as outlined here on the right-hand side of the page, significant actions to mitigate our ongoing risk and manage the risk that we have it [sic]. This is approximately 12% of our overall loan portfolio. As noted about $15 billion in total outstandings. These are the areas that we will continue to focus on as we move into 2009.

\*    \*    \*

In conclusion, we believe that we are well positioned, with the strong foundational elements that I have provided you an overview of, to weather this current period. We have a diversified business mix. We have attractive markets in which we have excellent market share. We have a solid capital and liquidity posture.

28.    After his prepared statement, defendant Chancy engaged in the following colloquy with the audience:

Unidentified Audience Member: I had a couple questions. The first is concerning provisioning only being up 8 basis points. I understand the rationale in terms of looking at the 38- to 89-day delinquencies, early stage in this funnel delinquencies, and seeing some stability.

- 17 -

My concern is this. We have heard from everyone, covering every facet of the economy, that in the last two months things have deteriorated significantly. So, my concern is, *you are nowhere even close to provisioning enough given current reality and near-term future reality*.

*I know it makes numbers look prettier on the quarter to not provision too much. But is it really an accurate reflection of what is going to be happening in the future?* Then I have a follow-up after that.

[Chancy:] Okay, well, as the industry does, focus on the current information that we have as it relates to our portfolio, as well as the forward view of how those portfolios are going to perform. We look over a period of time that is between one and two and a half years depending upon the type of portfolio. And we take all of that information into consideration when designing the appropriate level of reserves.

\*     \*     \*

One of the things that people as they are looking at SunTrust's reserve position often compare is our nonperforming loans; and nonperforming loans have been going up pretty substantially, particularly in the residential mortgage arena. One thing to note around that – and we try to provide some information in our earnings presentation deck to give you an illustration – is we have taken a substantial amount of chargeoff against those nonperforming loans in the residential category. About two-thirds of the loans have already been written down.

We go through a process at the end of 180 days where we do an updated fair market value of the property. We then mark it at 85% of that estimated fair market value; and we chargeoff the difference between our loan balance and that adjusted fair market value estimate. Those chargeoffs on those nonperforming loans have already been realized by the Company.

So when you are trying to balance the appropriate level of allowance by loan category, given the level of chargeoffs that have

already been realized as well as those that you expect in the future, we take each of those elements into consideration for the pools.

We also have a process where we go through on a loan-by-loan basis for all loans greater than $2 million that are in a nonperforming status, to do specific reserving. So all I can tell you is that we are taking all of the current and our expected views on these portfolios into consideration as we build up the allowance on a pool-by-pool basis.

***We certainly believe that it was adequate as of the end of the quarter. We will obviously continue to evaluate the reserve position.*** What we have said in the past is that we expect the reserve to continue to grow on a quarterly basis, although at a slowing pace relative to the last several quarters. And that was what we realized during the third quarter, we were up about $100 million quarter-over-quarter.

\*       \*       \*

Ed Groshans, Analyst, Omega: Ed Groshans with Omega. I guess going off the first question, talking about slowing and stabilizing, and given the disruptions that we've seen in October, how comfortable are you that when the fourth-quarter reports come out or from what you are seeing, you can say that those stabilization trends are continuing?

[Chancy:] The specific comment that we made around credit for the fourth quarter is that we would expect chargeoffs to continue to increase, and increase by approximately 20%, reflective – to your point – of the continued deterioration in the economy.

We are going to update the allowance as is appropriate at the end of every quarter. We think we are doing a prudent and thorough job of evaluating the risks that we have in our specific portfolio by loan subsegment. We will address the current data as well as the future risks as we go through and finalize the allowance again here at the end of the fourth quarter.

So we have not made, to be specific, a forward-looking statement to date as it relates to the allowance going forward. We have given you a chargeoff expectation which continues a trend of up about 20%.

\*       \*       \*

Unidentified Audience Member: Sorry, two quick questions. One is with respect to TARP, can you reapply, given the framework?

Secondly, I guess echoing off of other questions, on a risk-adjusted basis you guys had more room to raise TARP-wise. It would appear you are at around 2%; the average is around 2.8%. Frankly, everyone below the big guys have taken 3% or max. Is it you think you are better positioned, or why the 2%?

[Chancy:] I will answer your second question maybe first. As I mentioned in my presentation, we made the decision obviously to participate. Once you make that decision, there are lots of different considerations that go into what is the right number.

