UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

| | | |
|---|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civil Action No. 1:09-CV-0617-TWT (ECF Case) |
| Plaintiff, | ) ) | **LEAD PLAINTIFF'S FIRST AMENDED** |
| vs. | ) ) | **CLASS ACTION COMPLAINT** |
| SUNTRUST BANKS, INC., JAMES M. WELLS III, and MARK A. CHANCY, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) | Hon. Thomas W. Thrash, Jr. |

_____)

Lead Plaintiff, individually and on behalf of all other persons similarly situated, by the undersigned counsel, alleges the following upon personal knowledge as to the acts of Lead Plaintiff, and upon the investigation conducted by counsel as detailed below.

## NATURE OF THE ACTION

1.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of all persons and entities, other than Defendants (as defined herein) and their affiliates, who purchased SunTrust Banks, Inc. ("SunTrust" or the "Company") common stock during the

period July 22, 2008 through January 21, 2009, inclusive, who were damaged by Defendants' violations of the federal securities laws (the "Class" and "Class Period," respectively).  Excluded from the Class are Defendants herein and any of their respective current or former officers, directors, or any of their respective legal representatives, heirs, predecessors, successors and assigns, and any entity in which any Defendant has a controlling interest or of which the Company is a parent or subsidiary.

2.      At all times relevant hereto, SunTrust offered retail and commercial banking services through its wholly-owned SunTrust Bank subsidiary, which operated 1,692 full-service branches located throughout the southeastern United States, and specialized in making "Real Estate Loans," "Commercial Loans" and "Consumer Loans."

3.      Like many of its competitors, SunTrust grew at a torrid pace during the real estate boom that occurred in the southeastern United States from the year 2000 through 2007.  During this period, SunTrust was among the most aggressive lenders in the southeastern United States and experienced exponential growth by vastly increasing the size and scope of the real estate exposure in its loan portfolio. SunTrust did so by, among other things, approving and issuing loans to nonprime or "Alt-A" borrowers based on inflated appraisals and income data that drastically

exaggerated its borrowers' finances and largely ignored borrowers' ability to repay these loans. Among other things, SunTrust specialized in making highly risky pay-option adjustable-rate loans ("Option ARMs"), which gave borrowers the option of paying so little that the loan balances due actually rose over time. During this period, SunTrust also provided extensive financing to real estate developers and builders for residential construction. As a result of having engaged in these lending practices, at the commencement of the Class Period, SunTrust's loan portfolio was comprised of: (i) 60% Real Estate loans; (ii) 30% Commercial Loans; and (iii) 10% Consumer Loans.

4.      During late 2007, the easy credit that had fueled the real estate boom that commenced in 2000 began to dry up as interest rates on adjustable mortgage loans began to adjust upward, thereby increasing monthly mortgage payments dramatically. As a result, default rates among borrowers began to sky-rocket, and the real estate "boom" that had once seemed unstoppable suddenly began to turn to a real estate "bust." As the real estate and credit markets rapidly deteriorated through late 2007 and into 2008, defaults among Alt-A borrowers surged, especially among Alt-A borrowers holding Option ARMs. As a result, the secondary market for these types of loans dried up as investors stopped buying these loans from lenders, and SunTrust was left holding hundreds of millions of

dollars of loans that it could no longer securitize and sell to investors.  At the same time, real estate developers and builders who had obtained speculative construction loans from SunTrust and its peers similarly became unable to complete developments or to sell housing units.  As a result, SunTrust experienced a meteoric rise in the number of nonperforming loans in its loan portfolio.

5.     The real estate market melt-down was particularly prevalent in the southeastern United States where SunTrust had engaged in a number of highly risky lending practices prior to the Class Period by making loans to: (i) borrowers who were unable to validly document their ability to repay these loans; (ii) borrowers who lacked the ability to repay adjustable rate loans when the mortgage interest rates charged on the loans adjusted upward, thereby drastically increasing the amount of the monthly mortgage loan payments borrowers were required to make; (iii) builders and real estate developers who speculated with SunTrust's money by rapidly building large scale housing communities and condominium developments on nothing more than the hope that they would eventually be able to sell these housing units at a profit; and (iv) real estate speculators who purchased unoccupied housing units with the intention of quickly flipping these units for an easy profit.

6.     As the real estate "boom" turned to real estate "bust," SunTrust saw the condition of its loan portfolio – and as a result – its overall financial condition and business crumble rapidly.   By early 2008, Wall Street analysts began to speculate that SunTrust would likely experience the highest nonperforming loan rates of all banks in the southeastern United States because it had the largest real estate loan exposure of any loan portfolio among all of its competitors.

7.     Rather than admitting the truth concerning the sky-rocketing number of nonperforming loans in SunTrust's rapidly deteriorating loan portfolio, SunTrust and the Individual Defendants (as defined herein) defrauded members of the Class and financial market participants alike by deliberately hiding nearly half a billion dollars of nonperforming loans in SunTrust's loan portfolio by intentionally misclassifying these nonperforming loans as "In-Process" loans in order to artificially decrease the number and amount of the nonperforming loans and net-charge offs reported by SunTrust in its filings with the United States Securities and Exchange Commission ("SEC") during the Class Period.   The deliberate misclassification of these nonperforming loans was undertaken by Defendants in order to fraudulently manipulate SunTrust's publicly reported nonperforming loans, net charge offs, Allowance for Loan and Lease Losses ("ALLL"), and ultimately, SunTrust's net income.

8.     By engaging in the fraudulent scheme detailed herein, and subsequently making the materially false and misleading statements set forth herein and omitting to disclose the true facts known to Defendants concerning SunTrust's nonperforming loans, inadequate loan-loss reserves and dire financial condition, Defendants caused SunTrust's common stock to trade at artificially inflated prices throughout the Class Period.  Plaintiff and members of the Class were damaged when they unknowingly purchased shares of SunTrust common stock at such artificially inflated prices throughout the Class Period.

9.     Certain of the Individual Defendants were motivated to engage in this fraudulent conduct because SunTrust was a potential take-over target during much of the Class Period, and each stood to personally reap millions of dollars if SunTrust were taken over.  Specifically, a take-over would trigger the contractual change in control provisions in the Change In Control Agreement ("CIC") that had been entered into by and between SunTrust and certain Defendants whereby certain Defendants stood to receive millions of dollars in additional compensation in the event that SunTrust was acquired.

10.     When SunTrust's potential acquirers ultimately decided to acquire banks other than SunTrust in late 2008, Defendants scheme to avoid detection of their massive fraud was at an end and Defendants were forced to record a nearly $1

billion dollar provision for loan losses.  On January 22, 2009, SunTrust stunned members of the Class and financial market participants when it announced that, contrary to Defendants' previous pronouncements that SunTrust was experiencing a "slowing pace of credit deterioration" which "necessitated a lower level of reserve building," SunTrust would record $958.3 million in its provision for loan losses for the fourth quarter of 2008 – more than SunTrust reserved in the prior two quarters combined.  Because of Defendants' fraud, SunTrust common stock reached its Class Period high of $59.20 per share in September 2008.  Upon the revelation of Defendants' fraud, the price of SunTrust's common stock plunged 10.91% in a single day – closing at $13.55 per share, which represented a decline of 77% from its Class Period high attained in September 2008.

11.    The following chart depicts the impact of Defendants' materially false and misleading statements on the market price of SunTrust common stock both prior to and throughout the Class Period:



## JURISDICTION AND VENUE

12.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

13.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

14.    Venue is proper in this District because at all times relevant to this action, SunTrust maintained its principal executive offices in this District and many of the acts, transactions and wrongful conduct alleged herein, including the

dissemination to the investing public of the materially misleading statements at issue, occurred, in substantial part, in this District. In connection with the acts and conduct alleged in this Complaint, the Defendants, directly or indirectly, used the mails and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## PLAINTIFF'S INVESTIGATION

15.    Lead Plaintiff's allegations set forth herein are based on a thorough investigation conducted by and through its attorneys. Such investigation included a review and analysis of: (i) SunTrust's filings with the SEC throughout the Class Period; (ii) the Company's Annual Reports to shareholders during the Class Period; (iii) the Company's press releases and other publicly disseminated statements, including conference call transcripts made by Defendants during the Class Period; (iv) reports, articles, and other written materials concerning the Company and the subject matter of this Complaint; (v) analyst reports and investor advisory service reports; and (vi) information provided by individuals knowledgeable about the Company's business, operations and services.

## THE PARTIES

16.    Lead Plaintiff Waterford Township General Employees Retirement System purchased 900 shares of SunTrust common stock during the Class Period as set forth in the certification attached to the Initial Complaint filed on March 6, 2009, and was damaged thereby.

17.    Defendant SunTrust is a financial holding company with its headquarters located at 303 Peachtree Street, N.E., Atlanta, Georgia.  SunTrust's stock is traded under the symbol "STI" on the New York Stock Exchange ("NYSE") which is an open and efficient market.  Through its wholly-owned SunTrust Bank subsidiary, SunTrust offers retail and commercial banking services through 1,692 full-service branches located throughout the southeastern United States, including Alabama, Arkansas, Florida, Georgia, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, West Virginia and the District of Columbia.

18.    Defendant James M. Wells III ("Wells") was, at all relevant times, Chairman of the Board of Directors, President and Chief Executive Officer ("CEO") of SunTrust.  During the Class Period, Defendant Wells made a series of materially false and misleading statements and omitted to disclose material facts known to him concerning, among other things, SunTrust's nonperforming loans,

inadequate loan-loss reserves and dire financial condition.  As detailed herein, the materially false and misleading statements made by Defendant Wells were made in or during: (i) SunTrust's July 22, 2008 earnings press release; (ii) SunTrust's July 22, 2008 earnings conference call; (iii) Defendant Wells' August 7, 2008 Certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002; (iv) SunTrust's October 23, 2008 earnings press release; (iv) SunTrust's October 23, 2008 earnings conference call; (v) SunTrust's October 27, 2008 press release; (vi) Defendant Wells' November 7, 2008 Certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002; (vii) the November 7, 2008, BancAnalyst Association of Boston Conference; and (viii) SunTrust's December 9, 2008 press release.  As CEO of SunTrust, Defendant Wells had access to all information and documents concerning SunTrust's true financial condition, including, among other things, SunTrust's nonperforming loans, net charge offs, Allowance for Loan and Lease Losses, net income, capital position, asset and credit quality, and loan delinquencies.  During fiscal year 2007, Defendant Wells' total compensation was $3,428,954.  Throughout the Class Period, Defendant Wells owned, either directly or indirectly, approximately 191,378 shares of SunTrust common stock, excluding phantom stock units and unexercised options.  Further, pursuant to the CIC dated

August 5, 2008, entered into by and between Defendant Wells and SunTrust, Defendant Wells was contractually entitled to receive **$22,463,238** ($8,884,960 (Severance) + $1,776,493 (Accelerated vesting of long term incentives) + $3,670,666 (Retirement plans) + $8,131,119 (Other benefits and tax gross-up)) if SunTrust was acquired during the Class Period. *See* SunTrust Schedule 14A filed with the SEC on February 29, 2008.

19. Defendant Mark A. Chancy ("Chancy") was, at all relevant times, Chief Financial Officer ("CFO") of SunTrust. During the Class Period, Defendant Chancy made a series of materially false and misleading statements and omitted to disclose material facts known to him concerning, among other things, SunTrust's nonperforming loans, inadequate loan-loss reserves and dire financial condition. As detailed herein, the materially false and misleading statements made by Defendant Chancy were made in or during: (i) SunTrust's July 22, 2008 earnings conference call; (ii) Defendant Chancy's August 7, 2008 Certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002; (ii) the September 10, 2008, Lehman Brothers Global Finance Services Conference (iv) SunTrust's October 23, 2008 earnings conference call; (v) Defendant Chancy's November 7, 2008 Certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002; and (vi) the November 13, 2008,

Merrill Lynch Banking & Financial Services Conference. As CFO, Defendant Chancy had access to all information and documents concerning SunTrust's true financial condition, including, among other things, SunTrust's nonperforming loans, net charge offs, Allowance for Loan and Lease Losses, net income, capital position, asset and credit quality, and loan delinquencies. During fiscal year 2007, Defendant Chancy's total compensation was $1,810,941. Throughout the Class Period, Defendant Chancy owned, either directly or indirectly, approximately 46,972 shares of SunTrust common stock, excluding phantom stock units and unexercised options. Further, pursuant to the CIC dated August 5, 2008, entered into by and between Defendant Chancy and SunTrust, Defendant Chancy was contractually entitled to receive **$7,396,231** ($3,154,919 (Severance) + $898,365 (Accelerated vesting of long term incentives) + $2,388,291 (Retirement plans) + $2,388,291 (Other benefits and tax gross-up)) if SunTrust was acquired during the Class Period. *See* SunTrust Schedule 14A filed with the SEC on February 29, 2008.

20.    Defendants Wells and Chancy are hereinafter collectively referred to as the "Individual Defendants."

21.    The Individual Defendants, together with SunTrust, are collectively referred to as "Defendants."

22.     The Individual Defendants, by reason of their: (i) stock ownership; (ii) management positions; and/or (iii) membership on the Company's Board of Directors and Committees thereof, possessed control over the operations of the Company and possessed the power and/or ability to control each of the wrongful acts and practices complained of herein.  The Individual Defendants exercised such power and control to commit the fraudulent acts complained of herein, and to cause SunTrust to fail to disclose material, adverse, non-public information concerning the Company, and/or make the materially false and misleading statements contained in the Company's press releases, SEC filings, analyst conference call presentations, and investor conference presentations throughout the Class Period, as specified below.  The Individual Defendants were, therefore, "control persons" of SunTrust within the meaning of Section 20(a) of the Exchange Act.

