IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SUNTRUST BANKS, INC., JAMES M. WELLS III, and MARK A. CHANCY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. <br> 1:09-CV-0617-TWT |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

J. TIMOTHY MAST
Georgia Bar No. 476199
THOMAS B. BOSCH
Georgia Bar No. 068740
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
(404) 885-3000 (voice)
(404) 885-3900 (facsimile)

Attorneys for Defendants

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..........................................................................1

PLAINTIFF'S ALLEGATIONS ......................................................................5

I.    SUNTRUST'S PERFORMANCE DURING THE CLASS PERIOD................................................................................................5

II.    THE ALLEGED FRAUD ........................................................9

ARGUMENT AND CITATION OF AUTHORITY ............................................11

I.    PLEADING REQUIREMENTS ........................................................11

    A.    Rule 12(b)(6)............................................................................11

    B.    Rule 9(b) and the PSLRA .......................................................12

II.    PLAINTIFF DOES NOT SUFFICIENTLY ALLEGE ACTIONABLE FALSE STATEMENTS. ........................................13

    A.    Plaintiff's Allegations of Falsity Fail to Meet Rule 9(b) and the PSLRA's Heightened Pleading Requirements............13

        1.    Plaintiff's Conclusory Allegations That SunTrust Misclassified "Hundreds of Millions of Dollars" in Loans Are Insufficient. ................................................13

        2.    Plaintiff's Misclassification Allegations Cannot Be Reconciled with SunTrust's Reported Nonperforming Loans....................................................16

        3.    Plaintiff Fails To Connect the Alleged "Hundreds of Millions of Dollars" in Misclassified Loans to SunTrust's Performance. ...............................................18

    B.    Plaintiff's Section 10(b) Claim, in Reality, Is Based Impermissibly on Fraud by Hindsight. ....................................19

III.    PLAINTIFF'S ALLEGATIONS DO NOT GIVE RISE TO A "STRONG INFERENCE" OF SCIENTER. ....................................20

    A.    Plaintiff's Motive and Opportunity Allegations Do Not Establish a Strong Inference of Scienter.................................21

B.    Confidential Witness Statements Regarding Alleged Access to Information Do Not Establish a Strong Inference of Scienter. ...............................................25

C.    There Was No Suspicious Insider Trading, Thus Negating a Strong Inference of Scienter. ................................31

D.    Any Inference of Scienter Is Not As Compelling As Competing Inferences. .............................................32

IV.    THE ALLEGED GAAP VIOLATIONS DO NOT SALVAGE PLAINTIFF'S SECTION 10(b) CLAIM. ...........................................33

V.    DEFENDANTS' STATEMENTS ARE PROTECTED BY THE PSLRA'S SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE. ...................................................36

A.    The Alleged Misstatements Were Forward-Looking. .............37

B.    The Alleged Misstatements Were Accompanied by Meaningful Cautionary Language. .........................................39

VI.    PLAINTIFF HAS NOT ADEQUATELY ALLEGED LOSS CAUSATION. .....................................................42

VII.    PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED. .....................................................45

CONCLUSION ...............................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449
(S.D.N.Y. 2007)..................................................................................43

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................. 11, 12

*Blackmoss Invs., Inc. v. Aca Capital Holdings, Inc.*, 2010 U.S. Dist.
LEXIS 2899 (S.D.N.Y. Jan. 12, 2010)................................................35

*Bryant v. Avado Brands, Inc.,* 187 F.3d 1271 (11th Cir. 1999)........................ 13, 21

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005)................................. 11, 42, 44

*First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89
(S.D.N.Y. 1993)..................................................................................33

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) .................... 15, 26

*Glazer Capital Mgmt., LP, v. Magistri*, 549 F.3d 736 (9th Cir. 2008)....................22

*Greenhouse* v. *MCG Capital Corp.,* 392 F.3d 650 (4th Cir. 2004)........................43

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004).......... 23, 36

*Harris v. Ivax Corp.,* 182 F.3d 799 (11th Cir. 1999) ................................34

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005)......................34

*In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360 (N.D. Ga. 2005)...........36

*In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005) ..............19

*In re Coca-Cola Enters Sec. Litig.*, 2007 WL 2904160 (N.D. Ga. Oct. 3,
2007)..................................................................................................19

*In re Coca-Cola Enters., Inc.  Sec. Litig.*, 510 F. Supp. 2d 1187
(N.D. Ga. 2007) .................................................................... *passim*

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044
    (C.D. Cal. 2008) ...............................................................................34

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) ....................38

*In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008) ......................... 22, 24

*In re Merck & co., Inc., Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) ..........................40

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    2008 U.S. Dist. LEXIS 37993 (S.D.N.Y. May 8, 2008).....................................44

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ..................................................................1

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ................................................................44

*In re Mirant Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 789
    (N.D. Ga. Jan 7, 2009)....................................................... 25, 30, 33, 36

*In re Novastar Fin. Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166
    (W.D. Mo. June 4, 2008).............................................................................10

*In re PetsMart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999) ......................16

*In re S1 Corp. Sec. Lit.*, 173 F. Supp. 2d 1334 (N.D. Ga. 2001)............................38

*In re Serologicals Sec. Litig.*, 2003 U.S. Dist. LEXIS 27465
    (N.D. Ga. Feb. 20, 2003) .......................................................... 20, 33

*In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297
    (N.D. Ga. 2006) ...............................................................................16

*In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102
    (D. Mass. 2003) .......................................................................... 22, 23

*In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005).............. 13, 22

*In re Tellium, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 19467
    (D.N.J. June 30, 2005).................................................................................44

*In re Witness Systems, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 109173
(N.D. Ga. Mar. 31, 2008.................................................................42

*Income Trust v. Jabil Circuit, Inc.,* 2010 U.S. App. LEXIS 1009
(11th Cir. Jan. 19, 2010)........................................................... 20, 37

*Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340
(11th Cir. 2008) .............................................................................11

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001).....................................22

*Landmen Partners, Inc. v. The Blackstone Group, L.P.*, 2009 WL 3029002
(S.D.N.Y. Sept. 22, 2009) ...........................................................35

*Lentell* v. *Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005)..................42

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006)................44

*Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230 (11th Cir. 2008)...................... *passim*

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000).......................................20

*Parnes v. Gateway 2000,* 122 F.3d 539 (8th Cir. 1997).........................16

*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999).........................23

*Pugh v. Tribune Co.,* 521 F.3d 686 (7th Cir. 2008)...............................31

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
638 F. Supp. 2d 120 (D. Mass. 2009)............................................26

*Rosenberg v. Gould*, 554 F.3d 962 (11th Cir. 2009) ........................... 13, 21, 32, 45

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) ........................20

*Skubella v. Checkfree Corp.*, 2008 WL 1902118
(N.D. Ga. Apr. 25, 2008).......................................................... 27, 32, 37

*Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587 (N.D. Tex. 2004) ........................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...... 12, 13, 20, 32

*Waterford Twp. Gen. Empls. Ret. Sys. v. CompuCredit Corp.*,
   2009 U.S. Dist. LEXIS 112839 (N.D. Ga. Dec. 3, 2009) ...................... 12, 31, 44

**Statutes**

15 U.S.C. § 78j(b) ...............................................................................................3

15 U.S.C. § 78t(a) ...............................................................................................3

15 U.S.C. § 78u-4(b) ................................................................................... 13, 20

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................................37

17 C.F.R. §240.10b-5 ..........................................................................................3

**Accounting Authorities**

Statement of Financial Accounting Standards No. 5 ....................................... 33, 34

Statement of Financial Accounting Standards No. 114 .................................... 33, 34

Emerging Issues Task Force Topic No. D-80A (revised Sept. 2001) .....................34

## INDEX OF EXHIBITS

EXHIBIT A             March 2001 Change In Control Agreement
                      between SunTrust and James M. Wells III,
                      attached to SunTrust's Form 10-Q for period
                      ended March 31, 2001, filed on May 14, 2001

EXHIBIT B             August 10, 2004 Change In Control Agreement
                      between SunTrust and Mark A. Chancy, attached
                      to SunTrust's Form 10-Q for period ended
                      September 30, 2004, filed on November 12, 2004

EXHIBIT C             SunTrust Form 10-K for period ended December
                      31, 2007, filed on February 20, 2008

EXHIBIT D             SunTrust Schedule 14A, filed on February 20,
                      2008

EXHIBIT E             SunTrust Form 8-K, reporting SunTrust's Results
                      of Operations and Financial Conditions for the
                      Quarter Ended June 30, 2008, filed on July 22,
                      2008

EXHIBIT F             Transcript from SunTrust Earnings Conference
                      Call, dated July 22, 2008

EXHIBIT G             August 5, 2008 Change In Control Agreement
                      between SunTrust and James M. Wells III,
                      attached to SunTrust Form 10-Q for period ended
                      June 30, 2008, filed on August 7, 2008

EXHIBIT H             August 5, 2008 Change In Control Agreement
                      between SunTrust and Mark A. Chancy, attached
                      to SunTrust Form 10-Q for period ended June 30,
                      2008, filed on August 7, 2008