The money is on an attractive basis, but it is certainly not free, as I mentioned. *We looked at our own capital position. We look at the stress scenario on our credit portfolio. We looked at the ability for us to support loan growth, which is a primary driver for the capital, as you know. We also looked at the capital level that would support some potential acquisitions to the extent that they made economic sense for our shareholders on a long-term basis.*

*We took all of those different factors into consideration when determining that the $3.5 billion – which, like you said it, is a little bit more than 2% – was the right number for us based on those reviews.*

29.    On November 19, 2008, a Morgan Keegan analyst report on SunTrust stated:

**TARP Update** – STI filed an 8-K Monday morning stating that it had issued $3.5 billion in preferred stock and received the cash infusion

- 20 -

from the U.S. Treasury under the TARP capital purchase program on Friday. SunTrust could have applied for up to approximately $5 billion in TARP capital, but did not, as management is committed to refinancing the preferred shares as soon as possible and does not view this as permanent capital. In management's view, taking more TARP capital would only create a bigger refinancing burden down the road.

30.   Just 22 days later, on December 9, 2008, the Company issued a press release entitled "SunTrust Approved to Sell Remaining Allotment of Preferred Stock Under Treasury Program; 'Prudent Step' Bolsters Capital in Increasingly Uncertain Economy." The release stated in part:

> SunTrust Banks, Inc. said today it has received preliminary approval to sell to the U.S. Treasury the remaining $1.4 billion of preferred securities available to it under Treasury's Capital Purchase Program. As previously announced, SunTrust has already received an initial $3.5 billion under the program. This additional amount brings the combined total to approximately $4.9 billion, or the full 3% of risk weighted assets for which SunTrust was eligible.
>
> "As we now know from the most recent data, the economic situation is decidedly bleaker than was the case when we announced our initial, partial regulatory capital transaction under the Treasury program," said James M. Wells III, SunTrust Chairman and Chief Executive Officer. "Given the increasingly uncertain economic outlook, we have concluded that further augmenting our capital at this point is a prudent step, especially if the current recession proves to be longer and more severe than previously expected."

31.   As a result of these disclosures, SunTrust's stock price dropped $3.72 per share, a decrease of 11%, in one day. This decrease in SunTrust's stock price was a result of the artificial inflation caused by defendants' misleading statements coming

out of the stock price. The Company's stock continued to trade at artificially inflated levels, however, because defendants failed to fully disclose the adverse information set forth in ¶¶34-35, *infra*.

32.     On December 9, 2008, *Business Wire* published an article entitled "Fitch Rates SunTrust Bank's FDIC Guaranteed Debt 'AAA/F1+'," which stated in part:

> Fitch Ratings has assigned 'AAA/F1+' ratings to debt issued by SunTrust Bank through the FDIC Temporary Liquidity Guarantee Program (TLGP). Specifically, SunTrust Bank, a subsidiary of SunTrust Banks, Inc., issued $2.75 billion of senior unsecured debt under the TLGP. The debt issues consist of a $2 billion, three-year fixed rate tranche, maturing in November 2011 and a $750 million, two-year floating rate tranche maturing December 2010.

33.     On December 10, 2008, a Morgan Keegan analyst report on SunTrust stated:

> • We are downgrading our rating on SunTrust to Market Perform from Outperform following the recent period of outperformance in STI shares and on the bank's announcement yesterday that it had changed its previous decision and decided to access the remaining $1.4 billion in TARP capital (has already received $3.5 billion) that management had previously decided against applying for.

34.     On January 22, 2009, before the markets opened, the Company issued a press release entitled "SunTrust Reports 2008 Profit of $2.13 Per Share," which stated in part:

> SunTrust Banks, Inc. reported net income available to common shareholders of $746.9 million, or $2.13 per average common diluted share, for 2008 compared to $1,603.7 million, or $4.55 per average

common diluted share in 2007. Net income available to common shareholders in the fourth quarter was a loss of $379.2 million, or $1.08 per average common diluted share, compared to $3.3 million, or $0.01 per average common diluted share, in the fourth quarter of 2007. The Company's 2008 and fourth quarter results were adversely impacted by credit-related charges that reflect the dramatic deterioration in the economy, especially during the fourth quarter.

\*     \*     \*

Mr. Wells said the significant increase in the fourth quarter provision for loan losses from the prior quarter covered current loan charge-offs and also strengthened the Company's allowance for loan losses.