23.     Because of the Individual Defendants' positions with the Company, their access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or meetings of the Board and committees thereof, and through periodic reports and other non-public information concerning the Company that was provided to them in

connection with their positions within the Company, the Individual Defendants had access to undisclosed, material, adverse information concerning:

- the deliberate misclassification of millions of dollars of nonperforming loans in SunTrust's loan portfolio as "In-Process Loans" rather than "Nonperforming Loans;"

- the fraudulent scheme to understate SunTrust's nonperforming loans, ALLL, and loan charge-offs in order to enable SunTrust to report artificially inflated earnings; and

- the fraudulent scheme to mislead Class members and other financial market participants concerning the truth about SunTrust's nonperforming loans and the credit quality of SunTrust's loan portfolio.

24.    Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly or indirectly participated (or had the ability to participate) in the management of the Company, and was directly or indirectly involved in the day-to-day operations of the Company at the highest levels.  By virtue of such involvement, these Individual Defendants were privy to confidential proprietary information concerning the Company and its aggressive lending practices, exponentially increasing nonperforming loans and drastically deteriorating financial condition, all as alleged herein.

25.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, including the materially false and misleading

information contained in the Company's SEC filings, press releases, analyst conference calls, investor conferences, and other public documents. The Individual Defendants were aware, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the materially false representations contained therein.

26.    As officers and/or directors and controlling persons of a publicly-held company whose securities were registered with the SEC and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, financial condition and performance, growth, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false so that the market price of the Company's publicly traded common stock would be based

upon truthful and accurate information.   The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations as alleged below.

## NON-DEFENDANT SUNTRUST OFFICERS

27.    Thomas Freeman ("Freeman") was, at all relevant times, Chief Risk and Credit Officer of SunTrust.  As Chief Risk and Credit Officer during the Class Period, Freeman had access to all information and documents concerning SunTrust's true financial condition, including, among other things, SunTrust's nonperforming loans, net charge offs, Allowance for Loan and Lease Losses, net income, capital position, asset and credit quality, and loan delinquencies. Significantly, throughout the Class Period, Freeman was personally responsible for overseeing the Special Asset Group and therefore knew that members of the Special Asset Group were deliberately hiding nearly half a billion dollars of nonperforming loans in SunTrust's loan portfolio by intentionally misclassifying these nonperforming loans as "In-Process" loans in order to artificially decrease the number and amount of the nonperforming loans and net-charge offs reported by SunTrust in its SEC filings during the Class Period.   In addition, Freeman routinely received reports directly from SunTrust Senior Vice President Neil Clerico ("Clerico") concerning nonperforming loans and charge-offs, and reviewed

the **Past Due Reports** that were input into the COMPASS System. Throughout the Class Period, Freeman routinely kept Defendants Wells and Chancy informed of all material facts concerning SunTrust's true financial condition, including, among other things, the fact that members of SunTrust's Special Asset Group were deliberately hiding nearly half a billion dollars of nonperforming loans in SunTrust's loan portfolio by intentionally misclassifying these nonperforming loans as "In-Process" loans in order to artificially decrease the number and amount of the nonperforming loans and net-charge offs reported by SunTrust during the Class Period.

## SUBSTANTIVE ALLEGATIONS

**SunTrust Abandoned Its Historically Conservative Banking
Model In Pursuit Of Rapid Growth From 2000 Through Mid-2007**

28.    From the time SunTrust was founded in 1891 through the late 1990's, Atlanta-based SunTrust had long been known as one of the most conservative lending institutions in the United States.  SunTrust and its loan officers had historically been well aware of the fact that the bank's long-term survival was dependent on their ability to carefully evaluate the creditworthiness of potential borrowers and extend credit only to those borrowers who they carefully adjudged most capable of repaying their loans.  SunTrust's loan officers had traditionally been ultra-conservative in extending credit to borrowers because SunTrust,

historically, held the vast majority of the loans that SunTrust made in its own loan portfolio. Accordingly, SunTrust's loan officers were well aware that SunTrust's future depended upon it ultimately recapturing the funds SunTrust had lent through loan repayments. Simply stated, a bank like SunTrust depended on, and made money by, making loans to those most capable of repaying those loans.

29.    During the early part of the 2000s, however, the banking industry experienced a radical transformation in the manner in which lending institutions such as SunTrust made lending decisions. During this time period, Wall Street's financial alchemists began to invent a vast array of financial products that forever altered the manner in which once conservative lending institutions like SunTrust did business. They did so by allowing the banks that made the ultimate lending decisions to rid themselves of "repayment risk" (the risk that loans will not be repaid) by permitting the banks to sell their loans, without recourse, in the event that the borrower defaults.

30.    By purchasing the dizzying number of loans made by banks and creating securitized pools into which these loans were placed, Wall Street's alchemists enabled banks like SunTrust to divest themselves of repayment risk. Within a relatively short time period, this concept became widespread and the financial products themselves, which are known as Collateralized Mortgage

Obligations ("CMO's) or Mortgage Backed Securities, ("MBS"), became wildly popular as investors' appetites for these securities quickly became insatiable.

31.     With Wall Street constantly clamoring to purchase as much loan inventory as lenders could generate, banks such as SunTrust soon learned that their future profitability was no longer dependent on their ability to properly evaluate the credit worthiness of their borrowers and make loans that would be repaid. Instead, their path to future profitability was entirely dependent upon their ability to churn out large volumes of loans that could be sold to Wall Street and securitized for resale to investors.

32.     Eager to capitalize on this new profit and growth model, SunTrust's management team – headed by Defendants Wells and Chancy – quickly rid itself of SunTrust's legacy as a conservative lender and aggressively pursued its goal of making SunTrust the largest real estate lender in the southeastern United States. Defendants' effort was further aided by the fact that this region of the United States was experiencing one of the largest real estate booms in history.

33.     Defendant Wells and his new management team aggressively sought to – and did – expand the size and scope of SunTrust's loan portfolio and dramatically expanded SunTrust's exposure to higher-yielding non-prime or "Alt-A" loans.  SunTrust's loan portfolio included hundreds of millions of dollars in

Alt-A First and Second mortgage loans, which required little or no documentation ("Stated Income" or "No Doc" loans) of the borrowers' income or ability to pay (commonly referred to as "Liars loans"), interest-only loans, high loan-to-value ratio ("LTV") loans, adjustable rate mortgages ("ARMS"), low-initial interest rate loans ("Hybrid ARMS"), and "piggy-back" or "combo" loans, which allowed borrowers to purchase property and obtain a home equity line of credit with little or no money down. These non-traditional, non-prime, loan products all enabled SunTrust to close an ever-increasing volume of loans and to reap increasing profits by generating the loan inventory that Wall Street was after – all while underwriting loans without regard to borrowers' ability to repay.

34.    SunTrust was so successful in executing this strategy that it became the largest mortgage lender in Georgia and the third-largest mortgage lender in Florida. Not satisfied, however, Defendants' aggressive growth strategy eventually led SunTrust to underwrite loans in regions of the United States with which SunTrust's lending officers were unfamiliar – including places such as California, Seattle, Washington and Portland, Oregon – where SunTrust did not have branches or operations and "did not fully appreciate the risks it was taking by going into markets it didn't full understand," according to stock analyst Christopher W. Marinac at FIG Partners.

**SunTrust's Aggressive Growth Strategy**
**Greatly Increased Its Risk Exposure**

35.    By pursuing a several year-long growth strategy that involved extending loans to an ever-increasing universe of borrowers without careful consideration of the borrowers' ability to repay these loans, Defendants greatly increased the risk profile of SunTrust's loan portfolio.  However, as long as SunTrust was able to package and sell these loans into securitized loan pools that were being created and sold by Wall Street as CMO's and MBS', neither SunTrust nor the Individual Defendants cared because the risk of non-payment of these loans ultimately would not be borne by SunTrust.

36.    As Defendants were keenly aware, the success of this strategy hinged on Defendants' continued ability to sell these loans to Wall Street as inventory that would be pooled, securitized and sold to investors.  It was the sale of these loans that helped to insure that someone other than SunTrust would incur the losses when borrowers defaulted on loans made by SunTrust.

37.    Throughout much of the period from 2000 through late 2007, it appeared as if demand for loans made by SunTrust and its competitors was limitless on Wall Street, and no one even seemed to consider – let alone fear – the possibility that Wall Street's demand for these loans could eventually vanish

altogether, leaving the banks that had underwritten these risky loans left holding these loans in their loan portfolios and bearing the entire risk of non-payment.

38.    As evidence by SunTrust's SEC filings, by the end of 2006, SunTrust had amassed $47.9 billion in residential real estate loans and home equity lines. Remarkably, 37% of these loans were either "interest only" or "high loan to value ratio" loans, or were initially offered with very low introductory or "teaser" interest rates that were designed to entice borrowers who would not have qualified for these loans absent such enticements.  By June 30, 2008, SunTrust's exposure had increased to $48.2 billion in residential real estate and home equity loans (representing 38.3% of SunTrust's total loans).

39.    Hundreds of millions of dollars worth of these loans and credit commitments represented a major credit risk for SunTrust if Wall Street were to suddenly stop buying these loans because the vast majority of these loans included high risk features such as Interest-Only loans, high Loan-To-Value loans and low initial interest rate loans.  As of June 30, 2008, SunTrust owned $16.7 billion of interest only loans and approximately $1.6 billion of those loans had combined loan to value ratios in excess of 80%. Additionally, SunTrust owned approximately $2.3 billion of amortizing loans with combined loan to value ratios in excess of 80% with no mortgage insurance.

**The Number of Nonperforming Loans
In SunTrust's Loan Portfolio Soars As The
Credit and Real Estate Markets Begin To Crumble**

40.    Beginning in 2006, lenders began to feel the effects wrought by years of increasingly risky lending practices.  While SunTrust and its competitors had been content to throw caution and sound lending practices to the wind in pursuit of ever increasing profits for the past several years, it now appeared that common sense was beginning to return to the credit and real estate markets.  Suddenly, the old adage that a bank should not make a loan to an individual whom the bank knows does not have resources to repay did not seem so outlandish.

41.    By mid 2006, real estate prices began to stall and interest rates began to rise.  Soon borrowers, who had over-extended themselves by buying real estate with no money down, or with introductory low "teaser" rates, began to default on their loans. The default rate continued to rise dramatically throughout 2006, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgage loans.

42.    These problems grew worse in late 2006, as borrowers continued to default in record numbers.  A Standard & Poor's report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early

payment defaults.    An October 23, 2006, <u>Bloomberg</u> article reported that "'[d]elinquency trends and home prices' show a weakening real estate market."

43.    On December 14, 2006, the Mortgage Bankers Association ("MBA") reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of ARMs [Adjustable Rate Mortgages] reset at higher interest rates. The MBA also reported that delinquencies rose for all home loans, but most notably for adjustable loans made to sub-prime borrowers who were already stretched to their financial limits before the interest rates on their adjustable rate mortgages reset higher.

44.    In 2007, the Florida and Georgia real estate markets in which SunTrust had lent so heavily deteriorated much further. Real estate sales slowed, mortgage originations dried up, values began to plummet and foreclosures accelerated.

45.    By the end of the first quarter of 2008, SunTrust was no longer able to avoid the negative financial consequences that resulted from it having lent so aggressively in the Florida and Georgia real estate markets.  SunTrust also could not avoid the fact that, because common sense had come back to the credit markets, investors were no longer willing to purchase limitless pools of mortgage

backed securities filled with defaulting loans.  As a result, SunTrust found itself unable to unload hundreds of millions of dollars in real estate loans that it had made to the most marginal of borrowers.  Rather than admit the truth concerning SunTrust's dire financial condition, however, Defendants embarked on a fraudulent scheme in the hope that, by doing so, they could fraudulently mask SunTrust's true financial condition until SunTrust was ultimately acquired by a suitor and thereby allow themselves to reap millions of dollars.

**Defendants Actively Monitored SunTrust's
Loan Portfolio and Therefore Knew That
SunTrust's Nonperforming Loans Were
<u>Skyrocketing Throughout The Class Period</u>**

46.    Defendants had actual knowledge that the number of nonperforming loans in SunTrust's loan portfolio was growing exponentially through mid 2008 because the number and dollar amount of nonperforming loans in SunTrust's loan portfolio were key facts critical to SunTrust's core operations that were constantly monitored by Defendants and other senior ranking SunTrust officials on a weekly and monthly basis as detailed herein.

47.    Further, Defendants had actual knowledge of this fact because of the extensive monitoring and reporting infrastructure that Defendants had built to monitor the health of SunTrust's loan portfolio.  Throughout the Class Period, SunTrust and the Individual Defendants closely monitored the payment status and

delinquencies of the loans that comprised SunTrust's loan portfolio.  In order to do so, Defendants created an elaborate and sophisticated reporting and committee system that provided Defendants with up-to-the-minute information detailing the payment status of all loans in SunTrust's loan portfolio.  Among the specific internal SunTrust reports utilized by Defendants to monitor both the loan payment status and overall condition of SunTrust's loan portfolio were the: (i) "**Past Due Reports**"; (ii) "**Nonperforming Loan Reports**"; (iii) "**Analysis Reports**"; and (iv) "**Forecasting Binders**."

48.     According to CW #1, a former Monetary Manager at SunTrust's Atlanta, Georgia office between approximately 1998 and October 2009, SunTrust's Past Due Reports were generated by SunTrust's COMPASS system, which sorted delinquent loans into three "buckets," namely the "30 day delinquent bucket," the "60 day delinquent bucket," and the "90 day delinquent bucket."  SunTrust's Past Due Reports specifically informed Defendants of the number and outstanding balances of all loans in each of the three "delinquency buckets," and provided other detailed loan information and delinquency statistics including the specific individual loan identification numbers and details such as a borrower's outstanding balance for all of the loans reflected in a given Past Due Report.

49.    According to CW #1, weekly Past Due Reports were distributed to and reviewed by Defendants and loan officers, members of the Special Asset Group, and SunTrust's senior management every Monday.   Monthly Past Due Reports were similarly distributed to and reviewed by these same individuals at each month's end.    In addition, CW #1 also stated that, throughout the Class Period, Defendants also had the ability to run daily Past Due Reports utilizing the COMPASS System and could instantaneously view these Past Due Reports on the COMPASS System.