EXHIBIT I             SunTrust Form 10-Q for period ended June 30,
                      2008, filed on August 7, 2008

EXHIBIT J                SunTrust Form 8-K, filed in advance of
                         September 10, 2008, Lehman Brothers Financial
                         Services Conference, filed on September 8, 2008

EXHIBIT K                Transcript from SunTrust at Lehman Brothers
                         Global Finance Services Conference, dated
                         September 10, 2008

EXHIBIT L                SunTrust Form 8-K, reporting SunTrust's Results
                         of Operations and Financial Condition for the
                         Quarter Ended September 30, 2008, filed on
                         October 23, 2008

EXHIBIT M                Transcript from SunTrust Earnings Conference
                         Call, dated October 23, 2008

EXHIBIT N                SunTrust Form 8-K, announcing planned sale of
                         $3.5 billion in preferred stock to the U.S.
                         Treasury, filed on October 27, 2008

EXHIBIT O                SunTrust Form 10-Q, for period ended September
                         30, 2008, filed on November 7, 2008

EXHIBIT P                Transcript from SunTrust at BancAnalysts
                         Association of Boston Conference, dated
                         November 7, 2008

EXHIBIT Q                Transcript from SunTrust at Merrill Lynch
                         Banking and Financial Services Conference,
                         dated November 13, 2008

EXHIBIT R                SunTrust Form 8-K, announcing planned sale of
                         $1.4 billion in preferred stock to the U.S.
                         Treasury, filed on December 9, 2008

EXHIBIT S                SunTrust Form 8-K, reporting SunTrust's results
                         of Operations and Financial Condition for the full
                         year and fourth quarter ended December 31,
                         2008, filed on January 22, 2009

EXHIBIT T            Forms 4 reflecting SunTrust stock holdings of the
                     Individual Defendants during the Class Period

EXHIBIT U            Mark Douglas, *United States: The Year in
                     Bankruptcy 1008 - Part 1*, Mondaq Business
                     Briefing (Feb. 27, 2009)

EXHIBIT V            SunTrust Stock Chart

## PRELIMINARY STATEMENT

In late 2008, the national and global economy experienced an unprecedented financial collapse that hit the financial services industry particularly hard.[1]  For example, during this time, Fannie Mae and Freddie Mac were taken over by the federal government; Lehman Brothers declared bankruptcy; Washington Mutual failed; Merrill Lynch and Wachovia were acquired amid fears of their failure; Citigroup was rescued by the federal government; and, ultimately, in response to unprecedented economic conditions, Congress was compelled to enact the Emergency Economic Stabilization Act of 2008, as part of a $700 billion support package for the financial services industry.  Though negatively impacted by these events, SunTrust Banks, Inc. ("**SunTrust**") has survived with a strong capital base and is fully engaged in the banking business and helping the communities it serves.

Shortly after these events, on January 22, 2009, SunTrust reported its financial results for Q4[2] and year-end 2008.  As one might expect, and as SunTrust

---

[1] The Court may take judicial notice of these events and the credit crisis.  *See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) ("The Court may take judicial notice of the existence of the internet bubble and its subsequent crash. Fed. R. Evid. 201 (judicial notice of facts 'generally known within the territorial jurisdiction of the trial court . . . may be taken at any stage of the proceeding')") (additional citations omitted).

[2] References to financial quarters will be in the format "Q_."  SunTrust's fiscal year follows the calendar year.

repeatedly had warned the market, SunTrust's financial results during Q4 2008 were affected by the economic collapse in late 2008. Among other things, SunTrust's loan portfolio experienced increases in nonperforming loans and net charge-offs, and SunTrust also increased its allowance for loan and lease losses (the "**ALLL**") and provision for loan losses (the "**Provision**").

Apparently believing that SunTrust alone should have avoided the perils of the global economic free-fall, Plaintiff brings this putative class action on behalf of purchasers of SunTrust's common stock during the period between July 22, 2008, the date on which SunTrust reported its financial results for Q2 2008, and January 21, 2009, the day before SunTrust reported its financial results for Q4 and year-end 2008 (the "**Class Period**"). Though lengthy, and filled with speculation, conjecture, and conclusory assertions, Lead Plaintiff's First Amended Class Action Complaint (the "**FAC**") is wholly lacking in factual allegations that support its claims. Indeed, the entire FAC is based upon one speculative and implausible premise: in the hopes of attracting a merger partner, at the at the end of Q2 and Q3 2008, SunTrust moved "hundreds of millions of dollars" (of its $126 billion loan portfolio) in unidentified nonperforming loans from "non-accrual" status to "in-process" status in order to hide the true condition of SunTrust's loan portfolio.

Without any facts, Plaintiff speculates that these loans were moved "at the direction" of James M. Wells III, Chairman of SunTrust's Board of Directors and SunTrust's President and Chief Executive Officer, and Mark A. Chancy, SunTrust's Chief Financial Officer (together, the "**Individual Defendants**"), who allegedly were motivated to engage in this fraudulent scheme in the hope that they might be able to exercise long-standing change-in-control ("**CIC**") agreements in the event that merger "rumors" came to pass.

Armed with nothing more than this patchwork of speculation and unsupported conclusions, Plaintiff purports to assert two claims. Count I alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants. Plaintiff's claims should be dismissed for the following six reasons.

*First*, the FAC fails to plead with particularity any material misstatements or omissions. The FAC is filled with boilerplate, conclusory, and speculative allegations that SunTrust's nonperforming loans were understated by "hundreds of millions of dollars" in Q2 2008 and Q3 2008, but Plaintiff offers no facts—particularized or otherwise—upon which these allegations are based. Plaintiff also

makes no attempt to establish the actual amount of alleged misclassification or its impact on SunTrust's financial statements. Rather, Plaintiff clearly bases its assertion that SunTrust understated certain financial metrics in Q2 and Q3 2008 simply on the fact SunTrust increased these metrics in Q4 2008. Pleading fraud by hindsight, however, does not state a claim for securities fraud.

*Second*, Plaintiff has not pleaded particularized facts supporting a strong inference of scienter. Initially, Plaintiff alleges that the Individual Defendants were motivated to engage in fraud because they hoped to benefit from their CIC agreements should a "rumored" merger come to pass. Motive and opportunity, however, are not sufficient to establish scienter in the Eleventh Circuit. Even in circuits where motive and opportunity are sufficient, courts consistently have rejected allegations similar to those asserted by Plaintiff. Further, relying entirely on speculative and conclusory confidential witness statements, Plaintiff asserts that, by virtue of their positions within SunTrust, the Individual Defendants had access to data regarding SunTrust's loan portfolio. These types of allegations also fail to establish a strong inference of scienter.

*Third,* Plaintiff's allegations regarding GAAP violations are not pleaded with the requisite particularity.

*Fourth*, the statements at issue are protected by the Private Securities Litigation Reform Act of 1995 ("PSLRA")'s safe harbor for forward looking statements and the bespeaks caution doctrine.

*Fifth,* Plaintiff has not pleaded loss causation adequately.  SunTrust never disclosed any misclassification of nonperforming loans, and Plaintiff has not pleaded a nexus between the alleged fraudulent activity and SunTrust's Q4 2008 performance.  Plaintiff also fails to account for other negative influences on SunTrust's stock price, unrelated to the alleged fraud, or the fact that SunTrust's stock was in the midst of an extended decline prior to January 22, 2009.

*Sixth*, the Section 20(a) claim against the Individual Defendants must be dismissed because Plaintiff has not pleaded an underlying Section 10(b) violation.

## PLAINTIFF'S ALLEGATIONS

### I.    SUNTRUST'S PERFORMANCE DURING THE CLASS PERIOD

SunTrust is a financial holding company headquartered in Atlanta, Georgia, which through its SunTrust Bank subsidiary, offers retail and commercial banking services throughout the southeastern United States.  (¶ 17.)[3]  A large portion of SunTrust's business involves the making and holding of loans for its own portfolio, including real estate loans, commercial loans, and consumer loans—averaging over

---

[3] All references to the paragraphs in the FAC will be in the format "(¶ __)."

$126 billion during the Class Period. (¶ 2; s*ee* Ex. S, Fin. Data at 7-8.) SunTrust also holds certain loans "for sale" to third parties, which are accounted for separately from SunTrust's loan portfolio and represent a much smaller dollar amount—averaging approximately $4.6 billion during the Class Period. (*See, e.g.,* Ex. C at 22; Ex. S, Fin. Data at 7-8.)

Beginning in late 2007 and continuing throughout 2008, the real estate and credit markets deteriorated. (¶ 4.) This deterioration was reflected in SunTrust's financial results by, among other things, consistent increases in SunTrust's nonperforming loans, net charge-offs, and ALLL. (¶ 114.) Moreover, each of SunTrust's SEC filings and earnings releases issued during this time period, including those that are the subject of the FAC, included or incorporated extensive disclosures regarding the risks of continued economic decline and the potential impact on SunTrust's performance. *See infra* Argument, Part V.B.