\*     \*     \*

The Company recorded provision for loan losses of $962.5 million, or $410.0 million in excess of net charge-offs, increasing the allowance for loan losses to 1.86% of total loans during the fourth quarter. Additionally, during the fourth quarter, the Company recorded $236.1 million in operating losses, which were primarily related to losses stemming from borrower misrepresentations and insurance claim denials, and $100.0 million related to mortgage reinsurance reserves.

\*     \*     \*

Asset Quality

Nonaccrual loans, as of December 31, 2008, totaled $3,940.0 million compared to $3,289.5 million as of September 30, 2008 and $1,430.4 million as of December 31, 2007. Residential mortgage and construction loans were 47% and 32%, respectively, of total nonaccrual loans as of December 31, 2008. Net charge-offs for the fourth quarter were $552.5 million compared to $168.0 million for the fourth quarter in 2007. Annualized net charge-offs to average loans for the quarter ended December 31, 2008 was 1.72% compared to 1.24% for the quarter ended September 30, 2008 and 0.55% for the quarter ended December 31,

- 23 -

2007. The increase in net charge-offs was primarily related to consumer and residential real estate loans, as well as commercial related loans. Other real estate owned increased to $500.5 million, up 29.3% over September 30, 2008, as the Company foreclosed on the collateral securing nonperforming loans.

For the fourth quarter, the provision for loan losses exceeded net charge-offs by $410.0 million as the overall impact of the housing market and increased delinquencies impacted the allowance for loan losses, which totaled $2,351.0 million as of December 31, 2008 and was 1.86% of total loans. The allowance for loan losses was 1.05% of total loans as of December 31, 2007.

35.    Also on January 22, 2009, on the Company's fourth quarter 2008 earnings conference call, Chancy and Freeman made the following statements:

[Chancy:]  Related to our participation in the capital purchase program and as I'm sure you are aware, SunTrust originally chose to participate at less than the full amount available and then subsequently decided to increase the amount to the full 3% of risk weighted assets available to us.

Our original decision was predicated on a number of factors. Including the economic outlook in mid-October, the recently completed Coke transactions, the capital and liquidity that we deemed necessary to support organic loan growth, the 8% pretax costs of the capital relative to our ability to leverage the funds, and finally, refinancing considerations. So what changed?

As we pointed out in our press release in December, the economic data and outlook changed significantly in November and early December. Other factors influenced our thinking as well. As we were evaluating acquisition activity and opportunities we reached the conclusion that potential capital requirements were more significant than previously thought as asset and loan values had declined further. Another factor was the desire to ensure adequate capital to meet the borrowing needs of clients and prospects through this recession. And finally, we

noted that most regional banks issued the maximum amount of securities available and we did not wish to be at a competitive disadvantage.

\* \* \*

Total provision expense for the quarter was $963 million, bringing the full year amount to $2.5 billion. Net charge-offs increased to $553 million or 1.72% of loans in the fourth quarter. Charge-offs were increasing about as expected through November, however, a significant increase in December drove the overall rate of increase higher with residential mortgages being the largest contributor. $410 million of provision was recorded in excess of net charge-offs in the quarter. This excess provision increased the allowance to $2.4 billion, or 1.86% of loans. For the full year, we have increased the reserve by 83% or $1.1 billion from the end of 2007.

\* \* \*

[Freeman:] Annualized fourth quarter net charge-offs increased to 1.72% of average loans, up from 124 basis points in the third quarter. Charge-offs for all products increased in the quarter, with the largest growth in the construction, consumer and commercial categories. A leading indicator of credit quality is the 30 to 89 day delinquency. This ratio deteriorated in the fourth quarter, climbing to 1.81% at year end, after having been stable all year in the 1.5% range. While several product categories showed some upward trends in early stage delinquency, residential mortgages exhibited the highest rate of increase. And were the largest contributor to the overall increase.

The increase in early stage delinquencies was driven by a sudden jump in consumer roll rates in October and November with December showing some improvement in mortgage roll rates. Roll rates are the proportion of the delinquency stage, say 30 to 59 days past due that moves on to the next stage, say 60 to 89 days past due during the course of a reporting period. We adjusted our residential real estate roll rate assumptions for delinquency and frequency which necessitated an increase in the allowance for loan losses. The increase in projected mortgage losses drove the $410 million increase to 1.86% of loans. At

the margin, the expected increase in losses is driven by changes in consumer payment behavior, and the resulting increase in loss frequency.