50.    The second series of weekly reports that were provided to and reviewed by Defendants throughout the Class Period to monitor the condition of SunTrust's loan portfolio was a report known within SunTrust as the "Nonperforming Loan Report."   According to CW #2, a former First Vice President of Commercial Loan Operations located at SunTrust's Richmond, Virginia office between 2000 and 2006, CW#2 created the weekly Nonperforming Loan Reports each Thursday.  SunTrust then held a weekly "Nonperforming Loan Meeting" each Thursday during which that week's Nonperforming Loan Report was reviewed in detail.  The Nonperforming Loan Meetings were run by Joel Maddox who reported directly to C.T. Hill, SunTrust's Mid-Atlantic Banking Group and Retail Business Line Executive.   Mr. Maddox and C.T. Hill both

worked out of the Richmond, Virginia office. At the Nonperforming Loan Meetings, the loan officer handling the nonperforming loan would present an action plan concerning how SunTrust planned on dealing with a particular nonperforming loan. Mr. Maddox would report the results and affairs of the Nonperforming Loan Meetings to C.T. Hill and to Kris Anderson, Vice President of SunTrust's Special Assets Group in Atlanta, who would, in turn, report the results of the weekly Nonperforming Loan Meetings to Defendants.

51. The third series of reports that were provided to and reviewed by Defendants throughout the Class Period to monitor the condition of SunTrust's loan portfolio was a report known within SunTrust as the monthly "Analysis Reports." According to CW #3, a former Senior Financial Analyst in SunTrust's Corporate Reporting and Forecasting Department located in SunTrust's corporate headquarters in Atlanta, Georgia during the period February, 2005 through June, 2008, the Analysis Reports were prepared by a Senior Financial Analyst of the Corporate Reporting and Forecasting Department at SunTrust in Atlanta, and contained, among other things, detailed information concerning the nonperforming loans and "In-Process" loans in SunTrust's loan portfolio. The monthly Analysis Reports were distributed to and reviewed by SunTrust's Strategic Financial

Officer, Head of Treasury, Head of Accounting, and Defendants Wells and Chancy.

52.    Finally, the fourth type of report that was prepared for, distributed to, and reviewed by Defendants to monitor the condition of SunTrust's loan portfolio throughout the Class Period was a report known within SunTrust as the "Forecasting Binders." Like the Analysis Reports, the Forecasting Binders were also prepared by a Senior Financial Analyst of the Corporate Reporting and Forecasting Department at SunTrust in Atlanta and distributed to and reviewed by SunTrust's Strategic Financial Officer, Head of Treasury, Head of Accounting, and Defendants Wells and Chancy.

53.    According to CW #3, the information contained in the Forecast Binders included, among other things, detailed information concerning the nonperforming loans and "In-Process" loans in SunTrust's loan portfolio. The financial data contained in the Forecast Binders was carefully reviewed by Defendants each month during the "Forecast Review Meetings" that occurred every third Wednesday of the month. The Forecast Review Meetings were usually held in a SunTrust conference room or Defendant Chancy's office. At the end of each Forecast Review Meeting, Defendant Chancy followed up with any additional

questions concerning each line of business detailed in that month's Forecasting Binders.

54.    Because Defendants closely monitored the payment status and delinquency rate of SunTrust's loan portfolio, facts which were critical to SunTrust's core operations, Defendants each had actual knowledge that SunTrust was experiencing a meteoric increase in the number of nonperforming loans in SunTrust's loan portfolio.    The fact that Defendants possessed such actual knowledge was also confirmed by CW #1 who stated that SunTrust began to experience an exponential increase in mortgage and construction loan delinquencies beginning in April 2007 and that Defendants all had actual knowledge of this fact.

**Defendants Defrauded Class Members By Intentionally Understating The Number Of Nonperforming Loans In SunTrust's Loan Portfolio During The Class Period**

55.    Armed with actual knowledge concerning the rapidly deteriorating state of SunTrust's loan portfolio and concomitant increase in nonperforming loans, facts which were critical to SunTrust's core operations, Defendants defrauded Class members and financial market participants by intentionally understating both the number and dollar amount of the loans classified as nonperforming loans in SunTrust's loan portfolio **by approximately half a billion**

**dollars.** This fact has been confirmed by several Confidential Witnesses interviewed by Plaintiff's counsel.

56. According to CW #1 and CW #3, throughout the Class Period, Defendants carefully and actively monitored, reviewed and analyzed SunTrust's Past Due Reports, Nonperforming Loan Reports, Analysis Reports, and Forecasting Binders in order to stay apprised of the most up-to-date information available concerning, among other things, the number and dollar amount of the nonperforming loans in SunTrust's loan portfolio. As a result of reviewing and analyzing these weekly and monthly reports, and participating in and/or receiving informational reports concerning SunTrust's weekly Nonperforming Loan Meetings held each Thursday, and monthly Forecast Review Meetings that were held every third Wednesday of the month, Defendants and other senior ranking SunTrust officers, including, among others, SunTrust Senior Vice President, Neil Clerico, who reported directly to Freeman, had actual up-to-the-minute knowledge of the exact number of nonperforming loans in SunTrust's loan portfolio at all times throughout the Class Period.

57. Defendants utilized their extensive knowledge of SunTrust's nonperforming loans to defraud Class members and financial market participants by actively and fraudulently manipulating the nonperforming loan balance that was

publicly reported in SunTrust's financial statements and SEC filings throughout the Class Period.

58.    According to CW #2, acting at the direction of the Individual Defendants, SunTrust Vice President, Neil Clerico and SunTrust Vice President of the Special Assets Group, Kris Anderson routinely directed SunTrust employees in the Special Asset Group to temporarily transfer specifically pre-identified nonperforming loans in SunTrust's loan portfolio into an "In-Process" or "Pass-Through" account with an account number in the "17-300" series.   CW #2 explained that by temporarily transferring these specifically pre-identified nonperforming loans – many of which had outstanding balances in excess of $1 million – out of SunTrust's loan portfolio and into an "In-Process" or "Pass-Through" account, Defendants were able to fraudulently avoid: (i) classifying these pre-identified loans as "Nonperforming Loans" for financial statement and SEC reporting purposes, despite the fact that these loans were, indeed, nonperforming loans in SunTrust's loan portfolio; and (ii) charging these pre-identified loans off, thereby artificially understating SunTrust's actual loan losses and artificially inflating SunTrust's reported earnings throughout the Class Period.   According to CW #1, SunTrust Senior Vice President Clerico was intimately involved with all components, estimates and calculations of Suntrust's ALLL, and "no one would

question Neil's decisions to temporarily move nonperforming loans into the In-Process accounts." According to CW #1 and CW #2, Defendants Wells', Chancy's and Freeman's offices were located within corporate headquarters in close proximity with Messrs. Clerico's and Anderson's offices. In addition to daily business-related interaction between Defendants Wells, Chancy and Freeman, Messrs. Clerico and Anderson maintained close personal relationships with the Individual Defendants. According to CW #1, because of the close relationships that existed among the Individual Defendants and Messrs. Clerico and Anderson, the Individual Defendants supervised and directed, and therefore had actual knowledge of, the fraudulent scheme involving the deliberate misclassification of nonperforming loans as "In-Process" loans that caused SunTrust's SEC filings to be materially false and misleading throughout the Class Period.

59.   CW #1 further stated that, following the close of a financial reporting period, SunTrust employees in the Special Asset Group would then transfer these loans back into a nonperforming loan account – or non-accrual account – so as to make it appear as though these loans had always been classified in this manner from the time they first became nonperforming loans in order to avoid detection of Defendants' illegal scheme by SunTrust's auditors and bank examiners.

60.     Evidencing the fact that Defendants acted with the requisite scienter in executing their fraudulent scheme, CW #1 further stated that Defendants utilized this fraudulent technique of deliberately and temporarily mis-classifying nonperforming loans as "In-Process Loans" in order to fraudulently manipulate SunTrust's provision for loan losses, net charge offs, ALLL and ultimately SunTrust's net income.  CW #2 also stated that on several occasions, SunTrust's Vice President of the Special Assets Group, Kris Anderson, specifically directed CW #2 to temporarily transfer certain pre-identified loans into an "In-Process" account for the specific purpose of enabling SunTrust to report earnings that were materially greater than SunTrust would have reported had SunTrust truthfully and accurately reported all of its actual nonperforming loans, and that these instructions were always given towards the end of the quarter.

61.     According to CW #2, CW #2's refusal to comply with Kris Anderson's instructions to temporarily transfer a $21 million nonperforming loan into the 17-300 "In-Process" Account, led to CW #2's "early retirement" when SunTrust moved the non-accrual department to Atlanta, Georgia.  CW #1 continued to run the operations and processing component of the non-accrual department in Atlanta, however, no one was performing CW #2's function of monitoring the In-Process accounts.

62.    In 2007, CW #1 was reassigned to the position of Monetary Manager and his prior position, which involved running operations for SunTrust's non-accrual department, was relocated to SunTrust's HQ building where Messrs. Clerico and Anderson were both located.  This gave Anderson, Clerico and Freeman more control over processing non-accruals and charge-offs.

63.    According to CW #2, when the non-accrual department was moved from Richmond, Virginia to Atlanta, Georgia, the general ledger reconciliation component of the non-accrual department was moved to Florida.  The Florida office was responsible for matching up ticket entries, a simple data entry task. Unlike CW #2 and CW #2's staff, the people employed in the general ledger department in Florida were entry level employees – most without accounting degrees.  According to CW #2, these relatively uneducated Florida employees would simply match tickets and did not grasp the bigger picture, *i.e.*, the impact on SunTrust's balance sheet, thus enabling Messrs. Clerico, Anderson and Freeman to routinely misclassify nonperforming loans as "In-Process" loans without resistance from these employees because they did not fully comprehend the fraudulent nature of Defendants' scheme.

64.    Defendants directed and caused SunTrust to engage in the foregoing fraudulent scheme in order to, among other things, enable SunTrust to generate

fictitious data concerning its nonperforming loans, ALLL, loan chargeoffs, net income and earnings per share, all of which were incorporated into SunTrust's SEC filings throughout the Class Period.

## THE MATERIAL OMISSIONS AND MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING THE SECOND FISCAL QUARTER OF 2008

### A.    July 22, 2008 Press Release

65.    On July 22, 2008, Defendants caused SunTrust to issue a press release entitled, "SunTrust Reports Second Quarter Earning of $1.53 Per Share," in which Defendants SunTrust and Wells made the following materially false and misleading statements:

> **Our capital position solidified during the quarter as a result of the Coke stock-related transactions which make SunTrust even better prepared to address the challenges of the current environment, as well as strengthen our position for the long-term," said James M. Wells III, Chairman, President and Chief Executive Officer. "Against a backdrop of economic weakness, deteriorating market conditions, and industry-wide volatility,** our second quarter results reflect the Company's intense focus on managing our core business, balance sheet, and credit risk through this difficult cycle."
>
> *        *        *
>
> Credit
>
> **The Company's net charge-offs and certain other key credit metrics continued to deteriorate in the second quarter, though at a slower pace than the prior quarter**. … **Provision expense declined from the first quarter of 2008, as the slowing pace of credit deterioration necessitated a smaller increase in the reserve**.

Total provision expense was $448.0 million, as compared to $560.0 million in the first quarter of 2008 and $104.7 million in the second quarter of 2007.

\*        \*        \*

**The Company continued to record provision for loan losses at elevated levels in the second quarter of 2008, although it was down from the first quarter of 2008, as charge-offs increased less than expected and slowing deterioration in the portfolio necessitated a lower level of reserve building.**

(Emphasis added).

## B.    July 22, 2008 Earning Conference Call with Wall St. Analysts

66.    Also on June 22, 2008, Defendants hosted a conference call with analysts during which Defendants Wells and Chancy made materially false and misleading statements to Class members and analysts concerning SunTrust's "stable early stage delinquencies" and what Defendants termed a "pace of deterioration that is slowing." Defendant Wells falsely stated as follows:

[WELLS] … Our overall asset quality continued to deteriorate during the Second Quarter. Net charge-offs increased 9% from the First Quarter of 2008 $323 million, and non-performing assets increased approximately $800 million or 35%. **There were, however, some slightly more positive notes. Early stage delinquencies have remained stable in the 1.5% range for the last six months, and the additional provision expense required to increase the reserve declined by half.**

\*        \*        \*

> **Based on what we know today, we believe the actions we have taken to manage risk, increase the reserve, bolster capital, and to improve core earnings will be sufficient to see us through the better times.**

(Emphasis added).

67.    Defendant Chancy also misled Class members and analysts by making materially false and misleading statements that led them to believe that SunTrust was adequately reserved and the "slowing deterioration in the portfolio necessitated a lower level of reserve building":

> [CHANCY] … **Provision for loan losses remain cyclically high driven by residential real estate related charge-offs and the need to build loan loss reserves; however, provision declined as compared to the First Quarter as charge-offs increased less than we expected and slowing deterioration in the portfolio necessitated a lower level of reserve building.**
>
> \*      \*      \*
>
> Total provision expense for the quarter of $448 million includes charge-offs equal to an annualized 104 basis points of loans, plus $125 million or 10 basis points added to the reserve.
>
> **This resulted in provision expense declining by $112 million as compared to the First Quarter. As expected and communicated during our First Quarter earnings call, slowing growth and charge-offs and stable overall delinquencies required a lower level of reserve building than in the prior two quarters.**

(Emphasis added).

68.     During this earnings conference call, SunTrust also made a number of materially false and misleading statements by and through its Chief Risk and Credit Officer, Thomas Freeman.   Through Mr. Freeman, SunTrust stated in relevant part:

> Overall, combined charge-offs for the Second and Third Quarters are consistent with our expectations at the end of the First Quarter. Further, **nothing we see today suggests that charge-offs will increase or decrease dramatically in Fourth Quarter versus the second and Third Quarter levels**.
>
> *       *       *
>
> Our reserve expectations for the third quarter is a modest increase from the current levels **given the slowed deterioration in our credit statistics**. Non-performing assets increased $816 million during the quarter, to $3.1 billion.  **Excluding GB&T's NPAs of $170 million, the increase of this quarter of $647 million was slightly less than last quarters $665 million increase. We noted the flattening of the trend in early stage delinquency in the First Quarter presentation.**
>
> **This pattern continued into the Second Quarter, and the overall portfolio's 30 to 89 day delinquency rate has now been basically flat for six months.**

(Emphasis added).