Late in Q3 and through Q4 2008, the United States' economy in general— and the financial markets in particular—took a drastic turn for the worse, as evidenced by the failure of a number of the largest financial institutions in the country. For example, on September 7, 2008, the U.S. government took over Fannie Mae and Freddie Mac, causing extreme distress in the financial and mortgage markets. Soon thereafter, on September 14, 2008, Merrill Lynch was

sold to Bank of America amidst fears of a liquidity crisis.  The following day,

September 15, 2008, Lehman Brothers, one of the oldest investment banks on Wall

Street, declared bankruptcy.  On September 25, 2008, Washington Mutual was

seized by the Federal Deposit Insurance Corporation, and its assets were sold to

J.P. Morgan for $1.9 billion.  Though the economy already was faltering, these and

other failures sent the economy into a complete tailspin.  In response to these

unprecedented economic conditions, on October 3, 2008, Congress passed the

Emergency Economic Stabilization Act of 2008, which, among other things,

established the Troubled Asset Relief Program ("**TARP**").[4]

     As it had made clear in its SEC filings and earnings releases, SunTrust was

not immune from the global economic crisis.  (*E.g.,* Ex. C at 5, 9*; see infra*

Argument, Part V.)  Accordingly, consistent with its performance and disclosures

in prior quarters, SunTrust's nonperforming loans, net charge-offs, ALLL, and

Provision increased in Q4 2008.  (*See* Ex. S, Fin. Data at 7, 10.)  The table below

shows the following information related to SunTrust's loans for Q3 2007 through

Q4 2008 (dollars in thousands): quarter-end loans in its portfolio; the ALLL; the

---

[4] *See* Mark Douglas, *United States: The Year in Bankruptcy 2008—Part 1,*
Mondaq Business Briefing (Feb. 27, 2009) [attached hereto as Ex. U] (providing
timeline of economic collapse in 2008 and referencing additional Q4 2008 events).

Provision; net charge-offs; average nonperforming loans;[5] quarter-end

nonperforming loans; and SunTrust's loans held for sale[6] at quarter-end.

|  | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|---|---|
| **Total Loans in Portfolio** | 120,748,413 | 122,318,994 | 123,713,195 | 125,824,804 | 126,718,395 | 126,998,443 |
| **ALLL** | 1,093,691 | 1,282,504 | 1,545,340 | 1,829,400 | 1,941,000 | 2,350,996 |
| **Provision** | 147,020 | 356,781 | 560,022 | 448,027 | 503,672 | 962,494 |
| **Net Charge-Offs** | 103,691 | 167,968 | 297,186 | 322,672 | 392,072 | 552,498 |
| **Nonperforming: Daily Average Balance** | 877,500 | 1,170,700 | 1,799,000 | 2,514,100 | 3,309,200 | 3,853,200 |
| **Nonperforming: Quarter End Balance** | 1,003,848 | 1,460,258 | 2,068,747 | 2,788,686 | 3,670,558 | 4,402,674 |
| **Total Loans Held for Sale** | 8,675,427 | 8,851,695 | 6,977,289 | 5,260,892 | 4,759,761 | 4,032,128 |

---

[5] Prior to Q3 2008, SunTrust reported "total nonperforming loans" as the combination of "nonaccrual loans" and "restructured loans." (*E.g.,* Ex. E, Fin. Data at 10; Ex. S, Fin. Data at 10 n.5.)  Beginning in Q4 2008, SunTrust began reporting restructured loans separately from nonaccrual loans.  (*See* Ex. S, Fin. Data at 10, n. 5.)  For consistency, the table and all references to "nonperforming loans" in this memorandum include both nonaccrual loans and restructured loans, regardless of time period.

[6] Plaintiff's allegations that the alleged fraudulent scheme to avoid reporting nonperforming loans resulted from SunTrust's inability to sell loans as the secondary mortgage market began to decline in late 2007 demonstrate a fundamental misunderstanding of SunTrust's loan portfolio.  As made clear by SunTrust's SEC filings, SunTrust accounts separately for its loans held for sale, and these loans have no impact on the ALLL because SunTrust carries these loans, and records them on its financial statements at the lower of cost or market, or at fair value.  (*See, e.g.,* Ex. C at 22.)

## II.    THE ALLEGED FRAUD

The FAC alleges that increases in SunTrust's nonperforming loans, net charge-offs, ALLL, and Provision in Q4 2008 resulted not from the economic crisis that affected SunTrust and every other financial institution, but from the unraveling of an alleged fraudulent scheme purportedly directed by the Individual Defendants.  (¶¶ 7, 23, 58, 100-106, 110-115.)  Plaintiff alleges that SunTrust hid increases in its nonperforming loans—and thereby avoided increases to the ALLL, the Provision, and net charge-offs—by temporarily moving loans at quarter-end from nonperforming or "nonaccrual" status to "in-process."  (¶¶ 58-60.)

Plaintiff, without basis or explanation, selects "approximately half a billion dollars" as the amount of loans that SunTrust allegedly moved during the Class Period.  (¶ 55.)  According to Plaintiff, again without basis or explanation, by understating its quarter-end nonperforming loans by "hundreds of millions of dollars," SunTrust "manipulated" its ALLL and Provision by some unspecified amount.  (*E.g.,* ¶ 7.)  Finally, Plaintiff alleges that, at the end of each financial reporting period, SunTrust "transferred the loans back into a nonperforming loan account—or non-accrual account—so as to make it appear as though these loans had always been classified in this manner."  (¶ 59.)  As a result of this purported fraudulent scheme, Plaintiff alleges that eleven SEC filings, press releases, and

conference calls, issued or participated in by SunTrust and the Individual Defendants during the Class Period, contained false and misleading statements.[7] (¶¶ 65-99.)

Even though SunTrust never disclosed the purported misclassification of nonperforming loans, and has not restated its earnings for any financial reporting period during the Class Period,[8] Plaintiff claims that the alleged fraud was "revealed" on January 22, 2009, when SunTrust reported its financial results for Q4 and year-end 2008, which included increases in its nonperforming loans, ALLL, and Provision. (¶¶ 10, 110-115.) Plaintiff claims that this purported "revelation" caused SunTrust's stock to drop 10.91% on January 22, 2009. (*Id*.)

Plaintiff seeks to hold SunTrust and the Individual Defendants liable for this alleged fraud because the Individual Defendants: (i) had access to information regarding SunTrust's loan portfolio, including nonperforming loans (¶¶ 46-64);

---

[7] Plaintiff alleges that Exhibits E, F, I, J, K, L, M, N, O, P, and Q all contained false and misleading statements because of the underlying alleged misclassification of loans. Consequently, Plaintiff's claims do not rest on the specific contents of each statement, and the statements are addressed collectively. *See In re Coca-Cola Enter. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1193 n.1 (N.D. Ga. 2007).

[8] *See In re Novastar Fin. Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 44166, at *12 (W.D. Mo. June 4, 2008) (finding it "noteworthy that nobody—the SEC, Novastar's auditors, or anyone else—has suggested Novastar should or must restate its financial reports").

and (ii) purportedly wanted to reap the benefits of their CIC agreements upon the "rumored" acquisition of SunTrust (¶¶ 100-106).

<b><u>ARGUMENT AND CITATION OF AUTHORITY</u></b>

To state a claim for securities fraud under Section 10(b), Plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss." *Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005)).

## I.    PLEADING REQUIREMENTS

### A.    <u>Rule 12(b)(6)</u>

A Rule 12(b)(6) motion should be granted when the complaint fails to include factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* In order to survive, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570, 556). Even well-pleaded facts that are "merely consistent with" liability fall "short of the line between possibility and plausibility of 'entitlement to relief'" and are insufficient to state a claim.  *Id*.

### B.    Rule 9(b) and the PSLRA's

To state a Section 10(b) claim, a complaint must satisfy the pleading requirements of Fed. R. Civ. P. 9(b), as well as the additional "exacting pleading requirements" of the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Under Rule 9(b), a complaint "must state with particularity the circumstances constituting fraud."  *Waterford Twp. Gen. Empls. Ret. Sys. v. CompuCredit Corp.*, 2009 U.S. Dist. LEXIS 112839, at *13-14 (N.D. Ga. Dec. 3, 2009) (listing requirements for pleading fraud with particularity).

In addition to pleading fraud with particularity under Rule 9(b), the PSLRA requires plaintiffs: (1) to specify each allegedly false or misleading statement made by each defendant and specify the reasons why each such statement is false or misleading; (2) to state with particularity as to each allegation made on "information and belief" "all facts on which that belief is formed"; and (3) "with respect to each act or omission alleged to violate [Section 10(b)], state with particularity facts giving rise to a strong inference that the defendant[s] acted with

the required state of mind." 15 U.S.C. § 78u-4(b); *see In re Stone & Webster, Inc.*

*Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005) (stating that Plaintiff must provide

"facts that show exactly why the statements or omissions were misleading")

(internal quotations omitted). "[A]n inference of scienter must be more than

merely plausible or reasonable—it must be cogent and at least as compelling as

any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see,*

*e.g, Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009).