36.    As a result of these disclosures, SunTrust's stock price dropped from $15.21 per share to $13.55 per share, or 11%, in a single day.  This decrease in SunTrust's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

## DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

37.    Defendants' statements set forth above were materially false and misleading because they failed to disclose that:

(a)    Defendants' assets, including loans and mortgage-related securities, were impaired to a much larger extent than the Company had disclosed;

(b)    Defendants failed to properly record losses for impaired assets;

(c)    The Company's internal controls were inadequate to prevent the Company from improperly reporting the value of its assets; and

(d)    SunTrust was not as well capitalized as represented, and, notwithstanding the $3.5 billion the Company received on November 17, 2008 from TARP, the Company announced that it would have to raise an additional $1.4 billion in TARP funds just three weeks later.

## SUNTRUST'S FALSE FINANCIAL REPORTING

38.   During the Class Period, SunTrust's financial statements were not a fair presentation of the Company's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

39.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.01(a).

40.   A fundamental precept of GAAP is that impairment of financial securities that is deemed to be other than temporary should be recorded as a charge against earnings.  During the Class Period, defendants failed to properly account for SunTrust's impaired investments in violation of GAAP.

41. Due to these accounting improprieties, SunTrust's financial results and statements violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the

public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to

try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

42.    Further, the undisclosed adverse information is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## SCIENTER

43.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of SunTrust publicly traded securities during the Class Period.

44.    Defendants' scienter is further confirmed by SunTrust's loan charge-off procedure. According to that procedure, once a loan was delinquent 120 days, it was classified as non-performing and an appraisal was commissioned to determine the then-current value of the property. Once a loan became 180 days delinquent, the

difference between the loan amount and some proportion of the appraised value was charged off. Accordingly, the loans that SunTrust wrote down in October and January had become delinquent *at least six months earlier*. As these delinquencies aged, getting closer and closer to the 180-day limit, it became obvious to defendants that they would have to be written off. Indeed, at least two months before the October and January write-downs, SunTrust had appraised all of the properties at issue pursuant to its own procedures.

45.   Despite seeing this wave of charge-offs approaching, defendants actually lowered SunTrust's provision for loan losses during the Class Period from what they had been in the first quarter of 2008. Specifically, SunTrust maintained a provision of $560 million in the first quarter of 2008, but this was lowered to $448 million in the following quarter in order to boost SunTrust's financial performance. In the third quarter of 2008, which saw the bankruptcy of Lehman Brothers and the seizing up of the country's credit system, SunTrust's provision for loan losses was only $503.7 million, still less than it had been in the first quarter of the year. Finally, after SunTrust had raised $4.9 billion from TARP and another $2.75 billion from the Temporary Liquidity Guarantee Program, defendants raised the provision for loan losses a whopping 48% to $962.5 million.

- 31 -

## LOSS CAUSATION/ECONOMIC LOSS

46.    During the Class Period, as detailed herein, defendants made false and misleading statements about SunTrust's financial results and conditions and engaged in a scheme to deceive the market. This artificially inflated SunTrust's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, SunTrust's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of SunTrust publicly traded securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

47.    SunTrust's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

48.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of SunTrust who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan,

- 32 -

projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

49.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased SunTrust publicly traded securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

50.     At all relevant times, the market for SunTrust publicly traded securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, SunTrust filed periodic public reports with the SEC; and

(b)     SunTrust regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased SunTrust publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of SunTrust and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. SunTrust had more than 350 million shares of stock outstanding, owned by thousands of persons.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of SunTrust publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

55. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

57. Plaintiff incorporates ¶¶1-56 by reference.

58. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 36 -

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of SunTrust publicly traded securities during the Class Period.

60.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SunTrust publicly traded securities.  Plaintiff and the Class would not have purchased SunTrust publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

61.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of SunTrust publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

62.    Plaintiff incorporates ¶¶1-61 by reference.

63.    The Individual Defendants acted as controlling persons of SunTrust within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about SunTrust, the Individual Defendants had the power and ability to control the actions of SunTrust and its employees.  SunTrust

- 37 -

controlled the Individual Defendants and its other officers and employees. By reason

of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ.

P. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem

just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 6, 2009              COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                  JOHN C. HERMAN
                                  Georgia Bar No. 348370


                                  _____
                                            JOHN C. HERMAN

                                  Monarch Centre, Suite 1650
                                  3424 Peachtree Road, N.E.
                                  Atlanta, GA  30326
                                  Telephone:  404/504-6500
                                  404/504-6501 (fax)

- 38 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MATTHEW P. MONTGOMERY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

C:\Documents and Settings\garmstrong\Local Settings\Temporary Internet Files\OLK2\Cpt SunTrust (2).doc