69.     The market and investors swiftly reacted to SunTrust's and the Individual Defendants' seemingly positive announcement that credit deterioration was slowing, delinquencies were stable, net charge offs were stable and that SunTrust was adequately reserved for loan losses.   SunTrust's common stock

skyrocketed from $34.14 per share on July 21, 2008, to close at $39.66 per share on June 22, 2008. The price of SunTrust's common stock soared even higher still the following day closing at $43.21 per share on June 23, 2008, with approximately 16,605,000 and 19,965,000 shares traded, respectively – more than double the average daily trading volume during the Class Period.

70.    Defendants' statements in paragraphs ¶¶ 65-68, however, were materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

> i.    SunTrust's nonperforming loans were materially understated by hundreds of millions of dollars for the quarter ended June 30, 2008 because SunTrust's senior management and employees within the Special Asset Group were engaged in a fraudulent scheme whereby they intentionally and systematically misclassified hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans;

ii.    Defendants caused SunTrust to materially understate its ALLL for the quarter ended June 30, 2008, and by doing so, caused SunTrust's net income, earnings per share and Tier 1 Capital to be materially overstated for the quarter ended June 30, 2008; and

iii.    "early stage delinquencies" had not, as Defendants falsely stated, "remained stable in the 1.5% range for the last six months," and, as a result, "the additional provision expense required to increase the reserve" had not, as Defendants falsely stated, "declined by half." In truth, Defendants had deliberately, materially understated SunTrust's provision expense and reserve by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans.

**C.**     **August 7, 2008 Form 10-Q and Certifications for Quarter Ended June 30, 2008**

71.     On August 7, 2008, Defendants caused SunTrust to file its materially false and misleading quarterly report on Form 10-Q for the quarter ended June 30, 2008 with the SEC.    In addition to Defendants' materially false and misleading statements set forth above, ¶¶ 65-68, Defendants made the following false and misleading statements in the August 7, 2008 Form 10-Q:

**Allowance for Loan and Lease Losses**
**The Company's allowance for loan and lease losses is the amount considered adequate to absorb probable losses within the portfolio based on management's evaluation** of the size and current risk characteristics of the loan portfolio. **Such evaluation considers numerous factors, including, but not limited to prior loss experience, the risk rating distribution of the portfolios, the impact of current internal and external influences on credit loss and the levels of non-performing loans.** Specific allowances for loan and lease losses are established for large commercial and commercial real estate impaired loans that are evaluated on an individual basis. The specific allowance established for these loans and leases is based on a thorough analysis of the most probable source of repayment, including the present value of the loan's expected future cash flows, the loan's estimated market value, or the estimated fair value of the underlying collateral depending on the most likely source of repayment. General allowances are established for loans and leases grouped into pools based on similar characteristics. In this process, general allowance factors established are based on an analysis of historical charge-off experience and expected loss given default derived from the Company's internal risk rating process. Other adjustments may be made to the allowance for the pools after an assessment of internal and external influences on credit quality that are not fully reflected in the historical loss or risk rating data.

*See* SunTrust's Form 10-Q for the quarter ended June 30, 2008 at 7 (Emphasis added).

72.    SunTrust's Form 10-Q reiterated that same materially false and misleading information regarding the Bank's Provisions for Loan Losses and ALLL:

> **Provision for Loan Losses and Allowance for Loan and Lease Losses**
>
> *    *    *
>
> … A downturn in residential real estate prices has negatively affected the entire industry, including higher credit quality products and borrowers. **However, delinquency trends overall have remained flat from first quarter of 2008. As of June 30, 2008, accruing loans past due 30-89 days and 90 days or more were relatively flat compared to the first quarter of 2008.**
>
> **We maintain an ALLL that we expect will be adequate to absorb probable losses in the portfolio as of period-end based on management's evaluation of the size and current risk characteristics of the loan portfolio.** Such evaluations consider prior loss experience, the risk rating distribution of the portfolios, loss forecasting, the impact of current internal and external influences on credit loss, and the levels of non-performing loans. In addition to the review of credit quality through ongoing credit review processes, we conduct a comprehensive allowance analysis for our credit portfolios on a quarterly basis. Our ALLL Committee has the responsibility of affirming the allowance methodology and assessing significant risk elements in order to determine the appropriate level of allowance for the inherent losses in the portfolio at the point in time being reviewed.

*See* SunTrust's Form 10-Q for the quarter ended June 30, 2008, at 59 (emphasis added).

As of June 30, 2008, the ALLL totaled $1.8 billion, or 1.46% of total loans, compared to $1.0 billion, or 0.89%, of total loans as of June 30, 2007. ...

*    *    *

**We expect the economy to remain soft and home values to decline further in the near term. With that in mind, we also expect reserves to increase in the future. However, with a 41 basis point increase in the loan coverage ratio since December 31, 2007, we expect that future quarterly increases will be at a slower pace.**

*Id.* at 60 (emphasis added).

73.    Following the issuance of SunTrust's Second Quarter 2008 Form 10-Q on August 7, 2008, financial market participants once again reacted positively to the false statements made by Defendants in the Form 10-Q by driving SunTrust's common stock price up from $42.65 per share to $44.31 per share.

74.    Defendants' statements in paragraphs ¶¶ 71-72, however, were materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

i.    contrary to Defendants' representations concerning the manner in which SunTrust purportedly established its Allowance for Loan and Lease Losses, in truth, Defendants and SunTrust did not utilize this methodology, but rather intentionally and systematically misclassified hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid

45

having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans;

ii.    contrary to Defendants' representations that "delinquency trends overall have remained flat from the first quarter of 2008" and that "accruing loans past due 30-89 days and 90 days or more were relatively flat compared to the first quarter of 2008," Defendants knew that SunTrust's delinquency trends, in fact, had skyrocketed during the second quarter of 2008, and that the actual (but undisclosed) number of nonperforming loans in SunTrust's loan portfolio had not remained "relatively flat compared to the first quarter of 2008," but had similarly grown exponentially during the second quarter; and

iii.    contrary to Defendants' representations that "we maintain an ALLL that we expect will be adequate to absorb probable losses in the portfolio as of period-end," Defendants' knew that SunTrust's ALLL was materially understated during the second quarter because Defendants' had deliberately, materially understated SunTrust's provision expense and ALLL by

intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL during the second quarter.

75.    SunTrust's Form 10-Q for the quarter-ended June 30, 2008 was accompanied by Sarbanes-Oxley Certifications signed by Defendants Wells and Chancy, in which each of these Defendants falsely certified among other things that:

[t]his report does not contain any untrue statement of a material fact or omit to state a material fact…

*        *        *

[t]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant…

*        *        *

[I] have disclosed, based on our most recent evaluation of internal control over financial reporting …

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

76. The foregoing statements made by Defendants Wells and Chancy in their respective certifications were known to Defendants to be materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

i. SunTrust Form 10-Q for the quarter ended June 30, 2008 did, in fact, contain untrue statements of material fact and omitted to disclose material facts, including among others, the fact that: (a.) SunTrust's nonperforming loans and delinquency trends skyrocketed during the second quarter of 2008; (b.) SunTrust's ALLL was materially understated during the second quarter; and (c.) Defendants' had deliberately, materially understated SunTrust's provision expense and ALLL by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL during the second quarter.

48

ii.  Because Defendants had directed and caused SunTrust to intentionally and systematically misclassify hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, Defendants knew that SunTrust's Form 10-Q for the quarter ended June 30, 2008 did not, as Defendants falsely certified, "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."; and

iii.  Defendants, quite obviously had not, as they falsely certified, disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

**THE MATERIAL OMISSIONS AND MATERIALLY**
**FALSE AND MISLEADING STATEMENTS**
**CONCERNING THE THIRD QUARTER OF 2008**

**D.  September 8, 2008 Form 8-K**

77.  On September 8, 2008, in advance of the Lehman Brothers 2008 Financial Services Conference, SunTrust issued materially false and misleading

statements in a periodic report filed with the SEC on Form 8-K that stated in relevant part:

> **As for the fourth quarter, expectations continue to be that the charge-offs will not be dramatically higher or lower than the third quarter. Additionally, the level of the loan loss reserves is expected to increase, but at modest levels.**
>
> PowerPoint Presentation at 15 "Asset Quality Continued to Weaken, **Although at a Slower Pace**."

(Emphasis added).

78.    Defendant SunTrust's statement that SunTrust's charge-offs would not be "dramatically higher or lower" in the fourth quarter than in the third quarter was false because Defendants failed to disclose that SunTrust could only achieve this result by Defendants' acts of intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans (which artificially understated SunTrust's loan charge-offs) in order to avoid SunTrust having to report a material increase in loan charge-offs.  In addition, Defendants' statement that "the level of the loan loss reserves is expected to increase, but at modest levels," was similarly false and misleading because Defendants failed to disclose that SunTrust was able to maintain a materially understated loan loss reserve only because Defendants were engaged in the aforementioned fraudulent scheme.

79.    Class members and market participants reacted favorably to Defendants' issuance of the foregoing materially false and misleading statement by driving SunTrust's common stock price up from $45.42 per share on September 5, 2008, to close at $50.93 per share on September 8, 2008 – an increase of approximately 12.13% – with 16,366,200 shares traded.

### E.    Defendant Chancy's Statements Made During The September 10, 2008, Lehman Brothers Global Finance Services Conference

80.    On September 10, 2008, at the Lehman Brothers Global Finance Services Conference, Defendant Chancy made the following materially false and misleading statements:

> We believe that we have a very diversified franchise with a solid capital and liquidity position that provides a downside protection.
>
> *        *        *
>
> Despite the difficult environment and the impact on our recent financial performance, we are focused on managing through to better times and improved performance, which is going to be driven by initiatives that we are aggressively pursuing that include expense efficiency, growing revenues and improving the profitability of our balance sheet.
>
> *        *        *
>
> There's a lot of focus on capital, as there should be in today's environment. And one of the things that we mentioned is that at the end of the second quarter **we are continuing to evaluate our capital position. We believe that we have adequate capital, given our current views on the credit environment**.
>
> *        *        *

**Provision on a quarter-over-quarter basis declined. It was $448 million in the second quarter, down from $560 million in the first quarter.**

\*     \*     \*

**As it relates to the fourth quarter, we continue to believe that charge-offs will not be dramatically higher or lower**, again, as you have both an increasing level of charge-offs in certain categories … as well as some that we anticipate will decline.

**And as it relates to the allowance, while we believe that it will continue to grow over the next few quarters, we believe it will grow at a more modest level than it has in the past couple of quarters. So we are trying to give you some information to develop a view both on charge-offs, as well as provision expense and the allowance percentage**.

(Emphasis added).

81.    Defendant Chancy's statements in the foregoing paragraph were materially false and misleading at the times these statements were made because Defendant Chancy knew, but did not disclose that:

      i.    SunTrust's nonperforming loans were materially understated by hundreds of millions of dollars because SunTrust's senior management and employees within the Special Asset Group were engaged in a fraudulent scheme whereby they intentionally and systematically misclassified hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that

these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans;

ii.    Defendants caused SunTrust to materially understate its ALLL, and by doing so, caused SunTrust's net income, earnings per share and Tier 1 Capital to be materially overstated; and

iii.    SunTrust could only achieve charge-offs in the fourth quarter that were relatively similar to charge-offs taken in the third quarter because SunTrust and Defendants were artificially understating SunTrust's loan charge-offs by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid SunTrust having to report a material increase in loan charge-offs.  In addition, Chancy's statement that the level of the loan loss reserves is expected to increase, but at modest levels, was similarly false and misleading because Defendants failed to disclose that SunTrust was able to maintain a materially understated loan loss reserve only because Defendants were engaged in the aforementioned fraudulent scheme.

### F.      October 23, 2008 Press Release

82.     On October 23, 2008, Defendants caused SunTrust to issue a press release entitled, "SunTrust Reports Third Quarter Earnings of $0.88 Per Share; Company Says Resiliency Underscored by Continued Profitability and Improved Capital Position," in which Defendants SunTrust and Wells made the following materially false and misleading statements:

> **"SunTrust's continued profitability and improved capital position** not only underscore our resiliency in a quarter marked by unprecedented industry turmoil**, but also serve as a realistic basis for our confidence that we will continue to manage successfully --** albeit not unscathed -- through the challenges that our industry clearly will face in the period ahead," said James M. Wells III, Chairman, President and Chief Executive Officer.
>
> *          *          *
>
> Annualized quarterly net charge-offs in the third quarter of 2008 were 1.24% of average loans, up from 0.34% in the third quarter of 2007 and 1.04% in the second quarter of 2008. Net charge-offs were $392.1 million in the third quarter of 2008 compared to $322.7 million in the second quarter of 2008 and $103.7 million in the third quarter of 2007. **The increase in net charge-offs over the third quarter of 2007 reflects the deterioration in consumer credit and home values, particularly in residential real estate secured loans. The increase in net charge-offs in 2008 has been most pronounced in home equity lines, residential mortgages, and construction loans as home values continued to fall. The provision for loan losses increased to $503.7 million compared to $448.0 million in the second quarter of 2008 and $147.0 million in the third quarter of 2007**.  The allowance for loan and lease losses was $1,941.0 million as of September 30, 2008 and represented 1.54% of period-end loans.

(Emphasis added.)

54

### G.    October 23, 2008 Earnings Conference Call With Wall Street Analysts

83.    Also on October 23, 2008, following the release of SunTrust's financial results for the quarter ended September 30, 2008, Defendants hosted an earnings conference call with Wall Street analysts during which Defendant Wells made the following materially false and misleading statements:

> [WELLS] …moving on to some credit matters. Net charge offs increased to 1.24% of loans while NPAs increased 24% to $3.7 billion in the quarter.  Both of these outcomes were at the high end of the ranges we anticipated.  **On the other hand, our early stage delinquencies remained stable in the 1.5% range again this quarter.  Additionally, the forward view of lost content in the existing portfolio increased less than in the past few quarters.  The reserve growth of $112 million was lower than prior quarters and raised the loss reserve by 8 basis points to 154 basis points.  The bottom line is that asset quality has continued to deteriorate, while early stage delinquencies has not increased significantly during the course of the year non-performing loans and charge offs have**.…
>
> *       *       *
>
> **Based on the results of actions taken during the last two quarters and our credit outlook today we believe that we are appropriately capitalized**.…
>
> *       *       *
>
> **We are monitoring market conditions on an hour by hour basis to make certain that we are doing everything we can to reduce our vulnerability to economic and market dislocations**.