In assessing whether the FAC satisfies these standards, the Court may

consider documents upon which the FAC is based, as well as documents publicly

filed with the SEC. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276, 1280

(11th Cir. 1999).

## II. PLAINTIFF DOES NOT SUFFICIENTLY ALLEGE ACTIONABLE FALSE STATEMENTS.

### A. Plaintiff's Allegations of Falsity Fail to Meet Rule 9(b) and the PSLRA's Heightened Pleading Requirements.

1. Plaintiff's Conclusory Allegations That SunTrust Misclassified "Hundreds of Millions of Dollars" in Loans Are Insufficient.

Plaintiff alleges that SunTrust's public statements during the last three

quarters of 2008 were false and misleading due to SunTrust's alleged

misclassification of "hundreds of millions of dollars" in nonperforming loans as

"in-process." While Plaintiff alleges that this misclassification had the effect of

misstating SunTrust's reported ALLL, Provision, net charge-offs, early stage delinquencies, delinquency trends, and the adequacy of SunTrust's capitalization (including SunTrust's need for and use of TARP funds) (¶¶ 65-99), all of these purported "effects" turn upon Plaintiff's alleging particularized facts showing the alleged misclassification of loans during the Class Period.[9] (*E.g., ¶¶* 7-10.)

Plaintiff offers no facts in support of its allegation that SunTrust's nonperforming loans were "understated by hundreds of millions of dollars…." (*E.g.*, ¶¶ 70, 74, 78, 81, 86, 92.) Plaintiff does not identify any specific loans it alleges were "misclassified," or any facts supporting the assertion that "hundreds of millions of dollars" were misclassified. The closest Plaintiff comes to alleging any ***facts*** at all regarding any specific loans that were misclassified, or the amount of such loans, is a single, vague assertion made by Confidential Witness ("**CW**") #2. According to CW#2, at some point prior to his early retirement in 2006—***two years before the beginning of the Class Period***— he was requested by Kris

---

[9] Plaintiff's allegations regarding SunTrust's application for TARP funds appear to be based on the same allegations regarding the misclassification of nonperforming loans and fail for the same reasons. In any event, Plaintiff has stated no basis for these allegations—either through unsupported conclusions or well-pleaded facts. For example, Plaintiff's bald allegation that SunTrust knew when it first applied for TARP funds in late October and November 2009 that it would apply for additional TARP funds in December 2009, when the "economic situation was decidedly bleaker" (¶ 107), is not sufficient because Plaintiff does not allege a single fact in support of this conclusory assertion.

Anderson, a Vice President in the Special Assets Group, to temporarily move a $21 million nonperforming loan to the "in-process" account.  (¶ 61.)  Even with respect this $21 million loan, Plaintiff offers no additional facts, including facts explaining why classifying the loan as "in-process" would have been improper.

Indeed, Plaintiff appears simply to have pulled the "hundreds of millions of dollars" number from thin air.  This type of unsupported speculation is not sufficient to establish falsity under the PSLRA and Rule 9(b).  *E.g., Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1251 (11th Cir. 2008) (holding that estimates of fraud of $1 billion per year, based on limited examples provided by confidential witnesses "are *far too shaky* a foundation on which to make any reasonable calculus of the total amount of the fraud") (emphasis added); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1263 (11th Cir. 2006) (affirming dismissal of "vague and difficult to evaluate" claims of improper amortization and capitalization where the complaint failed to "specify when the improper accounting occurred," and "how and what products were improperly capitalized or amortized"); *In re Coca-Cola Enters., Inc.  Sec. Litig.*, 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007) ("*CCE*") ("[P]laintiff must state sufficient facts to give the Court confidence that the plaintiff can relate specific transactions to specific misstatements . . . Furthermore, the plaintiff must allege facts that show that the amount of sales or

revenue improperly recognized is material in relation to the size of the company's operation.").[10]

### 2.    Plaintiff's Misclassification Allegations Cannot Be Reconciled with SunTrust's Reported Nonperforming Loans.

Plaintiff's claims are implausible and cannot be reconciled with SunTrust's reported nonperforming loans during the Class Period.  At all relevant times, SunTrust reported both the quarter-end balance and the daily average balance for nonperforming loans.  (*E.g.,* Ex. L, Fin. Data at 7-11.)  Plaintiff alleges that SunTrust temporarily moved loans from nonperforming to "in-process" only "towards the end of the quarter" for quarter-end reporting purposes.  (¶¶ 58-60.) Plaintiff further alleges that following the close of the reporting period, these loans were moved back to nonperforming "so as to make it appear as though these loans

---

[10] Here, Plaintiff also fails to plead that, what it vaguely asserts is an understatement in nonperforming loans of "approximately half a billion dollars," or less than 0.4% of SunTrust's loan portfolio, is material.  *See, e.g.*, *Parnes v. Gateway 2000,* 122 F.3d 539, 547 (8th Cir. 1997) (holding alleged overstatement of assets was not material where amount equaled only 2% of total assets); *In re PetsMart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 994 (D. Ariz. 1999) (noting that "revenue shortfalls of 10% or less may be immaterial as a matter of law" and holding that a two percent decline in overall revenues was not material); *see also In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1310-11 (N.D. Ga. 2006) (finding plaintiffs failed to meet their pleading burden because their allegations did not "show whether the alleged channel-stuffing practices were widespread or anecdotal, whether they involved hundreds rather than millions of dollars worth of product, or how the alleged channel-stuffing transactions at the end of the quarters differed from sales made at other times during the quarter").

had always been classified in this manner from the time they first became nonperforming loans…." (¶ 59.)

According to Plaintiff, therefore, the alleged loans were classified correctly as nonperforming the vast majority of the time and misclassified as "in-process" for only brief periods of time at the end of each quarter. Thus, the average nonperforming loan balance during any quarter would have included the loans allegedly misclassified for quarter-end reporting purposes. Plaintiff does not even address the fact that SunTrust reported average balances for each quarter, which is wholly inconsistent with Plaintiff's alleged scheme to defraud.

The actual numbers reported by SunTrust also contradict Plaintiff's theory. Under Plaintiff's theory, SunTrust's nonperforming loan balance at quarter-end should be *less* than the average balance for the quarter due to the subtraction of "hundreds of millions of dollars" in temporarily misclassified loans. Here, however, the opposite is true. SunTrust's nonperforming loan balance at quarter-end is *greater* than the average balance during the quarter. For example, for Q2 2008, SunTrust reported an average balance of $2.51 billion in nonperforming loans and a quarter-end balance of $2.79 billion. (Ex. E, Fin. Data at 7, 10.) For Q3, these balances increased to $3.31 billion and $3.67 billion, respectively. (Ex. L, Fin. Data at 7, 10.)

A quarter-end balance greater than an average balance is consistent with SunTrust's reports and the worsening economic decline throughout the Class Period—*i.e.,* by the end of each quarter, there were more nonperforming loans than at the beginning, resulting in a quarter-end balance greater than the average balance during the quarter.  These results, however, are wholly incompatible with Plaintiff's theory that SunTrust **removed** "hundreds of millions of dollars" in loans from the nonperforming category at the end of each quarter.  Simply put, the entire premise of the FAC is implausible, and Plaintiff's claims should be dismissed

3.    Plaintiff Fails To Connect the Alleged "Hundreds of Millions of Dollars" in Misclassified Loans to SunTrust's Performance.

Plaintiff's allegations of falsity also are deficient because Plaintiff makes no attempt to connect the "hundreds of millions of dollars" in allegedly misclassified loans to SunTrust's performance.[11]  Plaintiff simply states that that nonperforming loans, net charge-offs, the ALLL, and the Provision increased in Q4 2008 (¶¶ 110-114), without making any attempt to quantify the amount of the increases attributable to the alleged prior misclassification versus the amount attributable to

---

[11] For example, Plaintiff does not account for the value of the properties underlying the allegedly misclassified loans, the length of time that they were "nonperforming," any prior mark-downs of the loans, or any of the other factors that go into the complex set of factors involved in determining the ALLL and the Provision.  (*See, e.g.*, Ex. C. at 31-33, 40-41 (describing process for establishing the ALLL and the Provision)).

the further deterioration in SunTrust's loan portfolio.  Again, Plaintiff's bald

assertions are insufficient to establish falsity.  *See In re Coca-Cola Enters Sec.

Litig.*, 2007 WL 2904160, at *2 (N.D. Ga. Oct. 3, 2007) (finding materially false

statements were not alleged with sufficient particularity because plaintiffs alleged

no facts tying channel stuffing allegations to false financial statements, leaving

"the Court and the Defendants . . . totally in the dark as to which financial

statements were false and by how much," and leaving the effect of improper

practices "totally . . . for speculation and conjecture"); *In re BellSouth Corp. Sec.

Litig.*, 355 F. Supp. 2d 1350, 1371-73 (N.D. Ga. 2005) (holding that materially

false and misleading statements regarding bad debt reserves not were pleaded

sufficiently where plaintiff failed to allege what portion of financial statement

entry was attributable to alleged fraudulent conduct).