(Emphasis added).

84.    On the same conference call, Defendant Chancy also made a series of materially false and misleading statements to Class members and securities analysts:

> [CHANCY] …Net charge-offs increased to $392 million or 1.24% of loans which was in line with the high end of our expectations. $112 million of provision was recorded in excess of net charge-offs and this excess provision increase the allowance ratio to 1.54%."

85.    During this earnings conference call, SunTrust also made a number of materially false and misleading statements by and through Chief Risk and Credit Officer Freeman.  Through Mr. Freeman, SunTrust stated in relevant part:

> [FREEMAN] **The overall credit picture is a deterioration in the third quarter continued at a pace consistent with our expectations and market conditions.**  Net charge offs increase to $392 million or 124 basis points annualized.  The increase in net charge-offs this quarter equates to just over 20% which is at the high end of the outlook we provided in July and consistent with the expectations in early September.  You will recall that our Second Quarter charge offs came in at the low end of our expectations.  Provision expense increased in the quarter to $504 million up from $448 million.  The allowance ended the quarter at $1.9 billion or 154 basis points of loans outstanding.  This is an increase of $112 million and an 8 basis point increase in reserve ratio.  **The rate of growth in the allowance is lower than in prior quarters.  Non-performing assets increased $717 million during the quarter to $3.7 billion.  NPAs increased at a faster pace in the third quarter compared to the second quarter. The rate of growth in construction and commercial NPAs increased during the quarter in contrast to a slower growth rate in residential mortgage and home equity lines of credit**.  ...

*    *    *

**We remain comfortable with our allowance relative to non-performers in part due to significant charge offs we have already recognized on the real estate secured NPLs and our specific reserve process**. … Additionally, as construction and commercial NPLs increase it is important to remember that specific reserves are held against NPLs that have balances of $2 million or more. While these charge offs have not yet occurred pending resolution or renegotiation we do hold specific reserves against all the impaired loans in excess of $2 million which reduces the carrying value of these loans to our current view of net realizable value.

**Finally, we have noted the flat trend in early stage delinquency in each of our presentations this year and the pattern continued in the third quarter.  Overall 30 to 89 day delinquency was 152 basis points which is up a few basis points from last quarter but basically at the same level since the end of last year**.

*       *       *

Construction non-accruals have been increasing over the past several quarters and currently total just over $1 billion.  ….

*       *       *

[T]he balance is up from the Second Quarter and while most of the increases in the core portfolio with lower loss severity, the increased balance suggests charge-offs in the Fourth Quarter will be consistent with the third quarter.

*       *       *

We began tightening in late 2006 in residential construction. As a result, balances and exposures are down considerably particularly in Florida and Atlanta, so  **while NPLs and charge offs have risen and will increase from here, the ultimate realization of risk will be much less than it otherwise could have been**.

*       *       *

57

> **The current internal forecast shows net charge offs in the Fourth Quarter up approximately 20% driven by continued weakness in the consumer sectors**.

(Emphasis added).

86.     Defendants' statements in paragraphs ¶¶ 82-85, were materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

     i.    SunTrust's nonperforming loans were materially understated by hundreds of millions of dollars for the quarter ended September 30, 2008, because SunTrust's senior management and employees within the Special Asset Group were engaged in a fraudulent scheme whereby they intentionally and systematically misclassified hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans;

    ii.    Defendants caused SunTrust to materially understate its ALLL for the quarter ended September 30, 2008, and by doing so, caused SunTrust's net income, earnings per share and Tier 1

Capital to be materially overstated for the quarter ended September 30, 2008;

iii. SunTrust's provision for loan losses had only increased to $503.7 million because Defendants had deliberately, materially understated SunTrust's provision expense and reserve by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-reserve against these nonperforming loans;

iv. "early stage delinquencies" had not, as Defendants falsely stated, "remained stable in the 1.5% range again this quarter;"

v. SunTrust was not "appropriately capitalized," as Defendants falsely stated; and

vi. Defendants were not "comfortable with [SunTrust's] allowance relative to non-performers in part due to significant charge offs [they had] already recognized on the real estate secured NPLs and [their] specific reserve process," as SunTrust falsely stated,

because Defendants knew that they had caused SunTrust to materially under-reserve against its nonperforming loans by having engaged in the fraudulent loan misclassification scheme detailed herein.

87.     The foregoing false statements made by Defendants and set forth in ¶¶ 82-85 above artificially buoyed the price of SunTrust common stock, which only declined $3.93 to $36.20 per share from the prior day's closing price.  Although SunTrust's common stock price declined following the issuance of these statements, these materially false and misleading statements nevertheless artificially inflated the stock price because, had Defendants revealed the truth concerning SunTrust's systematic fraudulent manipulation of reserve calculations by misclassifying millions of dollars in non-performing loans as "In-Process" loans in order to avoid having to disclose the fact that these loans were indeed non-performing, SunTrust's common stock would have declined far more precipitously in price than it actually declined.

## H.    October 27, 2008 Press Release re: Sale of $3.5 Billion TARP Preferred Shares

88.     On October 27, 2008, the Bank issued a press release entitled "SunTrust Plans Sale of $3.5 Billion in Preferred Stock to U.S. Treasury; Company

Separately Announces 30% Dividend Reduction." In the press release, Defendants

SunTrust and Wells falsely stated in relevant part:

> SunTrust Banks, Inc. said today that it has received preliminary approval from the U.S. Treasury for the sale of $3.5 billion in preferred stock and related warrants to the U.S. Treasury under the Capital Purchase Program of the Emergency Economic Stabilization Act of 2008. The approval is subject to certain conditions and the execution of definitive agreements.
>
> "**Our participation in the Capital Purchase Program enhances SunTrust's already solid capital position and will permit us to further expand our business and take advantage of growth opportunities**," said James M. Wells III, Chairman, President and CEO. "In addition, we are pleased to support the Treasury in its ongoing effort to address dislocations in financial markets and spur the market stabilization that is in the public interest."

(Emphasis added).

89.    The foregoing statements were materially false and misleading at the

time these statements were made because Defendants knew, but did not disclose

that the $3.5 billion in TARP funds that SunTrust would receive would not be used

to "permit [SunTrust] to further expand [its] business," as Defendants falsely

claimed in this release. Rather, Defendants knew, but did not disclose, that the

$3.5 billion in TARP funds that SunTrust would receive would be used to

immediately bolster SunTrust's Tier 1 Capital, which had been decimated by the

exponential increase in nonperforming loans in SunTrust's loan portfolio.

90.    The foregoing statement also misled Class members and financial market participants into believing that SunTrust was more well capitalized than many of its competitors and, as a result, that SunTrust and the Defendants had deliberately determined to borrow $1.4 billion less than the maximum available to SunTrust through the TARP Program.

### I.    November 7, 2008 Form 10-Q for the Quarter-Ended September 30, 2008

91.    On November 7, 2008, Defendants caused SunTrust to file its materially false and misleading quarterly report on Form 10-Q for the quarter-ended September 30, 2008 with the SEC.  In addition to the false and misleading financial results that SunTrust released on October 23, 2008, set forth above, Defendants made the following false and misleading statements in the November 7, 2008 Form 10-Q:

> **While further losses are possible,** <u>our experience during the third quarter reinforces our belief that we have appropriately written these assets down to fair value as of September 30, 2008</u>.

*See* SunTrust's Form 10-Q for the quarter-ended September 30, 2008 at 49 (emphasis added).

> The core mortgage portfolio was $22.8 billion, or 18.0% of total loans, as of September 30, 2008 and continues to perform reasonably well in light of current market conditions. **Delinquency levels increased modestly in the third quarter of 2008; however, relatively low loan to value levels mitigate our loss exposure**."
>
> *     *     *

We continue to be proactive in our credit monitoring and management processes to provide early warning for problem loans in the portfolio.

*Id.* at 64 (emphasis added).

**We maintain an ALLL that we expect will be adequate to absorb probable losses in the portfolio as of period-end based on management's evaluation of the size and current risk characteristics of the loan portfolio.** Such evaluations consider prior loss experience, the risk rating distribution of the portfolios, loss forecasting, the impact of current internal and external influences on credit loss, and the levels of non-performing loans. In addition to the evaluation of credit quality through ongoing credit review processes, we conduct a comprehensive allowance analysis for our credit portfolios on a quarterly basis. **Our ALLL Committee has the responsibility of affirming the allowance methodology and assessing significant risk elements in order to determine the appropriate level of allowance for the inherent losses in the portfolio at the point in time being reviewed.**

*Id.* at 67 (emphasis added).

As of September 30, 2008, the ALLL totaled $1.9 billion, or 1.54% of total loans, compared to $1.1 billion, or 0.91% of total loans as of September 30, 2007. ...

*Id.*

We expect the economy to remain weak and home values to decline further in the near term. With that in mind, we also expect reserves to increase in the future. **However, with a 48 basis point increase in the loan coverage ratio since December 31, 2007, we expect that future quarterly increases will be at a slower pace.**

*Id.* (Emphasis added).

92.    Defendants' statements in foregoing paragraph, however, were materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

    i.    contrary to Defendants' representation that "[their] experience during the third quarter reinforces [their] belief that [Defendants] have appropriately written these assets down to fair value as of September 30, 2008," Defendants knew that they had not caused SunTrust to do so, and that SunTrust's ALLL was materially understated during the second quarter because Defendants' had deliberately, materially understated SunTrust's provision expense and ALLL by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL during the third quarter;

    ii.    contrary to Defendants' representation that "we maintain an ALLL that we expect will be adequate to absorb probable losses in the portfolio as of period-end based on management's

evaluation of the size and current risk characteristics of the loan portfolio," Defendants knew that SunTrust's ALLL was materially understated because Defendants had caused SunTrust to intentionally and systematically misclassify hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL during the third quarter.

93.    SunTrust's Form 10-Q for the quarter ended September 30, 2008 was also accompanied by Sarbanes-Oxley Certifications signed by Defendants Wells and Chancy.  Each of these certifications was known to these two Defendants to be materially false at the times Defendants made such certifications because Defendants knew, but did not disclose that:

    i.    SunTrust's Form 10-Q for the quarter ended September 30, 2008 did, in fact, contain untrue statements of material fact and omitted to disclose material facts, including among others, the fact that (a.) SunTrust's nonperforming loans and delinquency trends skyrocketed during the third quarter of 2008; (b.)

SunTrust's ALLL was materially understated during the third quarter; and (c.) Defendants had deliberately, materially understated SunTrust's provision expense and ALLL by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL during the third quarter;

ii.    Because Defendants had directed and caused SunTrust to intentionally and systematically misclassify hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid having SunTrust disclose the fact that these loans were, indeed, nonperforming, Defendants knew that SunTrust's Form 10-Q for the quarter ended September 30, 2008, did not, as Defendants falsely certified, "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant;" and

  iii. Defendants, quite obviously had not, as they falsely certified, disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

**THE MATERIAL OMISSIONS AND MATERIALLY
FALSE AND MISLEADING STATEMENTS
<u>CONCERNING THE FOURTH QUARTER OF 2008</u>**

  **J. Defendant Wells' Statements Made During The November 7, 2008, BancAnalyst Association of Boston Conference**

  94. On November 7, 2008, at the BancAnalyst Association of Boston Conference, Defendant Wells made the following materially false and misleading statements to Class members and Wall Street analysts:

> I will now … discuss[] … our stable foundation -- **our solid capital position and balance sheet. The tier 1 capital ratio is a healthy 8.15%, up 68 basis points from the second-quarter level of 7.47%.** The increase is primarily related to the completion of the Coke transaction during the third quarter.
>
> The tier 1 ratio also benefited from a reduction in risk-weighted assets. **This reduction occurred in part due to our ongoing efforts to reduce illiquid trading securities, construction-related loans and commitments, and more generally to ensure that unused commitments are reduced and/or higher fees are assessed**.
>
>    *  *  *
>
> We announced our intent to sell $3.5 billion in preferred stock and related warrants to the U.S. Treasury under this program. This represents just over 2% of our risk-weighted assets, and **I'd like to be**

**clear that we applied for $3.5 billion, and that was the approved amount.**

**So, you ask, why did we not take the maximum 3%? Frankly, there were a lot of reasons. First, as I just articulated, we are currently well-capitalized**. We clearly realize, however, that there are extremely uncertain economic times and, given that, we felt that $3.5 billion was enough to get the job done. That job is to prudently grow loans, take advantage of opportunities that fit our strategic goals, and still provide us with an appropriate cushion against uncertainty.

*      *      *

I'll take a few moments now to provide a more in-depth view of the credit picture at SunTrust. **The commercial and commercial real estate portfolio comprises 43% of our total portfolio, and are performing reasonably well**.

*      *      *

The credit picture is that deterioration in the third quarter continued at a pace in line with our expectations, and with market conditions.

*      *      *

**The rate of growth in the ALLL was lower than in prior quarters as our expectation of inherent losses in the portfolio increased less than in the prior three quarters**.

Finally, we've noted that **the flat trend in early-stage delinquency** in each of our presentations this year, and that pattern **has continued into the third quarter**. Overall portfolio of 30 to 89-day delinquency was 1.52%, which was up a few basis points from last quarter, but basically at the same level since the end of last year.

**This trend is important and positive, as it signals no significant increase in the rate of new problem credits**. However, charge-offs

have increased over the same period as the severity of loss has increased due to real estate price declines.