## B.     Plaintiff's Section 10(b) Claim, in Reality, Is Based Impermissibly on Fraud by Hindsight.

Stripped of speculation and conclusions, the only ***facts*** alleged by Plaintiff in

support of its theory that SunTrust intentionally misclassified loans for quarter-end

reporting purposes in Q2 and Q3 2008 are the increases to nonperforming loans,

net charge-offs, the ALLL, and the Provision reported by SunTrust in Q4 2008.

(¶ 114.)  It is well-established, however, that pointing to later events and

disclosures as evidence that a company should have acted or made disclosures

earlier—*i.e.*, fraud by hindsight—does not state a claim for securities fraud.  *See, e.g., In re Serologicals Sec. Litig.*, 2003 U.S. Dist. LEXIS 27465, at *39 (N.D. Ga. Feb. 20, 2003) (holding that "securities laws do not entitle plaintiffs to bring claims based on fraud by hindsight" and dismissing Section 10(b) claims where "[o]nce boiled down to the factual allegations, without the plaintiffs' hyperbole, the instant complaint rests upon the bald assertion that [the company's] failure to take an impairment charge [earlier] was fraudulent . . . because of timing").[12]

Accordingly, Plaintiff's Section 10(b) claim should be dismissed.

## III.    PLAINTIFF'S ALLEGATIONS DO NOT GIVE RISE TO A "STRONG INFERENCE" OF SCIENTER.

The FAC fails to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b).  Moreover, any inference of scienter drawn from Plaintiff's allegations is not "plausible or reasonable," let alone "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314; *see Income Trust v. Jabil Circuit, Inc.,* 2010 U.S. App. LEXIS 1009, at *10-19 (11th Cir. Jan.

---

[12] *See also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (holding allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually insufficient to make out a claim of securities fraud) (internal citations omitted); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283  (3d Cir. 1992) (affirming dismissal of claims based on allegations that "charge[d] defendants with essentially failing to predict the future").

19, 2010) (setting forth Eleventh Circuit requirements for scienter and holding that allegations failed to give rise to an inference of scienter "at least as probable as a non-fraudulent explanation"); *Rosenberg,* 554 F.3d at 965.

## A.    Plaintiff's Motive and Opportunity Allegations Do Not Establish a Strong Inference of Scienter.

Plaintiff attempts to establish a strong inference of scienter by alleging that the Individual Defendants had motive to conceal SunTrust's true financial condition.  (¶¶ 100-106.)  In support of this theory, Plaintiff points to a "rumor" heard by a SunTrust "Servicing and Operations Business Systems Analyst (Level III)," and well known industry "rumors" that there might be some interest by Wells Fargo or JP Morgan in acquiring SunTrust.  (¶¶ 102-103.)  Based on nothing more than these rumors, Plaintiff alleges that the Individual Defendants were motivated to commit fraud because they—like many high-ranking corporate executives—had CIC Agreements that might be triggered if such an acquisition eventually came to pass.  (¶¶ 102-03.)

Initially, it is well-established in the Eleventh Circuit that "allegations of motive and opportunity, without more, are not sufficient to demonstrate the requisite scienter."  *CCE*, 510 F. Supp. 2d at 1201 (internal quotations omitted) (citing *Bryant,* 187 F.3d at 1286).  Consequently, even if Plaintiff's allegations

regarding "rumored" acquisitions were otherwise cogent—and they are not—such allegations of motive do not establish scienter in this Circuit.

Even in circuits where motive and opportunity are sufficient to establish scienter, courts consistently have rejected allegations almost identical to those made by Plaintiff. *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 480-81 (S.D.N.Y. 2008) ("As a threshold matter, we see no reason why the amended change-of-control agreements would save plaintiffs' allegations from the ordinary rule that a desire to maintain or increase executive compensation, imputable to all corporate officers, is insufficient."); *In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 127-28 (D. Mass. 2003) (rejecting allegations that defendants engaged in fraud "to make the Company attractive to a buyer in the short run and then position the Company for a sale which would trigger the change of control provisions of their employment cont[r]acts"), *aff'd,* 414 F.3d 187, 201 n.9 ("[W]e agree with the district court that [defendants'] change-in-control agreements did not provide a strong motive to engage in fraud."); *see Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) (affirming dismissal and holding alleged motive to protect and exercise change in control payments insufficient to establish scienter).[13]

---

[13] *See also Glazer Capital Mgmt., LP, v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("We join our sister circuits and hold that evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient

Though Plaintiff alleges that the Individual Defendants entered into new CIC agreements in August 2008, these new agreements provide substantially the same benefits as the previous CIC agreements.[14] (¶ 104.)  Further, the Individual Defendants would not automatically benefit from the CIC agreements upon a merger.  Rather, they would benefit only upon (i) a merger that qualified as a change in control; and (ii) their termination "*without Cause*" or resignation with "Good Reason" within a specified time period.  (Exs. G & H, § 3.1.)  *See Stone & Webster,* 253 F. Supp. 2d at 128 (holding that "the actual terms of the control agreements . . . undermine the factual support for the alleged motive").

Thus, in order to benefit under the CIC agreements, the Individual

---

to raise a strong inference of scienter."); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (holding in merger context that, "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction.  Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent."); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999) (holding allegations of personal gain expected from merger insufficient, and noting that although defendant *"could* have been motivated as the [plaintiffs] allege . . . [h]owever, we are not called on to decide whether the defendants' actions demonstrate a theoretically possible motive. . ." because the PSLRA allows "only those suits which demonstrate a strong inference of scienter to survive a motion to dismiss") (emphasis in original) (internal quotations omitted).

[14] *Compare* Exs. A & B, § 3, *with* Exs. G & H, § 3.  Conceding the similarities, Plaintiff cites not to the August 2008 agreements, but to a February 2008 disclosure summarizing the benefits provided by the 2001 and 2004 CIC agreements.  (¶¶ 18-19.)

Defendants' alleged fraud would have needed to go unnoticed both during due diligence and after a merger.  *Id.*  Plaintiff alleges no facts supporting its speculation that an acquiring bank would not have discovered the alleged fraudulent scheme and that the Individual Defendants would have been able to benefit from the CIC agreements.  *Id.* ("It is inconsistent with the plaintiffs' theory to suppose that a purchaser would not recognize the fraud . . . . The significant gamble inherent in a scheme that would succeed only if a careless buyer acquired S&W at just the right moment is enough to negate any strong inference of scienter on the basis of motive and opportunity.").

Finally, Plaintiff's motive allegations rest on rumors and speculation that Wells Fargo or JP Morgan might be interested in acquiring SunTrust.  (¶¶ 101-102.)  Such speculative allegations are not sufficient to support motive.  *See In re IMAX*, 587 F. Supp. 2d at 480 ("While we would hesitate to find the allegations of motive sufficient even if the complaint had alleged that an acquisition was not just probable, but imminent, the fact that IMAX was merely in the exploratory phase of pursuing an acquisition only highlights the speculative and conclusory nature of the concrete benefit that could have been realized by [defendants]").  Accordingly, the Section 10(b) claim should be dismissed.

**B.    Confidential Witness Statements Regarding Alleged Access to Information Do Not Establish a Strong Inference of Scienter.**

Plaintiff relies on three confidential witnesses in an attempt to establish that the Individual Defendants knew of and directed the misclassification of "hundreds of millions of dollars" in nonperforming loans as in-process for quarter-ending reporting purposes. (¶¶ 46-64.) Initially, Plaintiff has not pleaded particularized facts establishing the alleged misclassification. *See supra* Argument, Part II. Plaintiff also has failed to allege particularized facts showing that the Individual Defendants knew of or participated in any such alleged misclassification.

The Eleventh Circuit recently held that, in considering allegations based upon confidential witness statements:

> the weight to be afforded to allegations . . . depends on the ***particularity of the allegations made*** in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given ***if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame***.

*Mizzaro,* 544 F.3d at 1240 (emphasis added); *see In re Mirant Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 789, at *91-92 (N.D. Ga. Jan 7, 2009) (discrediting a confidential witness because the informant merely gave a "laundry list" of improper conduct, but the statements did not demonstrate proximity, direct relationships to, or knowledge of the alleged fraud allegations); *Pyramid Holdings,*

*Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009) (finding that the confidential witnesses' statements were merely anecdotes, lacking specificity or meaningful context).

Here, two of the CWs relied upon by Plaintiff left SunTrust before the start of the Class Period. CW#2 left SunTrust in 2006, ***two years prior to the start of the Class Period*** (¶ 50), and CW#3 left SunTrust in June 2008, one month before the start of the Class Period (¶ 51). Further, none of the CWs relied upon by Plaintiff:

- worked directly with the Individual Defendants;

- profess any knowledge of any correspondence, discussions, meetings, etc., in which the Individual Defendants participated and during which any alleged misclassification of loans was addressed;

- participated in SunTrust's financial reporting; or

- offer any facts establishing that the Individual Defendants knew of or participated in any alleged wrongdoing during the Class Period (or at any other time).