\*        \*        \*

We began this tightening in 2006 and in early 2007, particularly in residential construction. As a result, balances and exposures are down considerably, particularly in Florida and in Atlanta. So while non-performing loans and charge-offs have risen, and will increase from here, the ultimate realization of risk will be much less than it would otherwise have been.

\*        \*        \*

So in conclusion, **SunTrust is well-positioned to weather the current storm. A diversified business mix (inaudible) attractive markets coupled with solid capital and liquidity, provide a firm base from which to grow our business**.

(Emphasis added).

95.    Financial market participants reacted to Defendant Wells' materially false and misleading statements in precisely the manner that Defendants had hoped they would.    Defendant Wells' statements immediately halted a two-day cumulative stock price decline of 14.7% and caused SunTrust's common stock to rebound by 4.6% and close at $38.68 per share.

96.    Defendant Wells' statements in the foregoing paragraph were materially false and misleading at the time these statements were made because Defendants knew, but did not disclose that:

i.     contrary to Wells' statement that SunTrust had a "solid capital position and balance sheet," Defendants knew that SunTrust's capital had been badly impaired and SunTrust was only days away from seeking the remaining $1.4 billion in TARP funds that was available to SunTrust in order to bolster its Tier 1 Capital;

ii.     Well's statement that SunTrust had not sought the maximum 3% or $4.9 billion available to it in TARP Funds because Defendants "felt that $3.5 billion was enough to get the job done," was false because Defendants knew at the time that Wells made this statement that SunTrust was preparing to borrow an additional $1.4 billion in TARP Funds;

iii.     Wells' statement that "the rate of growth in the ALLL was lower than in prior quarters" was false because Defendants knew that SunTrust's ALLL was materially understated because Defendants' had deliberately, materially understated SunTrust's provision expense and ALLL by intentionally and systematically misclassifying hundreds of millions of dollars of nonperforming loans as "In-Process" loans in order to avoid

having SunTrust disclose the fact that these loans were, indeed, nonperforming, and to enable SunTrust to materially under-state its ALLL in the third quarter; and

iv.    contrary to Wells' representation that the "flat trend in [SunTrust's] early stage delinquencies [was continuing]," Defendants knew that SunTrust's nonperforming loans and delinquency trends had skyrocketed during the third quarter of 2008.

**K.    Defendant Chancy's Statements Made During The November 13, 2008, Merrill Lynch Banking & Financial Services Conference**

97.    On November 13, 2008, at the Merrill Lynch Banking & Financial Services Conference, Defendant Chancy made the following materially false and misleading statements to Class members and Wall Street analysts:

> Despite the difficult operating environment that we all are challenged with right now, we believe that we are well positioned to work through this period and come out a stronger Company, to be even more competitive on a go-forward basis.

> \*    \*    \*

> As many of you know, we announced our intent and were ultimately approved to participate in the capital purchase program. We applied for and received approval for $3.5 billion worth of preferred stock, which is a little bit more than the 2% allocation. That is the level that we requested.

**We went through, as you might expect, a pretty thorough review, looking at our own capital position as we exited the third quarter. We did some sensitivity analysis around our credit metrics and our capital position, which we feel very good about**.

\*       \*       \*

UNIDENTIFIED AUDIENCE MEMBER: … I had a couple of questions. The first is concerning provisioning only being up 8 basis points. I understand the rationale in terms of looking at the 38- to 89-day delinquencies, early stage in this funnel delinquencies, and seeing some stability.

My concern is this. We have heard from everyone, covering **every facet of the economy, that in the last two months things have deteriorated significantly. So, my concern is, you are nowhere even close to provisioning enough given current reality and near-term future reality.**

I know it makes numbers look prettier on the quarter to not provision too much. But is it really an accurate reflection of what is going to be happening in the future?  …

MARK CHANCY: Okay, well, as the industry does, focus on the current information that we have as it relates to our portfolio, as well as the forward view of how those portfolios are going to perform. **We look over a period of time that is between one and two and a half years depending upon the type of portfolio. And we take all of that information into consideration when designing the appropriate level of reserves**.

\*       \*       \*

One of the things that people as they are looking at SunTrust's reserve position often compare is our non-performing loans; and non-performing loans have been going up pretty substantially, particularly in the residential mortgage arena. One thing to note around that … is

we have taken a substantial amount of charge off against those non-performing loans in the residential category. About two-thirds of the loans have already been written down.

We go through a process at the end of 180 days where we do an updated fair market value of the property. We then mark it at 85% of that estimated fair market value; and we charge off the difference between our loan balance and that adjusted fair market value estimate. Those charge offs on those nonperforming loans have already been realized by the Company.

So when you are trying to balance the appropriate level of allowance by loan category, given the level of charge offs that have already been realized as well as those that you expect in the future, we take each of those elements into consideration for the pools.

We also have a process where we go through on a loan-by-loan basis for all loans greater than $2 million that are in a non-performing status, to do specific reserving. So all I can tell you is that **we are taking all of the current and our expected views on these portfolios into consideration as we build up the allowance on a pool-by-pool basis**.

**We certainly believe that it was adequate as of the end of the quarter. We will obviously continue to evaluate the reserve position.** What we have said in the past is that we expect the reserve to continue to grow on a quarterly basis, although at a slowing pace relative to the last several quarters. And that was what we realized during the third quarter, we were up about $100 million quarter-over-quarter.

\*       \*       \*

ED GROSHANS, ANALYST, OMEGA: Ed Groshans with Omega. I guess going off the first question, talking about slowing and stabilizing, and given the disruptions that we've seen in October, how comfortable are you that when the fourth-quarter reports come out or

from what you are seeing, you can say that those stabilization trends are continuing?

MARK CHANCY: We have not made a significant number of forward-looking statements around credit during the third-quarter earnings release. **What I was specifically referring to was our statement over the course of the past couple of quarters that we expected the allowance to continue to grow at a slowing pace. That is what we realized in the third quarter**.

\*       \*       \*

We are going to update the allowance as is appropriate at the end of every quarter. **We think we are doing a prudent and thorough job of evaluating the risks that we have in our specific portfolio by loan subsegment.**

\*       \*       \*

UNIDENTIFIED AUDIENCE MEMBER: …. I guess echoing off of other questions, on a risk-adjusted basis you guys had more room to raise TARP-wise. It would appear you are at around 2%; the average is around 2.8%. Frankly, everyone below the big guys have taken 3% or max. Is it you think you are better positioned, or why the 2%?

MARK CHANCY: I will answer your second question maybe first. As I mentioned in my presentation, we made the decision obviously to participate. Once you make that decision, there are lots of different considerations that go into what is the right number.

The money is on an attractive basis, but it is certainly not free, as I mentioned. **We looked at our own capital position. We look at the stress scenario on our credit portfolio. We looked at the ability for us to support loan growth, which is a primary driver for the capital, as you know. We also looked at the capital level that would support some potential acquisitions to the extent that they made economic sense for our shareholders on a long-term basis.**

**We took all of those different factors into consideration when determining that the $3.5 billion -- which, like you said it, is a little bit more than 2% -- was the right number for us based on those reviews.**

(Emphasis added).

98.    Similar to the false statements made by Defendant Wells' only 6 days earlier, Defendant Chancy's materially false and misleading statements were also well-received by analysts and the investing public and again halted a three-day cumulative stock price decline of 12.5% and caused SunTrust's common stock price to rebound by 4.9% and close at $35.67 per share.

99.    Defendant Chancy's statements in the foregoing paragraph were materially false and misleading at the times these statements were made because Defendants knew, but did not disclose that:

    i.    contrary to Chancy's statement that Defendants had thoroughly reviewed SunTrust's capital position at the end of the third quarter and that, after having done so, Defendants felt, "pretty good about it," Defendants knew that SunTrust's capital was so badly impaired that SunTrust was preparing to seek an immediate capital infusion of $1.9 billion in TARP Funds;

    ii.    contrary to Chancy's reassurance that Defendants had, in fact, considered the current state of the economy and taken "all of

that information into consideration when designing the appropriate level of reserves," Defendants knew that SunTrust was materially under-reserved and that SunTrust had been able to maintain a materially understated loan loss reserve only because Defendants were engaged in the aforementioned fraudulent scheme;

iii.    contrary to Chancy's representation that Defendants believed that SunTrust's reserve position "was adequate at the end of the [third] quarter," Defendants knew that SunTrust was materially under-reserved and that SunTrust had been able to maintain a materially understated loan loss reserve only because Defendants were engaged in the aforementioned fraudulent scheme;

iv.    contrary to Chancy's representation that Defendants "expected the allowance to continue to grow at a slowing pace [in the third quarter]," Defendants knew that SunTrust experienced a meteoric rise in nonperforming loans in the third quarter and the SunTrust's already grossly inadequate ALLL was now even further materially understated; and

v.    contrary to Chancy's representation that Defendants had considered "different factors" in determining that the "$3.5 billion [in TARP Funds] … was the right number for us based on those reviews," Defendants knew that SunTrust's capital was so materially impaired that SunTrust was in the process of obtaining an additional $1.9 billion in TARP Funds that would be used to immediately bolster SunTrust's capital.

**Defendants' Desire For SunTrust To Be Acquired**
**By JP Morgan or Wells Fargo Motivated**
**<u>Defendants to Conceal SunTrust's True Financial Condition</u>**

100.    Because the Individual Defendants had actual knowledge of the massive increase in SunTrust's nonperforming loans and were well aware that they had acted to prevent the public disclosure of these losses by directing that millions of dollars in these nonperforming loans be misclassified as "In-Process Loans", the Individual Defendants were highly motivated to perpetuate their fraudulent scheme in the hope that they could do so long enough for SunTrust to be acquired because such an acquisition would, in all likelihood, prevent the disclosure of Defendants' fraudulent scheme altogether.

101.    SunTrust's ever-growing geographic footprint in the southeastern United States made it one of the more attractive mid-sized regional banking

institutions for potential acquisition by the nation's largest banks – including JP Morgan Chase ("JP Morgan")  and Wells Fargo & Co. ("Wells Fargo") – both of which were anxious to gain market share in the rapidly-growing region.  According to CW #4, a former Servicing and Operations – Business Systems Analyst (Level III) at SunTrust's Richmond, Virginia offices during the period December 1995 through October 2008, there was a persistent rumor that Wells Fargo was making preparations to acquire SunTrust.

102.  Beginning in the fall of 2007 rumors had begun to circulate among members of the financial community that JP Morgan and Wells Fargo were interested in acquiring SunTrust because such an acquisition could offer these large national banks an increased presence in the southeastern United States.   For SunTrust, an acquisition would have enabled its deteriorating loan portfolio to become subsumed within a larger bank that was better capitalized and could therefore shoulder the massive loan losses that SunTrust was incurring in the real estate loan segment of its portfolio. The Individual Defendants also stood to benefit greatly from SunTrust being acquired in at least two ways.   First, such an acquisition would enable the Individual Defendants to avoid being held responsible for the massive loan losses incurred by SunTrust because it was unlikely that those losses would ever come to light in the context of a merger.   Second, a merger

would certainly trigger the change in control provisions of the CIC that had been entered into by and between SunTrust and certain of the Individual Defendants. Upon the triggering of such provisions, these Individual Defendants would have been entitled to reap millions of dollars in payments and other benefits different from the standard incentive normally provided to SunTrust's officers or directors.

103.   In December 2007, a stock analyst at Punk Ziegel & Co. issued a report stating that it is "highly probable" JP Morgan Chase will make a major acquisition, noting Washington Mutual and SunTrust as likely targets.   Analyst speculation that SunTrust would be acquired continued well into 2008 when, on June 23, 2008, just prior to the commencement of the Class Period, Ladenburg Thalman analyst Richard Bove reported that SunTrust could be a likely acquisition target for Wells Fargo or JP Morgan.

104.   While the market and analysts were commenting on potential acquisition rumors, SunTrust updated and revised its CIC with Defendants Wells and Chancy and others.   The revised CICs, annexed as exhibits to SunTrust Form 10-Q for the quarter-ended June 30, 2008, were referenced therein as follows:

> On August 5, 2008, the Company entered into Amended and Restated Change in Control Agreements with each executive officer who already had such an agreement. Copies of the Amended and Restated Change of Control Agreement between the Company and each of James M. Wells III (principal executive officer and a named executive officer), Mark A Chancy (principal financial officer and a

named executive officer), William R. Reed, Jr. (named executive officer), William H. Rogers, Jr. (named executive officer), and Timothy E. Sullivan (named executive officer) are filed as exhibits 10.1 through 10.5 to this Quarterly Report.

Generally, the amendments to such agreements were made to conform such agreements to the requirements of Internal Revenue Code Section 409A and the regulations which were recently enacted under such Code Section. The Agreements provide specified benefits to the executive if the executive is actually or constructively terminated within a 2 or 3 year period following a change of control. Section 409A imposes an additional income tax and penalties on recipients of certain nonqualified deferred compensation payments that do not comply with election and payment rules.

*See* SunTrust's Form 10-Q for the quarter-ended June 30, 2008, at p. 80.

105. As SunTrust's Proxy Statement filed on February 29, 2008 made clear, Defendants Wells and Chancy stood to make millions upon a change in control should their employment be terminated and were therefore highly motivated to perpetrate Defendants' fraudulent scheme. Such compensation that Defendants Wells and Chancy were to receive pursuant to the CIC was compensation different from the standard incentive normally provided to SunTrust's officers or directors.