The statements of the CWs demonstrate, at best, that the Individual Defendants had access to information regarding SunTrust's loan portfolio. (¶¶ 46-64.) It is well-established, however, that allegations regarding access to information, attendance at meetings, and similar circumstances are not sufficient to plead scienter. *See Garfield,* 466 F.3d at 1264 (holding scienter not pleaded by

allegations that defendants attended monthly meetings at which "the aggressive channel stuffing and mounting problems with accounts receivable[s]" were discussed because "[a]bsent from these allegations are any particularized averments of fraud or scienter"); *Skubella v. Checkfree Corp.*, 2008 WL 1902118, at *9 (N.D. Ga. Apr. 25, 2008) (rejecting "boilerplate allegations that the Defendants had access to reports"); *CCE*, 510 F. Supp. 2d at 1200-01 (finding allegations that defendants had access to detailed reports and had a duty to monitor those reports insufficient to establish scienter); *see also Mizzaro,* 544 F.3d at 1250 (finding allegations that defendants "must have known" about alleged fraud insufficient where plaintiff cited "no documentation, communication, or conversation suggesting that the high-ranking defendants knew anything about the alleged fraud").

**CW#1.** CW#1 was a "Monetary Manager" with SunTrust from 2007 until October 2009, and previously held an unspecified position, "which involved running the operations of SunTrust's non-accrual department." (¶¶ 48, 62.) Plaintiff offers no description of CW#1's job function, responsibilities, or interaction with the Individual Defendants during the Class Period, and does not specify whether CW#1's statements—albeit vague and conclusory—relate to the pre-2007 period or his post-2007 role as a "Monetary Manager."

In any event, the information provided by CW#1 is non-specific and unremarkable. CW#1 merely summarizes certain information and reports, which he asserts were "distributed to and reviewed by" a variety of people, ranging from loan officers to "members of SunTrust's senior management," including the Individual Defendants. (¶¶ 48-49, 56.) CW#1 also states that at the end of some unspecified reporting periods, individuals in SunTrust's Special Assets Group transferred certain unspecified loans from "in-process" back to nonperforming or nonaccrual status. (¶ 59.) CW#1 does not provide any factual allegations establishing that the Individual Defendants were involved in or aware of this alleged activity. Rather CW#1 notes simply that the Individual Defendants had offices "within corporate headquarters in close proximity" to Mr. Clerico and Ms. Anderson, the individuals who purportedly "directed" the movement of nonperforming loans. (¶ 58.) CW#1 concludes that that, because "of the close relationships among the Individual Defendants and Messrs. Clerico and Anderson," the Individual Defendants must have been involved in the alleged fraud. (¶ 58.) None of these allegations support a strong inference of scienter. *See Mizzaro*, 544 F.3d at 1247-50 (stating that an absence of allegations of specific communications from the individual defendants regarding the alleged fraud

"weighs strongly against the inference that the named defendants . . . orchestrated the fraud").

*CW#2.*  CW#2 is a former "First Vice President of Commercial Loan Operations" who worked in SunTrust's Richmond, Virginia, office prior to retiring in 2006, two years before the start of the Class Period.  (¶ 50.)  Again, Plaintiff offers no description of CW#2's job function, responsibilities, or interaction with the Individual Defendants, and does not specify the time period to which CW#2's statements apply (other than that they must apply to activities in 2006 or earlier).

Similar to CW#1, CW#2 summarizes a number of reports to which the Individual Defendants may have had access and a meeting that the Individual Defendants did not even attend (both from the pre-Class Period).  (¶ 50.)  CW#2 also states that at some unspecified point in time—at least two years prior to the Class Period—two SunTrust Vice Presidents directed members of the "Special Assets Group" to temporarily reclassify certain unspecified nonperforming loans as "in-process."  (¶ 58.)  Though CW#2 speculates that these Vice Presidents acted at the direction of the Individual Defendants, he, like CW#1, offers no facts to support this supposition.  (¶ 58.)  Again, none of these allegations support a strong inference of scienter.  *See Mizzaro*, 544 F.3d at 1247-50; *see also CCE*, 510 F.

Supp. 2d at 1200 ("[B]ald assertion that the Defendants acted intentionally does not provide the requisite specificity to clear the scienter hurdle.").

CW#2 also states that his refusal—in 2006 or earlier—to temporarily transfer a $21 million loan to "in-process" led to his early retirement, and then speculates as to what might have happened after SunTrust's nonaccrual department was moved from Richmond to Atlanta and Florida. (¶¶ 60-61, 63.) These general statements and speculation do not relate to the Class Period, are irrelevant to Plaintiff's claims in this litigation, and have nothing to do with the Individual Defendants' state of mind. Simply put, they are not the type of particularized facts necessary to establish a strong inference of scienter. *See Mizzaro*, 544 F.3d at 1247 (holding that allegations of widespread fraud based on limited examples of wrongdoing are "not enough" to create a strong inference of scienter); *In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *91 (discounting confidential witness statement where, "although [statement] reveals apparently inappropriate behavior, it neither directly implicates the knowledge or actions of [defendant] nor relates directly to the accounting fraud which is alleged against him").

*CW#3.* CW#3 is a former "Senior Financial Analyst" in SunTrust's "Corporate Reporting and Forecasting Department" who left SunTrust in June 2008, prior to the start of the Class Period. (¶ 56.) Similar to CW#1 and CW#2,

Plaintiff offers no information regarding CW#3's job responsibilities, and CW#3's statements establish only that the Individual Defendants had access to information regarding SunTrust's loan portfolio.  (¶¶ 53, 56.)

Plaintiff's Section 10(b) claim should be dismissed because Plaintiff's allegations based on the statements of these confidential witnesses do not establish a strong inference of scienter.

### C. There Was No Suspicious Insider Trading, Thus Negating a Strong Inference of Scienter.

Notably absent from the FAC are any allegations regarding the sale of SunTrust stock by the Individual Defendants during the Class Period.[15]  As recognized by the Eleventh Circuit and this Court, the lack of insider trading during the Class Period "weighs against inferring scienter."  *Mizzaro*, 544 F.3d at 1253, (citing *Pugh v. Tribune Co.,* 521 F.3d 686, 695 (7th Cir. 2008) ("[t]he fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of the [company's] stock fell.")); *see also CompuCredit*, 2009 U.S. Dist. LEXIS 112839, at *25 ("[A]bsence of allegations [of stock sales] against key players refutes any inference of [scienter].") (quotations omitted).

---

[15] Indeed, the Forms 4 filed during the Class Period demonstrate that the Individual Defendants did not, in fact, divest themselves of beneficial ownership of any SunTrust stock.  (Ex. T.)

**D.    Any Inference of Scienter Is Not As Compelling As Competing Inferences.**

In determining scienter, "court[s] must take into account plausible opposing inferences." *Rosenberg,* 554 F.3d at 965 (quoting *Tellabs*, 127 S. Ct. at 2504-05). In its January 22, 2009 press release, SunTrust stated that "***[t]he Company's 2008 and fourth quarter results were adversely impacted by credit-related charges that reflect the dramatic deterioration in the economy, especially during the fourth quarter.***"  (¶ 111 [emphasis in FAC]; Ex. S, Ex. 99.1 at 1.)

Plaintiff has alleged no particularized facts casting doubt on SunTrust's statement that increases in nonperforming loans, net charge-offs, the ALLL, and the Provision were caused by the undisputed "dramatic deterioration in the economy," let alone particularized facts sufficient to create a cogent and equally or more compelling inference of scienter.  Therefore, the Court should dismiss Plaintiff's Section 10(b) claim.  *See Skubella*, 2008 WL 1902118, at *9 (finding inference of nonfraudulent intent more compelling based upon the "totality of the situation" and "ignoring the boilerplate recitations endemic to these types of pleadings").

## IV.   THE ALLEGED GAAP VIOLATIONS DO NOT SALVAGE PLAINTIFF'S SECTION 10(b) CLAIM.

Plaintiff's general allegations that SunTrust's financial statements violated GAAP add nothing to Plaintiff's Section 10(b) claim.  (¶¶ 116-132.)  It is well-established that GAAP violations must be pleaded with particularity.  *E.g., In re Mirant,* 2009 U.S. Dist. LEXIS 789, at *78-79 ("Because GAAP provides accountants with a wide range of discretion, GAAP violations must be pled with particularity.").  "Accordingly, plaintiffs must plead pertinent facts, including particular transactions as well as the underlying basis for any figures asserted by Plaintiffs, demonstrating that the specified accounting principal applies." *Id.; accord In re Serologicals,* 2003 U.S. Dist. LEXIS 27465, at *29-31.