106. Specifically, pursuant to the CICs, upon a change in control followed by a termination of the executive's employment by SunTrust without "cause," SunTrust was to pay or provide to Defendants Wells and Chancy a total sum of **$22,463,238** and **$7,396,231**, respectively, which included, among other things,

three (3) times their Executive's Current Compensation Package. Defendants Wells' and Chancy's Executive Compensation Package included their base pay, short-term (annual) incentives ("Management Incentive Plan" or "MIP"), and long-term incentives ("Performance Unit Plan" or "PUP").

| Individual Defendant | 2007 Total Compensation | Approximate Compensation Pursuant to Change In Control Agreement |
|---|---|---|
| James M. Wells III | $3,428,954 | $8,884,960 (Severance)<br>$1,776,493 (Accelerated vesting of long term incentives)<br>$3,670,666 (Retirement plans)<br>$8,131,119 (Other benefits and tax gross-up)<br>Total: **$22,463,238** |
| Mark A. Chancy | $1,810,941 | $3,154,919 (Severance)<br>$898,365 (Accelerated vesting of long term incentives)<br>$954,656 (Retirement plans)<br>$2,388,291 (Other benefits and tax gross-up)<br>Total: **$7,396,231** |

**The Truth Concerning SunTrust's Dire**
**Financial Condition Begins To Emerge**

107. On December 9, 2008, SunTrust issued a press release entitled "SunTrust Approved to Sell Remaining Allotment of Preferred Stock Under Treasury Program" which stated in relevant part:

> **SunTrust Banks, Inc. said today it has received preliminary**
> **approval to sell to the U.S. Treasury the remaining $1.4 billion of**
> **preferred securities available to it under Treasury's Capital**

**Purchase Program**. … This additional amount brings the combined total to approximately $4.9 billion, or the full 3% of risk weighted assets for which SunTrust was eligible.

As we now know from the most recent data, the economic situation is decidedly bleaker than was the case when we announced our initial, partial regulatory capital transaction under the Treasury program, said James M. Wells III, SunTrust Chairman and Chief Executive Officer. Given the increasingly uncertain economic outlook, we have concluded that further augmenting our capital at this point is a prudent step, especially if the current recession proves to be longer and more severe than previously expected.

(Emphasis added).

108.   Following this partial disclosure – which stood in stark contrast to the statements made by Defendants Wells and Chancy only days earlier that Defendants had carefully concluded that SunTrust would only borrow $3.5 of the $4.9 billion in TARP Funds available to it – SunTrust's common stock price dropped $3.72 per share to $30.04 per share – an 11% decrease in a single day.

109.   However, the complete truth concerning the dire state of SunTrust's financial condition, including the fact that Defendants had caused SunTrust to materially understate its ALLL throughout the Class Period had not yet been disclosed.  As a result, SunTrust common stock continued to trade at artificially inflated prices until the complete truth concerning SunTrust's financial condition was fully disclosed on January 22, 2009.

**The Truth Concerning SunTrust's Dire**
**Financial Condition Is Fully Revealed**

110.    When SunTrust's potential acquirers ultimately decided to acquire banks other than SunTrust in late 2008, Defendants' fraudulent scheme and their hope that they could avoid detection of their massive fraud was at an end, and Defendants were forced to record a nearly $1 billion dollar provision for loan losses.

111.    On January 22, 2009, before the markets opened, SunTrust issued a press release that stunned financial market participants and, for the first time, revealed the truth concerning the dire state of SunTrust's financial condition. Specifically, the press release revealed for the first time that SunTrust had not previously established adequate allowances for loan losses and was now forced to dramatically increase its ALLL.  Defendants SunTrust and Wells stated in the press release, in pertinent part:

> SunTrust Banks, Inc. reported net income available to common shareholders of $746.9 million, or $2.13 per average common diluted share, for 2008 compared to $1,603.7 million, or $4.55 per average common diluted share in 2007. … **The Company's 2008 and fourth quarter results were adversely impacted by credit-related charges that reflect the dramatic deterioration in the economy, especially during the fourth quarter.**

*    *    *

**The Company recorded provision for loan losses of $962.5 million**, or $410.0 million in excess of net charge-offs, increasing the allowance for loan losses to 1.86% of total loans during the fourth quarter. **Additionally, during the fourth quarter, the Company recorded $236.1 million in operating losses, which were primarily related to losses stemming from borrower misrepresentations and insurance claim denials, and $100.0 million related to mortgage reinsurance reserves**.

*        *        *

**Non-performing loans to total loans increased to 3.10% as of December 31, 2008, from 2.60% as of September 30, 2008** and 1.17% as December 31, 2007, due mainly to increased levels of non-performing residential mortgage and construction loans.

*        *        *

Asset Quality

**Nonaccrual loans, as of December 31, 2008, totaled $3,940.0 million compared to $3,289.5 million as of September 30, 2008 and $1,430.4 million as of December 31, 2007**. Residential mortgage and construction loans were 47% and 32%, respectively, of total nonaccrual loans as of December 31, 2008. Net charge-offs for the fourth quarter were $552.5 million compared to $168.0 million for the fourth quarter in 2007. Annualized net charge-offs to average loans for the quarter ended December 31, 2008 was 1.72% compared to 1.24% for the quarter ended September 30, 2008 and 0.55% for the quarter ended December 31, 2007. The increase in net charge-offs was primarily related to consumer and residential real estate loans, as well as commercial related loans. Other real estate owned increased to $500.5 million, up 29.3% over September 30, 2008, as the Company foreclosed on the collateral securing non-performing loans.

(Emphasis added).

112.   That same day, Defendants conducted SunTrust's fourth quarter 2008 earning conference call with market analysts during which Defendant Wells made the following statements:

> **I want to point out that our pretax loss is driven primarily by increased reserves for credit, fraud and mortgage reinsurance losses**.
>
> *        *        *
>
> I'll note that asset quality deteriorated as the economy weakened. **The down-draft in the economy caused** by both higher than expected charge-offs in December, and **increased early stage delinquencies**. As a result, we materially increased our loan loss reserves by $410 million to 1.86% of loans. While we are clearly disappointed with the impact of higher loan losses, reinsurance and fraud reserves on our income statement, these reserve increases are prudent and necessary given the state of the economy and uncertainty surrounding the future.

(Emphasis added).

113.   Defendant Chancy also participated in the January 22, 2009 conference call and stated, in pertinent part, as follows:

> Related to our participation in the capital purchase program … SunTrust originally chose to participate at less than the full amount available and then subsequently decided to increase the amount to the full 3% of risk weighted assets available to us.
>
> Our original decision was predicated on a number of factors. Including the economic outlook in mid-October, the recently completed Coke transactions, the capital and liquidity that we deemed necessary to support organic loan growth, the 8% pretax costs of the capital relative to our ability to leverage the funds, and finally, refinancing considerations. So what changed?

*    *    *

As we were evaluating acquisition activity and opportunities **we reached the conclusion that potential capital requirements were more significant than previously thought as asset and loan values had declined further**. …

(Emphasis added).

114.    The following table illustrates the precarious financial condition that existed at SunTrust throughout the Class Period as a result of Defendants' fraud:

|  | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 |
|---|---|---|---|---|
| Quarterly Change in Provision for Loan Losses | $56.44MM | $104.68MM | $147MM | $356.8MM |
| Net Loan Charge-Offs | $84.95MM | $111.72MM | $126.28MM | $191.35MM |
| Allowance for Loan and Lease Losses ("ALLL") | $1.03B | $1.05B | $1.09B | $1.28B |
| ALLL as % of Total Loans | 0.88% | 0.88% | 0.90% | 1.05% |
| ALLL as % of Nonperforming Loans | 155.5% | 137.4% | 109.0% | 61.7% |
|  |  |  |  |  |
|  | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
| Quarterly Change in Provision for Loan Losses | $560MM | $448MM | $503.7MM | $958.3MM |
| Net Loan Charge-Offs | $297.2MM | $322.6MM | $392.1MM | $598.1MM |
| Allowance for Loan and Lease Losses ("ALLL") | $1.545B | $1.8B | $1.94B | $2.351B |
| ALLL as % of Total Loans | 1.25% | 1.46% | 1.54% | 1.86% |
| ALLL as % of Nonperforming Loans | 74.7% | 72.0% | 62.1% | 61.7% |
|  |  |  |  |  |
|  | Q1 2009 | Q2 2009 |  |  |
| Quarterly Change in Provision for Loan Losses | $994.1MM | $962.2MM |  |  |
| Net Loan Charge-Offs | $610.1MM | $801.2MM |  |  |
| Allowance for Loan and Lease Losses ("ALLL") | $2.735B | $2.896B |  |  |

86

| ALLL as % of Total Loans | 2.21% | 2.37% | | |
|---|---|---|---|---|
| ALLL as % of Nonperforming Loans | 60.40% | 53.8% | | |

115.   As a result of Defendants' stunning revelations on January 22, 2009, SunTrust's common stock declined from $15.21 per share to $13.55 per share, or 11% in a single trading day with approximately 16,907,500 shares traded.  This decrease in SunTrust's common stock price was the result of the artificial inflation caused by Defendants' materially false and misleading statements finally coming out of the stock price.

**Throughout The Class Period SunTrust's Financial Statements
Were Materially False and Misleading and Violated GAAP**

116.   During a November 2000 speech at the AICPA National Conference for Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio. **As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred**.

(Emphasis added).

117.   Under   Generally   Accepted   Accounting   Principles   ("GAAP"), SunTrust was required to have adequate reserves for: (1) estimated credit losses for

loans specifically identified as being impaired; (2) estimated credit losses for loans or groups of loans with specific characteristics that indicate probable losses; and (3) estimated credit losses inherent in the remainder of the portfolio based on current economic events and circumstances.

118.    The SEC also provides explicit guidance on the proper accounting for loan losses that Defendants were required to follow, but did not.  Staff Accounting Bulletin ("SAB") No. 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a **disciplined and consistently applied process** . . . . A registrant's loan loss allowance methodology generally should . . . **[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data** . . . .

(Emphasis added).

SAB No. 102 also provides:

> Factors that should be considered in developing loss measurements includ[ing] . . . [l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .

The SEC further states that:

> For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements. Therefore, the staff believes it is appropriate for an

entity's management to review, on a periodic basis, its methodology
for determining its allowance for loan losses.

119.   SunTrust's ALLL reserves during the Class Period were materially
inadequate and did not reflect the high risk of loss inherent in its real estate
portfolio, which included Alt-A first and second lien loans, low documentation and
no documentation loans, ARMS, interest-only loans, and "piggy-back" or "combo"
loans. SunTrust's reserves, therefore, violated GAAP and SEC rules.  Further, the
Company's understated reserves resulted in overstatements of net income, retained
earnings, total assets and total shareholders equity, and earnings per share, as set
forth on SunTrust's financial statements. Because some of those overstated
financial statement items were components of the SunTrust's Tier 1 capital ratio,
that capital ratio was incorrectly overstated during the Class Period for this reason
alone and others described herein.

120.   During the Class Period, SunTrust failed to provide adequate, specific
reserves related to the impairment of its real estate loan portfolio, which included a
significant concentration of loans in the troubled Florida and Georgia housing
market. For example, during the Class Period, over 45% of SunTrust's residential
loan portfolio involved real estate loans on property located in the states of Florida
and Georgia. Both of these states had experienced a significant increase in real
estate prices during the period prior to 2007 and subsequently experienced a very

high default and foreclosure rate by late 2007. Statement of Financial Accounting

Standards ("SFAS") No. 114, <u>Accounting by Creditors for Impairment of a Loan</u>

<u>and Emerging Issues Task Force ("EITF") Topic No. D-80, Application of FASB</u>

<u>Statements No. 5 and No. 114 to a Loan Portfolio</u> clearly describe that an

evaluation of loan impairment must be made in context of current information and

events. For example, SFAS No. 114, ¶8 states:

> **<u>A loan is impaired when, based on current information and</u>**
> **<u>events, it is probable that a creditor will be unable to collect all</u>**
> **<u>amounts due according to the contractual terms of the loan</u>**
> **<u>agreement</u>**. As used in this Statement and in Statement 5, as
> amended, **<u>all amounts due according to the contractual terms</u>**
> means that both the contractual interest payments and the contractual
> principal payments of a loan will be collected as scheduled in the loan
> agreement.

(Emphasis added).

SFAS No. 114, ¶10 states:

> The conditions for accrual . . . are not inconsistent with the accounting
> concept of conservatism. **<u>Those conditions are not intended to be so</u>**
> **<u>rigid that they require virtual certainty before a loss is accrue</u>***d*.
> They require only that it be **<u>probable </u>**that an asset has been impaired
> or a liability has been incurred and that the amount of loss be
> **<u>reasonably</u>** estimable.

(Emphasis added).

121. Prior to, and most certainly by the beginning of the Class Period,

Defendants knew that a significantly greater portion of SunTrust's loan portfolio

containing the Florida and Georgia real estate loans (which included high-risk exotic mortgage loans) than SunTrust had publicly reported was impaired and, as a result, Defendants were required, under GAAP, to estimate the potential loss exposure and establish appropriate reserves (in the form of a valuation allowance) at that time. SFAS No. 114, ¶13 states:

> . . . [if] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), **a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense**.

(Emphasis added).

122. To calculate the Bank's potential loss exposure, SunTrust was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principal and interest). SFAS No. 114, ¶13 states:

> When a loan is impaired . . . **a creditor shall measure impairment based on the present value of expected future cash flows** discounted at the loan's effective interest rate . . . .

(Emphasis added).

123. During 2007 and 2008, SunTrust had significant exposure to the Florida and Georgia real estate loan market, and Defendants knew that hundreds of millions of dollars worth of these loans had already become nonperforming. This fact, along with SunTrust's lack of experience in lending and servicing high-risk

exotic real estate loans, required that SunTrust record and expense hundreds of millions of dollars more in impaired loans throughout the Class Period.  By failing to accrue properly for hundreds of millions in additional impaired loans, Defendants' reported financial results, as reflected in press releases, statements to analysts, and SunTrust's Form 10-Q quarterly reports filed with the SEC for the fiscal quarters-ending June 30, 2008 and September 30, 2008, were materially false and misleading, in violation of GAAP and SEC rules.

124.   Even where loans were not delinquent and not impaired under GAAP, Defendants were required to provide reserves to reflect the risks associated with loans with similar characteristics to those that were impaired. EITF Topic No. D-80 states:

> • **Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP**. The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

> • . . . some loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have **specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics**. Loans in the first category must be accounted for under FAS 114 and **loans in the second category should be accounted for under FAS 5**. Under FAS 5, **a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan**. [fn] Moreover, current

> GAAP . . . emphasize that **the loss does not have to be virtually certain in order to be recognized**.

(Emphasis added).