Here, Plaintiff fails to plead GAAP violations with the requisite particularity.  Though Plaintiff cites to Statement of Financial Accounting Standards ("FAS") No. 5 and 114, it fails to identify any specific transactions that allegedly violate GAAP, fails to quantify the amount of any such transactions, and fails to allege what the proper application of GAAP would have yielded.  Nor does Plaintiff address the complex judgments and determinations that are involved in setting the ALLL (*e.g.,* Ex. C. at 10, 31-34, 40-41), let alone allege particularized facts showing that SunTrust's ALLL estimates during the Class Period did not fall within the range of reasonable judgment.  *See* FAS 114 ("Measuring impairment of

a loan requires judgment and estimates, and the eventual outcomes may differ from those estimates."); *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the future."), *aff'd*, 27 F.3d 763 (2d Cir. 1994).

Plaintiff's allegations also contradict the express requirements of GAAP. Under FAS 5 and 114, "a loss should be recognized only if [1] it is probable that the loss has been incurred at the date of the financial statements and [2] the amount of the loss can be reasonably estimated." Emerging Issues Task Force ("EITF") Topic No. D-80A (revised Sept. 2001) at Q.10.[16] EITF further provides:

> Losses should not be recognized before it is probable that they have been incurred, even though it may be probable based on past experience that losses will be incurred in the future. It is inappropriate to consider possible or expected future trends that may lead to additional losses.

*Id.* at "Overview of [GAAP] for Loan Impairment." Here, Plaintiff's conclusory assertions that possible or expected future trends ultimately could have led to

---

[16] *See also In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (holding that to make out a claim under FAS 5, plaintiffs must plead facts demonstrating that defendants had knowledge of losses prior to the issuance of the financial statements). *See generally In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008) (holding that the plaintiffs' failure to address FAS 5's requirement that "losses 'should not be recognized before it is probable that they have been incurred'" rendered the complaint fatally flawed because plaintiffs had not "adequately ple[d] that the losses were 'probable' at the time of reporting, or that the magnitude of the loss could be reasonably estimated").

additional losses in the future do not support recording any losses under GAAP. Plaintiff has not pleaded particularized facts showing that that the losses had been "incurred" at the time the financial statements were issued and that the magnitude of the loss could be reasonably estimated.

Plaintiff's allegations that SunTrust failed to disclose a significant "concentration of credit risk" related to its concentration of mortgage loans in Florida and Georgia do not alter the analysis. (¶¶ 130-131.) First, Plaintiff has not alleged any facts showing that the accounting standards cited by it are applicable here. Second, according to the FAC, the existing risks that should have been disclosed were publicly available months before the Class Period. (¶ 6.) Though SunTrust had no duty to disclose these publicly known risks, *see Landmen Partners, Inc. v. The Blackstone Group, L.P.*, 2009 WL 3029002, at *9 (S.D.N.Y. Sept. 22, 2009), SunTrust did, in fact, disclose precisely the risks of which Plaintiff now complains. (*E.g.*, Ex. C. at 5, 9, 30-35; Ex. I at 20, 57-61; Ex. L at Ex. 99.3; Ex. 0 at 22, 64-69). *See Blackmoss Invs., Inc. v. Aca Capital Holdings, Inc.*, 2010 U.S. Dist. LEXIS 2899, at *24 (S.D.N.Y. Jan. 12, 2010) (holding that disclosure of risks upon which complaint is based renders complaint insufficient as a matter of law).

Finally, Plaintiff's GAAP allegations are based on the same alleged misconduct as the rest of the FAC—*i.e., the* alleged misclassification of nonperforming loans (*see* ¶¶ 121, 123, 125)—and fail for the same reasons addressed in Parts II & III, *supra*. *See CCE*, 510 F. Supp. 2d at 1200. In sum, Plaintiff's bald, boilerplate, and conclusory allegations regarding GAAP violations are, as a matter of law, insufficient to establish either falsity or scienter. *See, e.g., In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1377 (N.D. Ga. 2005) ("[T]he mere assertion that the [allowance for doubtful accounts] calculations violated a financial accounting rule without explanation is akin to pleading a legal conclusion.") (citations omitted); *In re Mirant*, 2009 U.S. Dist. LEXIS 789, at *85 (dismissing Section 10(b) claims where plaintiffs' allegations "would not lead a reasonable person to deem the inference of scienter at least as strong as the opposing inference that [defendant reported results] within accounting discretion").

## V.    DEFENDANTS' STATEMENTS ARE PROTECTED BY THE PSLRA'S SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE.

The PSLRA creates a "[s]afe harbor" for "forward-looking" statements that are (a) "identified" as "forward-looking;" and (b) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §

78u-5(c)(1)(A)(i).[17]  Even intentionally fraudulent statements are protected if they are accompanied by meaningful cautionary language.  *Jabil Circuit,* 2010 U.S. App. LEXIS 1009, at \*24.  Similarly, under the bespeaks caution doctrine, "a forward-looking statement is rendered immaterial as a matter of law when accompanied by meaningful cautionary language."  *Id.* at \*27.

### A.    The Alleged Misstatements Were Forward-Looking.

Forward-looking statements include: (i) a statement containing a projection of revenues, income, earnings per share, capital expenditures, or other financial items; (ii) a statement of the plans and objectives of management for future operations; (iii) a statement of future economic performance; and (iv) any statement of the assumptions underlying or relating to the preceding statements. 15 U.S.C. §78u-5(i)(1)(A)-(D).  "[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact . . . the entire list of factors is treated as a forward-looking statement," subject to the protection of the safe harbor.  *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir.

---

[17] A defendant's forward-looking statement is also protected if a plaintiff fails to show that the statement was made with "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii).  Where, as here, the complaint fails to raise an inference of fraudulent intent, the statements are protected under the safe harbor as well.  *See, e.g., GSC Partners*, 368 F.3d at 239 (affirming dismissal of complaint where plaintiffs failed to demonstrate that defendants had "actual knowledge" of falsity).

1999); *accord Skubella*, 2008 WL 1902118, at *7-8 (stating that though company's historical Q3 performance was not protected, mixed statements of Q3 performance and Q4 expectations were "entitled to safe harbor protection").

Here, the allegedly false or misleading statements were forward-looking because all involved a mix of historical information and opinions regarding SunTrust's financial performance going forward. (¶¶ 65-99.)[18] Further, each document alleged to contain a misstatement expressly stated that it contained "forward-looking statements," and each conference call was prefaced with a reminder that forward-looking statements would be made during the course of the call.[19] This is sufficient to identify the alleged misstatements as forward-looking. *See, e.g., Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591-92 (N.D. Tex. 2004) (finding press release adequately identified particular paragraphs as forward-looking where it stated that it "contain[ed] forwarding-looking statements"); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008) (finding

---

[18] Many of these statements also qualify as "puffery" or "soft information" (*see* ¶¶ 65, 80, 82, 94-95, 97), and therefore are not actionable under the securities laws. *E.g., In re S1 Corp. Sec. Lit.*, 173 F. Supp. 2d 1334, 1350 & n.13 (N.D. Ga. 2001) (collecting cases and holding that "[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions").

[19] Ex. 3 at 4, Press Release ("PR") at 14-15; Ex. F at 2; Ex. I at 36-37; Ex. J at 3-4, Presentation at 2; Ex. K at 2; Ex. L at 2, PR at 17, Ex. 99.3; Ex. M at 2; Ex. 9 at 2, PR at 2; Ex. O at 40; Ex. P at 2; Ex. Q at 2.

press release sufficient where it cautioned "that statements containing words such
as 'expect' were forward-looking").

### B. The Alleged Misstatements Were Accompanied by Meaningful Cautionary Language.

All of Defendants' allegedly misleading statements were accompanied by
meaningful cautionary language. The allegedly false statements issued prior to
October 23, 2008, included their own risk disclosures and explicitly incorporated
the risk disclosures contained in SunTrust's 2007 Form 10-K. (*See supra* note
19.)[20] SunTrust's 2007 10-K specifically emphasized the risks of which Plaintiff
now complains:

- **Weakness in the economy and in the real estate market, including
  specific weakness within our geographic footprint, has adversely
  affected us and may continue to adversely affect us.**
  If the strength of the U.S. economy in general and the strength of the local
  economies in which we conduct operations declines, or continues to decline,
  this could result in, among other things, a deterioration of credit quality or a
  reduced demand for credit, including a resultant effect on our loan portfolio
  and allowance for loan and lease losses. A significant portion of our
  residential mortgages and commercial real estate loan portfolios are
  composed of borrowers in the Southeastern and Mid-Atlantic regions of the
  United States, in which certain markets have been particularly adversely
  affected by declines in real estate value, declines in home sale volumes, and
  declines in new home building. These factors could result in higher
  delinquencies and greater charge-offs in future periods, which would
  materially adversely affect our financial condition and results of operations.

---

[20]  SunTrust and the Individual Defendants similarly incorporated risk disclosures
during the conference calls at issue. (*See supra* note 19.)