125.    SunTrust failed to act in accordance with GAAP by ignoring the probable loss characteristics in groups of very high risk mortgage loans on the distressed Florida and Georgia markets that were increasingly suffering from delinquencies and foreclosures.   It was not until year end 2008, well after the housing market had already collapsed, that SunTrust significantly increased its loan write-offs and provision for ALLL.   During the Class Period, SunTrust deliberately misclassified nonperforming loans as "In-Process" loans so that SunTrust could record much smaller write-offs and reserves than it was actually required to in accordance with GAAP.   As a result, SunTrust's financial results for the fiscal quarters-ending June 30, 2008 and September 30, 2008 materially understated the loan and lease loss reserves by hundreds of millions of dollars, and conversely overstated SunTrust, assets, net income, earnings per share and Tier 1 Capital.

126.    Similarly, SFAS No. 5, Accounting for Contingencies, ¶22 states that "**accrual shall be made even though the particular receivables that are uncollectible may not be identifiable**." (Emphasis added).

127.    SunTrust's financial statements also violated GAAP as a result of Defendants' failure to adequately disclose the material loss contingencies and significant concentrations of risk related to the loans that had imploded due to the housing downturns in the Florida and Georgia real estate markets.

128.    Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss. *See* SFAS No. 5, ¶1. The collectability of mortgage loans is an example of a loss contingency.  GAAP requires that an estimated loss from a loss contingency "be accrued by a charge to income . . . if both of the following conditions are met: (a) **[i]nformation available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statement**"; and "**(b) [t]he amount of loss can be reasonably estimated**." *See* SFAS No. 5, ¶8. (Emphasis added).

129.    Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency is required when there is at least a "**reasonable possibility**" that a loss or an additional loss may be

incurred.[1] SFAS No. 5, ¶10.  (Emphasis added).  The disclosure shall indicate the nature of the contingency and shall provide an estimate of the possible loss or range of loss or state that such an estimate cannot be made. *See* SFAS No. 5, ¶10.

130.   SFAS No. 107, <u>Disclosures about Fair Value of Financial Instruments</u>, required that SunTrust disclose "all significant concentrations of credit risk arising from **<u>all</u>** financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions. As alleged herein, SunTrust's mortgage loans from the afflicted Florida and Georgia markets clearly represented a significant concentration of credit risk.

131.   If a significant concentration of risk represents a material contingency, the risk must be disclosed in interim financial statements in accordance with Accounting Principles Board Opinion ("APB") No. 28, <u>Interim Financial Reporting</u>.  The purpose behind these GAAP provisions is to warn investors about concentrations of risk that **<u>may</u>** result in losses under changed conditions – not to

---

[1]    GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is **<u>more than remote but less than likely</u>**." SFAS No. 5, ¶3. (Emphasis added).

wait until those losses become substantial (which they already were by the end of 2007) – and then disclose the concentration of risk **after** the losses have already harmed investors.

132. Similarly, AICPA Statement of Position ("SOP") No. 94-6, Disclosure of Certain Risks and Uncertainties, requires disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. SOP 94-6 defines a "severe impact" as a "significant financial disruptive effect on the normal functioning of the entity." For SunTrust, the Florida and Georgia mortgage loans presented a group concentration of credit risk that threatened to, and ultimately did, severely impact the Bank's financial position and financial results.

**Inapplicability of the Statutory Safe Harbor**

133. The statutory safe harbor provided for forward-looking statements pursuant to 15 U.S.C. § 78u-5 does not apply to any of the false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions known to Defendants. In addition, to the extent that certain Defendants may claim that certain of the statements alleged to be false and misleading may be characterized as forward looking, (i) such

statements were not identified as "forward-looking statements" when made; (ii) there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected"; and (iii) there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

134.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SunTrust who knew that those statements were false when made.   The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false financial statements purportedly prepared in accordance with GAAP.

**Applicability of Presumption of
<u>Reliance: Fraud On The Market Doctrine</u>**

135.   At all relevant times, the market for SunTrust common stock was an efficient market for the following reasons, among others:

a.      SunTrust common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market;

b.      As a regulated issuer, SunTrust filed periodic public reports with the SEC and the NYSE;

c.      SunTrust was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.  Among the securities firms that followed the Company during the Class Period were: Deutsche Banc; Fox-Pitt Kelton Cochran Caronia Waller; Keefe, Bruyette & Woods; JP Morgan; Ladenburg Thalman; Morgan Keegan; Portales Partners; and Stern Agee & Leach, Inc.;

d.      SunTrust regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. Each of these releases was publicly available and entered the public marketplace; and

e.    As a result, the market for SunTrust common stock promptly digested current information with respect to SunTrust from all publicly-available sources and all such information was reflected in market prices of SunTrust common stock. Under these circumstances, all those who acquired SunTrust common stock during the Class Period suffered similar injury through their acquisition of such securities at artificially inflated prices and a presumption of reliance applies.

**Loss Causation/Economic Loss**

136.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated SunTrust's stock price and operated as a fraud or deceit on Class Period purchasers of SunTrust stock by misrepresenting, among other things, the actual number and dollar value of SunTrust's nonperforming loans, ALLL, Charge-offs, net income and Tier 1 Capital. Defendants achieved this facade of success by deliberately

causing SunTrust to intentionally misclassify millions of dollars in nonperforming loans as "In-Process Loans" and then making a series of false and misleading statements regarding these material issues as alleged above.

137.   As a result of Defendants' fraudulent conduct as alleged herein, the prices at which SunTrust's common stock traded were artificially inflated during the Class Period.  When Plaintiff and other members of the Class purchased their SunTrust common stock, the true value of such common stock was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

138.   During the Class Period, Defendants intentionally misclassified millions of dollars worth of nonperforming loans so that SunTrust could avoid reporting these loans and taking the necessary charges, which would have drastically negatively impacted SunTrust's reported financial performance during the Class Period.  Defendants also made numerous false and misleading statements regarding the quality of the loans held in SunTrust's real estate portfolio and overall financial condition.  Later, however, when the truth gradually leaked out and Defendants' prior misrepresentations and fraudulent conduct was disclosed and became apparent to the market, SunTrust stock fell precipitously as the prior artificial inflation came out of SunTrust's stock price.   As a result of their

purchases of SunTrust stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

139.  By their misrepresentations, Defendants consistently presented a misleading picture of SunTrust's nonperforming loans, the health of SunTrust's loan portfolio and SunTrust's business.  Thus, instead of truthfully disclosing, during the Class Period, that hundreds of millions of dollars in loans made by SunTrust that were continuing to be held by SunTrust had become nonperforming, Defendants caused SunTrust to falsely understate its nonperforming loans by nearly half a billion dollars and conceal the inadequacy of SunTrust's internal controls.

140.  In ignorance of the materially false and misleading nature of the statements made by the Defendants, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and the other members of the Class relied to their detriment on such statements, and/or on the integrity of the market, in purchasing their SunTrust stock at artificially inflated prices during the Class Period.  Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

141.  These false statements directly or proximately caused, or were a substantial contributing cause, of the damages and economic loss sustained by

Plaintiff and the other members of the Class, and maintained the artificial inflation in SunTrust's stock price throughout the Class Period, until the truth leaked into and was revealed to the market, at which time the prior artificial inflation came out of the stock.

142.   Defendants' false and misleading statements had the intended effect and directly or proximately caused, or were a substantial contributing cause, of SunTrust's stock trading at artificially inflated levels throughout the Class Period.

143.   As set forth in detail above, in SunTrust's January 22, 2009 press release, the truth regarding SunTrust's nonperforming loans, loan losses and financial condition was finally revealed to members of the Class. As a direct result, the artificial inflation created by Defendants' fraud was removed from SunTrust's stock price, and the price of SunTrust's common stock plummeted, causing real economic loss to investors who had purchased the stock during the Class Period.

144.   The timing and magnitude of SunTrust's stock price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  Stated another way, there were no change in economic circumstances, change in investor expectations, new industry specific facts or SunTrust specific facts other than the

revelation of Defendants' fraud, conditions, or other news events, which taken separately or together account for the decline in the price of SunTrust common stock as detailed herein.

145.    The materially false and misleading statements made by Defendants throughout the Class Period, as alleged herein, had the intended purpose and effect of causing SunTrust's common stock to trade at artificially inflated levels throughout the Class Period.

## CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action on its behalf and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons, other than Defendants their heirs, successors and assigns and the members of the Individual Defendants' immediate families, who purchased SunTrust common stock in the open market during the period July 22, 2008 through January 21, 2009, inclusive, and who were damaged by Defendants' violations of the federal securities laws.

147.    Members of the Class are so numerous that joinder of all members is impracticable.  As of February 18, 2009, there were over 356 million shares of SunTrust common stock outstanding that were held by hundreds of holders of record.  During the Class Period SunTrust was listed and actively traded on the

NYSE.  While the exact number of Class members is unknown to the Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of Class members.

148.  SunTrust common stock was traded on an efficient and developed securities market throughout the Class Period.  Thousands of brokers nationwide had immediate access to trading information about SunTrust through the NYSE, and, on average, thousands of shares of SunTrust common stock traded daily throughout the Class Period.

149.  Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and other members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff.  Plaintiff has no interests that are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

150.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

151.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether SunTrust and the Individual Defendants violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder;

b.   whether the Individual Defendants were "control persons" of SunTrust during the Class Period within the meaning of Section 20(a) of the Exchange Act;

c.   whether Defendants participated in and pursued the common course of conduct complained of herein;

d.   whether documents, filings, releases and statements disseminated to the investing public during the Class Period omitted and/or misrepresented material facts about SunTrust;

e.   whether the market price of SunTrust's common stock was artificially inflated throughout the Class Period due to the material nondisclosures and/or misrepresentations complained of herein;

f.      whether, with respect to the claims under the Exchange Act and Rule 10b-5, Defendants acted knowingly, willfully, or recklessly in omitting to state and/or misrepresenting material facts; and

g.      whether the members of the Class have sustained damages as a result of Defendants' misconduct and, if so, the proper measure of such damages.

## COUNT I

**(For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

152.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.  This claim is asserted against all Defendants.

153.  These Defendants each carried out a plan, scheme and course of conduct which was intended to and did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) artificially inflate and maintain the market price of SunTrust common stock.   In furtherance of this unlawful scheme, plan and course of conduct, these Defendants each took the actions set forth herein.

154.  Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements made not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members in an effort to maintain artificially high market prices for SunTrust's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

155.   In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, et seq.) and S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, completed and accurate information.

156.   Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's nonperforming loans, ALLL, loan charge-offs and net profit, as specified herein.  Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to mislead purchasers of SunTrust's common stock concerning the Company's financial condition, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Class members.

157.  The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company and were members of the Company's management team, or were members of the Board of Directors; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers or directors of the Company, were privy to and participated in the drafting, reviewing

and/or approving the materially false and misleading SEC filings, statements, releases, reports and other public representations of and about, and the Individual Defendants signed the Company's public filings with the SEC, which public filings contained the allegedly materially misleading statements; (iii) the Individual Defendants knew or had access to the material, adverse, non-public information about SunTrust's nonperforming loans, ALLL, loan charges-offs and net income, which was not disclosed; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew was materially false and misleading or recklessly disregarded as such.

158. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SunTrust's financial condition and business affairs from Class members and financial market participants and supporting the artificially inflated price of its common stock.

159. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market

price of SunTrust's common stock was artificially inflated throughout the Class Period. In ignorance of the fact that the market price of SunTrust's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased SunTrust's common stock at artificially high prices and were damaged thereby.

160.   At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true nature of the operations of the Company and the noncompliance with federal law, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have acquired their SunTrust common stock, or, if they had acquired such securities, they would not have done so at the artificially inflated prices which they paid.

161.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

162.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of SunTrust common stock during the Class Period.

## COUNT II
### (For Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

163.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.  This claim is asserted against the Individual Defendants.

164.   The Individual Defendants acted as controlling persons of SunTrust within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their stock ownership, executive positions and board membership, as alleged above, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the operations of the Company, and possessed the power and/or ability to control each of the wrongful acts and practices complained of herein, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's internal reports, press releases, public filings and other statements

alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

166.    As set forth above, SunTrust violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of SunTrust, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of SunTrust common stock during the Class Period.

## **Prayer for Relief**

**WHEREFORE**, Plaintiff, on its own behalf and on behalf of the other members of the Class, respectfully requests that this Court enter judgment in Plaintiff and Class members' favor and against Defendants as follows:

1.    Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the

Class defined herein and declaring Plaintiff to be a proper Class representative;

2.    Awarding Plaintiff and the other members of the Class the maximum damages recoverable under the law;

3.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs and expenses; and

4.    Awarding such other relief as this Court may deem just and proper.

### Jury Trial Demand

Plaintiff demands a trial by jury.

DATED:  December 23, 2009          ____s/Steven J. Estep_____

STEVEN J. ESTEP
Georgia Bar No. 250450

**Cohen Cooper Estep & Allen**
3350 Riverwood Parkway, Ste. 2220
Atlanta, GA 30339
Telephone: 404-814-0000
Facsimile: 404-616-8900
*Liaison Counsel for Class*

Paul O. Paradis, Esq.
Gina M. Tufaro, Esq.
Frank Schirripa, Esq.
**HORWITZ, HORWITZ & PARADIS,**
Attorneys At Law
405 Lexington Avenue – 61st Flr.
New York, NY 10174

Telephone:  (212) 986-4500
Facsimile: (212) 986-4501

*Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

| | | |
|---|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | 1:09-CV-0617-TWT |
| | ) | |
| vs. | ) | (ECF Case) |
| | ) | |
| SUNTRUST BANKS, INC., SUNTRUST BANK, JAMES M. WELLS III, WILLIAM H. ROGERS, JR. and MARK A. CHANCY, | ) ) ) | Hon. J. Thomas W. Thrash, Jr. |
| | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## CERTIFICATE OF SERVICE

The undersigned herby certifies that the foregoing FIRST AMENDED COMPLAINT was electronically filed with the Clerk of the Court using the CM/ECF system, which serves notification of such filing to all CM/ECF participants.

This 23rd day of December 2009.

/s/ STEVEN J. ESTEP
STEVEN J. ESTEP