- **Weakness in the real estate market, including the secondary residential mortgage loan markets, has adversely affected us and may continue to adversely affect us.**
  . . . Declining real estate prices and higher interest rates have caused higher delinquencies and losses on certain mortgage loans, particularly Alt-A mortgages and home equity lines of credit and mortgage loans . . . These trends could continue. These conditions have resulted in losses, write downs and impairment charges in our mortgage and other lines of business, especially in the third and fourth quarters of 2007. Continued declines in real estate values, home sales volumes and financial stress on borrowers . . . could have further adverse effects on borrowers that result in higher delinquencies and greater charge-offs in future periods, which adversely affect our financial condition or results of operations. . . .

- **Recently declining values of residential real estate may increase our credit losses, which would negatively affect our financial results.**
  . . . Many of our loans are secured by real estate (both residential and commercial) in our market area. A major change in the real estate market, such as deterioration in the value of this collateral, or in the local or national economy, could adversely affect our customer's ability to pay these loans, which in turn could impact us . . . . We cannot fully eliminate credit risk, and as a result credit losses may occur in the future.

- **Deteriorating credit quality, particularly in real estate loans, has adversely impacted us and may continue to adversely impact us.**
  We have experienced a downturn in credit performance . . . and we expect credit conditions and the performance of our loan portfolio to continue to deteriorate in the near term. This deterioration has resulted in an increase in our loan loss reserves throughout 2007, which increases were driven primarily by residential real estate and home equity portfolios. Additional increases in loan loss reserves may be necessary in the future. Deterioration in the quality of our credit portfolio can have a material adverse effect on our capital, financial condition and results of operations.

(Ex. C. at 5, 9; *see id.* at 30-35.)  *See In re Merck & co., Inc., Sec. Litig.*, 432 F.3d

261, 273 n.11 (3d Cir. 2005) (affirming dismissal of complaint where "[t]he

cautionary language was sufficient because the press release incorporated by reference the cautionary statements in Merck's 2000 Form 10-K, as well as those in its periodic reports").

In response to the unprecedented economic turmoil in late 2008, SunTrust made similar and additional disclosures on October 23, 2008, and the subsequent statements incorporated these updated disclosures. (*See supra* note 19.) The October 23, 2008 risk disclosures included even more warnings, and noted that:

- **Difficult market conditions have adversely affected our industry**
  Dramatic declines in the housing market over the past year, with falling home prices and increasing foreclosures, unemployment and under-employment, have negatively impacted the credit performance of real estate related loans and resulted in significant write-downs of asset values by financial institutions . . . . The resulting economic pressure on consumers and lack of confidence in the financial markets has adversely affected our business, financial condition and results of operations. Market developments may affect consumer confidence levels and may cause adverse changes in payment patterns, causing increases in delinquencies and default rates, which may impact our charge-offs and provision for credit losses. A worsening of these conditions would likely exacerbate the adverse effects of these difficult market conditions on us and others in the financial institutions industry.

(Ex. L at Ex. 99.3.)  SunTrust also added detailed disclosures regarding, among other things, "unprecedented" levels of market volatility, the adverse impact to SunTrust caused by other banks' worsening condition, uncertainty regarding the stabilization effects of TARP, and SunTrust's significant exposure to credit risk and the imprecision inherent in setting loss reserves. (*Id.*)  In short, Defendants'

statements are protected by the PSLRA's safe harbor and the bespeaks caution
doctrine, and Plaintiff's Section 10(b) claim should be dismissed.

## VI.  PLAINTIFF HAS NOT ADEQUATELY ALLEGED LOSS CAUSATION.

To plead loss causation, a plaintiff must allege that a "misstatement or
omission concealed something from the market that, when disclosed, negatively
affected the value of the security."  *In re Witness Systems, Inc. Sec. Litig.*, 2008
U.S. Dist. LEXIS 109173, at *23 (N.D. Ga. Mar. 31, 2008 (quoting *Lentell* v.
*Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005)); *see Dura,* 544 U.S. at 345
(stating that the purpose of securities law is "not to provide investors with broad
insurance against market losses, but to protect them against those economic losses
that misrepresentations actually cause").

Here, the FAC fails to plead the requisite causal connection between the
alleged misrepresentations and Plaintiff's alleged losses.  Initially, the mere fact
that SunTrust recorded additional nonperforming loans and increased its ALLL
and net charge-offs in Q4 2008 does not reveal that SunTrust's prior statements
were false and misleading; it reveals only that SunTrust reacted to worsening
economic conditions.  *See CCE*, 510 F. Supp. 2d at 1205 (finding loss causation
not pleaded where plaintiffs failed to state a "nexus" between the disclosure in
which the truth allegedly was reveled and the alleged fraud).

Here, Plaintiff cannot avoid the fact that SunTrust's stock declined in tandem with the economic tailspin of late 2008. Indeed, prior to the "revelation" of the alleged fraud, SunTrust's stock price had fallen 75% from a Class Period high of $59.20 on September 19, 2008, to a Class Period low of $15.07 on January 20, 2009.[21] *See 60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) ("The essential point is that by the time of the disclosures which allegedly caused the economic loss . . . the stock had already lost almost all its value—declining from 24.75 on January 25 to 5.01 on June 14."). Plaintiff wholly ignores these facts in seeking to ascribe the January 22, 2009 drop in SunTrust's stock price to the alleged "revelations" regarding the purported fraud.[22] (¶ 115.)

As the Supreme Court has recognized, a stock drop could be caused "not [by] the earlier misrepresentation, but [by] changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts,

---

[21] *See* Ex. V (chart showing the price of SunTrust's stock during the Class Period). The January 22, 2009 drop is not even the largest drop during the Class Period. For example, on September 29, 2008, SunTrust's stock price dropped from a prior close of $50.48 to $38.75, a 23% drop. The Court may take judicial notice of stock prices on a motion to dismiss. *See, e.g., Greenhouse* v. *MCG Capital Corp.,* 392 F.3d 650, 655 & n.4 (4th Cir. 2004).

[22] Plaintiff also alleges a "partial disclosure" on December 9, 2008, when SunTrust announced that it planned to seek an additional $1.4 billion under TARP. (¶¶ 107-109.) Plaintiff does not allege what was "partially disclosed," and, in any event, the statements had nothing to do with nonperforming loans.

conditions, or other events." *Dura,* 544 U.S. at 343; *see CompuCredit*, 2009 U.S.

Dist. LEXIS 112839, at *28 (finding loss causation not pleaded adequately where,

among other things, "what [was] most likely [was] that any loss sustained by the

Plaintiff was due to general market conditions"). Here, Plaintiff cannot

"distinguish the alleged fraud from the 'tangle of [other] factors' that affect a

stock's price." *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 568 F.

Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura*, 544 U.S. at 343). Therefore,

Plaintiff cannot plead loss causation, and its Section 10(b) claim should be

dismissed. *See id.* ("[W]hen the plaintiff's loss coincides with a market-wide

phenomenon causing comparable losses to other investors, the prospect that the

plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when

it has not adequately ple[]d facts which, if proven, would show that its loss was

caused by the alleged misstatements as opposed to intervening events.") (internal

quotations omitted).[23]

---

[23] *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 U.S. Dist. LEXIS 37993, at *25-43 (S.D.N.Y. May 8, 2008) (dismissing complaint that failed to distinguish loss from the "collapse of the Internet sector" and "other bad news," and where the "long, steady decline" in the value of the company's stock "proceeded apace with the 'crater[ing]' of the Internet sector"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 245-246 (S.D.N.Y. 2006) (dismissing claims where "both market-wide and industry-specific stock indices declined dramatically," and the company's "stock performance mimicked [industry tracking] indices remarkably closely"); *In re Tellium, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 19467,

## VII.  PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED.

Control person liability under Section 20(a) of the Exchange Act is contingent upon establishing a primary violation.  *Rosenberg*, 554 F.3d at 966-67 (dismissing Section 20(a) claims).  As discussed above, the FAC fails to sufficiently allege primary liability under Section 10(b), and, accordingly, Plaintiff's claims under Section 20(a) must be dismissed.  *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the FAC in its entirety.

---

at *88 (D.N.J. June 30, 2005) (holding that complaint did not show "that the misrepresentations of any of the Defendants proximately caused the lower price of [the company's] stock, as opposed to the uncommonly severe decline in stock prices across all sectors of the U.S. economy and in the telecommunications sector in particular during the Class Period") (internal quotations and citations omitted).

Respectfully submitted, this 23rd day of February, 2010.

TROUTMAN SANDERS LLP

*/s/ Thomas B. Bosch*
J. TIMOTHY MAST
Georgia Bar No. 476199
tim.mast@troutmansanders.com
THOMAS B. BOSCH
Georgia Bar No. 068740
tom.bosch@troutmansanders.com

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3900 (facsimile)

Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE OF LOCAL RULE 7.1D

I hereby certify that the foregoing brief has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1B.

*/s/ Thomas B. Bosch*
THOMAS B. BOSCH

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing MEMORANDUM OF

LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS was

electronically filed with the Clerk of Court using the CM/ECF system, which

serves notification of such filing to all CM/ECF participants.

This 23rd day of February, 2010.

*/s/ Thomas B. Bosch*

THOMAS B. BOSCH

Georgia Bar No. 068740
