UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>vs.<br><br>SUNTRUST BANKS, INC., JAMES M. WELLS III and MARK A. CHANCY,<br><br>Defendants. | Civil Action No.<br>1:09-CV-0617-TWT<br>(ECF Case) |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


STEVEN J. ESTEP
Georgia Bar No. 250450
**Cohen Cooper Estep & Allen**
3350 Riverwood Parkway, Ste. 2220
Atlanta, GA 30339
Telephone: 404-814-0000
Facsimile: 404-616-8900
*Liaison Counsel for Class*

Paul O. Paradis
Gina M. Tufaro
Justin Shane
**Horwitz, Horwitz & Paradis**
Attorneys at Law
405 Lexington Avenue, 61st Floor
New York, NY 10174
Telephone: 212-986-4500
Facsimile: 212-986-4501
*Lead Counsel for Class and Attorneys for Lead Plaintiff Waterford Township General Employees Retirement System*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ...................................................................................4

   Defendants' Materially False and Misleading
   Statements Concerning SunTrust's Capital...........................................................6

   Defendants' Materially False and Misleading
   Statements Concerning SunTrust's Non-Performing Loans...............................10

   Defendants Wells and Chancy Personally
   Directed and Supervised The Fraudulent Scheme ...............................................14

   Defendants' Fraud Is Revealed ......................................................................16

ARGUMENT .........................................................................................................17

   I.   Pleading Requirements under Fed. R. Civ. P. 12(b)(6)................................17

   II.   Plaintiff Has Stated a Claim for Violations of Section 10(b) ...................17

     A.   Plaintiff Has Satisfied the Pleading Requirements of Rule 9(b) ...............18

       1.   The Complaint Alleges Particularized
          Facts Detailing Defendants' Fraud ......................................................20

       2.   SunTrust's Reported Loan Balances Are Wholly Consistent with
          Plaintiff's Theory ................................................................................24

       3.   Plaintiff Need Not Allege The Exact Amount By Which Defendants'
          Fraud Impacted SunTrust's Financials ...............................................26

     B.   Plaintiff Alleges Facts Creating a Strong Inference that Defendants Acted
       with Scienter.........................................................................................29

       1.   Plaintiff Alleges That Defendants
          Directly Participated in the Scheme to Defraud ..................................30

2.   Plaintiff's Allegations Regarding Confidential Witnesses Establish A Strong Inference Of Scienter. ...............................................................32

3.   Defendants' Positions at SunTrust Further Demonstrate That They Possessed Knowledge of the Fraudulent Scheme...................................33

4.   Defendants' Motive Further Corroborates a Strong Inference of Scienter..............................................................................................36

C.   Plaintiff Alleges Facts Sufficient to Establish Loss Causation.................37

D.   The Complaint Alleges Defendants' GAAP Violations with Particularity ............................................................................................39

E.   Defendants' Cannot Avail Themselves of the PSLRA's Safe Harbor or the "Bespeaks Caution" Doctrine ...............................................................42

CONCLUSION........................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008).......................................................passim

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................17

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) .........................................................................35

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .........................................................................22

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ...........................................................................42

*In re 3Com Sec. Litig.*,
761 F. Supp. 1411 (N.D. Cal. 1990)............................................................23, 26

*In re BellSouth Corp. Sec. Litig.*,
 355 F. Supp. 2d 1350 (N.D. Ga. 2005)..............................................................28

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ............................................................................39

*In re Choicepoint, Inc., Sec. Litig.*,
C. No. 1:05-CV-00686-JTC, 2006 U.S. Dist. LEXIS 97903 (N.D. Ga.
Nov. 19, 2006) ...................................................................................................38

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
510 F. Supp. 2d 1187 (N.D. Ga. 2007) ("*CCE*").......................................passim

*In re Coca-Cola Enters. Sec. Litig.*,
 C.A. No. 1:06-CV-0275-TWT, 2007 U.S. Dist. LEXIS 74227 (N.D. Ga.
Oct. 3, 2007) ......................................................................................................28

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................................33, 34

*In re First Merchants Acceptance Corp. Sec. Litig.*,
No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) ...........39

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008) (*"Merrill"*) ..............................................39

*In re Mesa Airlines, Inc. Sec. Litig.*,
Master File No. 94-690 JC/WWD, 1996 U.S. Dist. LEXIS 22820
(D.N.M. May 31, 1996) ..................................................................................23

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................19, 22, 31

*In re Premiere Techs., Inc. Sec. Litig.*,
C.A. No. 1:98-CV-1804-JOF, 2000 U.S. Dist. LEXIS 19207 (N.D. Ga.
Dec. 8, 2000) ..................................................................................................30, 42

*In re Scientific Atlanta, Inc., Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002) .........................................................40, 43

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) ...................................................................38

*In re Westinghouse Sec. Litig.*
(*"Westinghouse"*), 90 F.3d 696 (3d Cir. 1996)................................19, 41, 42, 43

*In re Witness Sys., Inc., Sec. Litig.*,
2008 U.S. Dist. LEXIS 109173 (N.D. Ga. Mar. 31, 2008) ...............................37

*In re World Access Sec. Litig.*,
119 F. Supp. 2d 1348 (N.D. Ga. 2000)...............................................................27

*Marrari v. Med. Staffing Network Holdings, Inc.*,
395 F. Supp. 2d 1169 (S.D. Fla. 2005) ...............................................................42

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) ...................................................................passim

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ..............................................................................36

*Robbins v. Koger Props., Inc.*,
116 F.3d 1441 (11th Cir. 1997) ..........................................................................39

*Rosenberg v. Gould*,
    554 F.3d 962 (11th Cir. 2009) ............................................................................29

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) .......................................................................19

**STATUTES AND RULES**

15 U.S.C. § 78u-4(b)(2) .........................................................................................29

15 U.S.C. § 78u-5(c)(1) .........................................................................................42

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the
    "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) .....................................passim

Fed. R. Civ. P. 9(b) .........................................................................................passim

Fed. R. Civ. P. 12(b)(6)................................................................................1, 17

## PRELIMINARY STATEMENT

Lead Plaintiff Waterford Township General Employees Retirement System brings this securities fraud class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased common stock of Defendant SunTrust Banks, Inc. ("SunTrust" or the "Company") between July 22, 2008 and January 21, 2009 (the "Class" and "Class Period" respectively). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder.  Defendants have moved to dismiss Plaintiff's First Amended Class Action Complaint (the "Complaint") under Fed. R. Civ. P. 12(b)(6).  For the reasons set forth herein, Defendants' Motion To Dismiss must be denied in its entirety.

This securities fraud class action arises from Defendants' fraudulent scheme to artificially inflate the market price of SunTrust Bank's common stock throughout the Class Period.  Defendants conducted the fraudulent scheme detailed in the Complaint to conceal the fact that approximately a **half a billion dollars** worth of real estate loans that SunTrust had made to sub-prime, Alt-A and construction loan borrowers were in default, and SunTrust was therefore in dire need of a **$4.9 billion dollar capital infusion**.

Defendants' fraud involved intentionally misclassifying hundreds of millions of dollars of "Non-Performing" loans in SunTrust's loan portfolio as "In-Process" loans in order to artificially decrease the number and dollar amount of the "Non-Performing" loans and net-charge offs reported by SunTrust in its filings with the United States Securities and Exchange Commission ("SEC") during the Class Period.    The deliberate misclassification scheme was undertaken by Defendants in order to fraudulently misrepresent SunTrust's financial position by publicly under-stating the Company's "Non-Performing" loans, net charge offs, Allowance for Loan and Lease Losses ("ALLL"), and ultimately, over-stating SunTrust's capital and net income – all of which caused the market price of SunTrust common stock to become and remain artificially inflated throughout the Class Period.  Cplt. ¶ 7.

Defendants' fraudulent scheme was elegant in its simplicity and extremely effective at masking the fact that the publicly reported value of SunTrust's: (i) loan portfolio was artificially inflated by approximately a half a billion dollars; and (ii) SunTrust's capital was materially overstated throughout the Class Period.  Cplt. ¶¶ 7, 86.  Indeed, the only truly remarkable aspect of Defendants' fraudulent scheme is the fact that this fraud was personally conceived of, directed and overseen by SunTrust's very own Chief Executive Officer and Chief Financial Officer, defendants James M. Wells and Mark A. Chancy.  Cplt. ¶¶ 55, 58.  As detailed in

the Complaint, SunTrust's CEO and CFO were direct participants in virtually all aspects of this fraudulent scheme throughout the entirety of the Class Period, and both were personally highly motivated to engage in this fraud because they each stood to make millions of dollars by their misconduct. Cplt. ¶ 9.

Defendants' fraud was finally revealed on January 22, 2009, when SunTrust reported its 2008 fourth quarter earnings and stunned Class members by announcing that its provision for loan losses had increased by nearly $1 billion ($958.3 million). This staggering increase stunned market participants because Defendants' had made a series of strong positive statements throughout the Class Period that were intended to – and did – assure Class members that: (i) SunTrust was highly capitalized; (ii) the deterioration to its loan portfolio had slowed; and (iii) its loan loss provisions were more than adequate. The fourth quarter increase to loan loss provisions and ALLL caused SunTrust to suffer a net operating loss for the quarter and resulted in an 11% plunge in the price of SunTrust's common stock the following day. Plaintiff and members of the Class were damaged when they unknowingly purchased shares of SunTrust common stock at such artificially inflated prices throughout the Class Period. Cplt. ¶ 8.

Not surprisingly, Defendants deny the existence of any fraudulent scheme and argue that the sharp decline in the market price of SunTrust common stock was caused by the "global economic free-fall" that resulted from the "economic

collapse in late 2008." Def. Br. at 1-2. Plaintiff's Complaint, however, demonstrates both the factual falsity of Defendants' argument, and the stunning degree of deliberateness with which Defendants acted to deceive Class members and financial market analysts alike about the truth concerning SunTrust's loan portfolio and capital base throughout the Class Period.

## STATEMENT OF FACTS

In seeking dismissal of Plaintiff's Complaint, Defendants attempt to liken SunTrust to its competitors and argue that Defendants are not liable for the losses incurred by Class members because those losses were caused by the "economic crisis that affected SunTrust and every other financial institution" in late 2008 -- rather than Defendants' own fraudulent conduct.

As demonstrated by the highly particularized allegations set forth in the Complaint, Defendants' arguments fail for several reasons. First, Defendants' current attempt to liken SunTrust to its peers stands in stark contrast to the series of materially false and misleading statements made by Defendants during the Class Period that were intended to -- and did -- lead Class members and financial market analysts alike to believe that SunTrust was unlike its peers because SunTrust was strongly capitalized and properly recorded its "Non-Performing" loans on its books.

As the financial crisis was unfolding during the late summer and fall of 2008, the United States Department of the Treasury ("Treasury") acted to prevent the spread of the financial contagion. One measure taken by the Treasury involved the submission of draft legislation to Congress on September 20, 2008, that authorized the Treasury to purchase troubled assets from banks and other financial institutions. This initiative, and the legislation that was eventually enacted into law, became known as the "Troubled Asset Relief Program" or "TARP" Program.

While the birth of the TARP Program helped to quell some of the panic that existed in the financial markets during the late summer and fall of 2008, the creation of the TARP Program also fueled an immediate frenzy among financial market participants to uncover which banks and financial institutions: (i) were the weakest among their peers; (ii) most in need of assistance from the TARP Program; and (iii) would ultimately survive. In an effort to uncover the truth about the health of banking institutions across the United States, market analysts and investors in bank sector stocks quickly began to search for clues that would help them assess the relative health of these institutions vis-à-vis their competitors.

Although they were not legally obligated to do so, almost universally, management at financial institutions across the country responded by making a series of statements and pronouncements concerning the health – or lack thereof – of their respective financial institutions. Financial market participants quickly

utilized these statements to sort bank stocks into two categories – namely those that they perceived as "healthy" and that they therefore wanted to own, and those that were "weak" and were to be avoided.  It is against this factual backdrop that the series of materially false and misleading statements detailed in the Complaint that were made by Defendants during the Class Period must be assessed.

**Defendants' Materially False and Misleading**
**Statements Concerning SunTrust's Capital**

During the height of the financial maelstrom of 2008, panic and speculation ran rampant that SunTrust would not survive the crisis because it was among the U.S. banks that were most heavily exposed to sub-prime, Alt-A and construction loans.  Because of this, many financial analysts viewed SunTrust as severely undercapitalized.  During the week of July 14, 2008, CreditSights analyst David Hendler reported that he believed SunTrust would need to set aside an additional $5 billion to cover future loan losses.[1]  Similarly, on July 23, 2008, Reuters reported that Friedman Billings Ramsey analyst Scott Valentin had reiterated his "underperform rating" on SunTrust and stated, "unless the company decides to divest assets, or it issues additional hybrid capital securities, **we do not believe current capital levels are sufficient for the next two and a half years**."

---

[1]    Hendler specifically estimated that the $5 billion number would include $2.5 billion for home equity loans, almost $1.4 billion for construction loans and nearly $500 million for residential mortgage loans made to sub-prime and Alt-A borrowers.    Analyst Hendler's observation later proved prescient when SunTrust ultimately sought and received a $4.9 billion capital injection through the TARP Program.  Cplt. ¶ 107.

(Emphasis added). In reaction to analyst Valentin's report, the price of SunTrust common stock fell 9% from $43.21 to $39.28 on July 24, 2008.

In furtherance of their fraudulent scheme to artificially inflate the price of SunTrust stock, Defendants fiercely denied the truth of analysts' statements and responded by making a series of materially false and misleading statements concerning SunTrust's capital that were intended to -- and did -- mislead Class members and analysts to believe that SunTrust was solidly capitalized. For example, during the September 10, 2008 *Lehman Brothers Global Financial Services Conference*, Defendant Chancy made the following materially false and misleading statements concerning SunTrust's capital: "[**W**]**e believe that we have a very diversified franchise with a solid capital and liquidity position** that provides downside protection. . . we are continuing to evaluate our capital position. **We believe that we have adequate capital**, given our current views on the credit environment." (Emphasis added). Cplt. ¶ 80. Similarly, on October 23, 2008, SunTrust hosted a conference call with analysts following the release of SunTrust's results for the quarter ended September 30, 2008. During this conference call, Defendant Wells made the following materially false and misleading statements concerning SunTrust's capital, "[B]ased on the results of actions taken during the last two quarters and our credit outlook today **we believe we are appropriately capitalized**." (Emphasis added). Cplt. ¶ 83.

The falsity of Defendants' representations that SunTrust was "solid[ly]" and "appropriately" capitalized is perhaps best demonstrated by the fact that, on October 27, 2008 -- **a mere four days after Defendant Wells had falsely boasted of SunTrust being "appropriately capitalized" – SunTrust announced it was seeking a massive $3.5 billion capital infusion from the Treasury by participating in the TARP Program**.  Cplt. ¶ 88.  Remarkably, however, even with this stunning announcement, Defendants had not yet finished making materially false and misleading statements concerning SunTrust's capitalization.

On November 7, 2008, SunTrust and Defendant Wells participated in the *BancAnalyst Association of Boston Conference* where Defendant Wells continued to make materially false and misleading statements concerning SunTrust's capital by stating,

> I'd like to be clear that **we applied for $3.5 billion, and that was the final approved amount.  So, you ask, why did we not take the maximum 3%?  Frankly, there were a lot of reasons.  First, as I just articulated, we are currently well-capitalized** . . .  So in conclusion, Suntrust is well-positioned to weather the current storm.  **A diversified business mix . . . coupled with solid capital and liquidity, provide a firm base from which to grow our business**.

Cplt. ¶ 94.[2]

---

[2]     Financial market participants reacted to Defendant Wells' materially false and misleading statements in precisely the manner that Defendants had hoped they would.  Defendant Wells' statements immediately halted a two-day cumulative stock price decline of 14.7% and caused SunTrust's common stock to rebound by 4.6% and close at $38.68 per share.  Cplt. ¶ 97.

On November 13, 2008, Defendants attended the *Merrill Lynch Banking &*
*Financial Services Conference*, where Defendant Chancy also continued to make
materially false and misleading statements concerning SunTrust's capital.   In
response to analysts' questions concerning why SunTrust had only taken $3.5
billion in TARP Program funds when SunTrust could have taken a maximum of $
$4.9 billion, Chancy falsely stated:

> We went through, as you might expect, a pretty thorough review,
> looking at our own capital position as we exited the third quarter. **We**
> **did some sensitivity analysis around our credit metrics and our**
> **capital position, which we feel very good about**.
>
> \*        \*        \*
>
> **We looked at our own capital position. We looked at the stress**
> **scenario on our credit portfolio. We looked at the ability for us to**
> **support loan growth, which is a primary driver for the capital, as**
> **you know.** We also looked at the capital level that would support
> some potential acquisitions to the extent that they made economic
> sense for our shareholders on a long-term basis.
>
> **We took all of those different factors into consideration when**
> **determining that the $3.5 billion -- which, like you said it, is a little**
> **bit more than 2% -- was the right number for us based on those**
> **reviews.**

(Emphasis added).   Cplt. ¶ 97.   The material falsity of Defendant Chancy's
statement that SunTrust had only sought $3.5 billion in TARP funds, rather than
the maximum allowable $4.9 billion in TARP funds because the $3.5 billion
amount was "the right number" and purportedly all that SunTrust needed to bolster
its capital, was quickly revealed just days later.  On  December 9, 2008, SunTrust

once again stunned Class members and analysts alike when it announced that it had applied for and been approved to receive an additional $1.4 billion capital injection from the TARP Program – the maximum amount available to SunTrust under the TARP Program.  Cplt. ¶ 107.  Following this announcement, SunTrust's common stock price plunged $3.72 per share to $30.04 per share – an 11% decrease in a single day.  Cplt. ¶ 107.

**Defendants' Materially False and Misleading**
**Statements Concerning SunTrust's Non-Performing Loans**

In addition to doubting that SunTrust was adequately capitalized to weather the financial crisis, analysts and investors also seriously questioned whether SunTrust had sufficiently reserved for loan losses on its mortgage loans made to sub-prime, Alt-A and construction loan borrowers.

Defendants once again denied analysts' suggestions that SunTrust had under-reserved for its loan losses and deliberately responded by making a series of materially false and misleading statements concerning SunTrust's ALLL account and loan loss provision expense that were intended to -- and did -- mislead Class members and analysts to believe that SunTrust had properly recorded and reserved for the loan losses in its loan portfolio.

On July 22, 2008, Defendant Wells made the following false and misleading statements,

> **Provision expense declined from the first quarter of 2008, as the slowing pace of credit deterioration necessitated a smaller increase in the reserve**.
>
>                 *     *     *
>
> There were, however, some slightly more positive notes. **Early stage delinquencies have remained stable in the 1.5% range for the last six months, and the additional provision expense required to increase the reserve declined by half.**

Cplt. ¶¶ 65, 66.  (Emphasis added).  On July 22, 2008, SunTrust hosted a conference call with analysts following the release of SunTrust's results for the quarter ended June 30, 2008.  During this conference call, Defendant Chancy made the following materially false and misleading statements concerning SunTrust's loan loss provision and overall loan delinquencies,

> **[loan loss] provision declined as . . . charge-offs increased less than we expected and slowing deterioration in the portfolio necessitated a lower level of reserve building.**
>
>                 *     *     *
>
> **This resulted in provision expense declining by $112 million as compared to the First Quarter.** As expected and communicated during our First Quarter earnings call, **slowing growth and charge-offs and stable overall delinquencies required a lower level of reserve building than in the prior two quarters.**

Cplt. ¶ 67.  (Emphasis added).  During this same conference call, SunTrust Chief Risk and Credit Officer also falsely stated,

> We noted the flattening of the trend in early stage delinquency in the First Quarter presentation.

> **This pattern continued into the Second Quarter, and the overall portfolio's 30 to 89 day delinquency rate has now been basically flat for six months.**

Cplt. ¶ 68.  (Emphasis added).[3]

Defendants continued to make similarly false and misleading statements throughout the Fall of 2008.  For example, during the September 10, 2008 *Lehman Brothers Global Financial Services Conference*, Defendant Chancy made the following materially false and misleading statement,

> **Provision on a quarter-over-quarter basis declined.** It was $448 million in the second quarter, down from $560 million in the first quarter.

> \*      \*      \*

> **As it relates to the fourth quarter, we continue to believe that charge-offs will not be dramatically higher or lower . . .**

> **And as it relates to the allowance,** while we believe that it will continue to grow over the next few quarters, **we believe it will grow at a more modest level than it has in the past couple of quarters. So we are trying to give you some information to develop a view both on charge-offs, as well as provision expense and the allowance percentage**.

Cplt. ¶ 80.  (Emphasis added).

---

[3]     The market and investors swiftly reacted to SunTrust's and the Individual Defendants' positive announcement that credit deterioration was slowing, delinquencies were stable, net charge offs were stable and that SunTrust was adequately reserved for loan losses. SunTrust's common stock skyrocketed from $34.14 per share on July 21, 2008, to close at $39.66 per share on June 22, 2008.  The price of SunTrust's common stock soared even higher still the following day closing at $43.21 per share on June 23, 2008, with approximately 16,605,000 and 19,965,000 shares traded, respectively – more than double the average daily trading volume during the Class Period.  Cplt. ¶ 69.

On October 23, 2008, SunTrust hosted a conference call with analysts following the release of SunTrust's results for the quarter ended September 30, 2008.   During this conference call, SunTrust Chief Risk and Credit Officer Freeman made the following materially false and misleading statement,

> **We remain comfortable with our allowance relative to non-performers in part due to significant charge offs we have already recognized on the real estate secured NPLs and our specific reserve process. . . .  Finally, we have noted the flat trend in early stage delinquency in each of our presentations this year and the pattern continued in the third quarter**

Cplt. ¶ 85.   (Emphasis added).   Defendants continued making similarly false statements during the November 7, 2008, *BancAnalyst Association of Boston Conference* where Defendant Wells falsely stated,

> **The rate of growth in the ALLL was lower than in prior quarters as our expectation of inherent losses in the portfolio increased less than in the prior three quarters**.
>
> Finally, we've noted that **the flat trend in early-stage delinquency** in each of our presentations this year, and that pattern **has continued into the third quarter**. Overall portfolio of 30 to 89-day delinquency was 1.52%, which was up a few basis points from last quarter, but basically at the same level since the end of last year.
>
> **This trend is important and positive, as it signals no significant increase in the rate of new problem credits**.

Cplt. ¶ 94.  (Emphasis added).

13

**Defendants Wells and Chancy Personally**
**Directed and Supervised The Fraudulent Scheme**

At the times Defendants made the foregoing statements, Defendants had actual knowledge that these statements were materially false and misleading because Defendants carefully and actively monitored, reviewed and analyzed SunTrust's Past Due Reports, Nonperforming Loan Reports, Analysis Reports, and Forecasting Binders throughout the Class Period. Because Defendants did so, they had actual knowledge that: (i) SunTrust's nonperforming loans were materially understated by approximately a half a billion dollars throughout the Class Period; (ii) SunTrust's ALLL was materially understated, and its net income, earnings per share and Tier 1 Capital were materially overstated throughout the Class Period; (iii) "early stage delinquencies" had not, as Defendants falsely stated, "remained stable"; and (iv) SunTrust was not "appropriately capitalized," as Defendants falsely stated. Cplt. ¶¶ 70, 74, 76, 78, 81, 86, 89, 92, 93, 96, 99.

As a result of reviewing and analyzing these weekly and monthly reports, and participating in and/or receiving informational reports concerning SunTrust's weekly Nonperforming Loan Meetings held each Thursday, and monthly Forecast Review Meetings that were held every third Wednesday of the month, Defendants had actual up-to-the-minute knowledge of the exact number of nonperforming loans in SunTrust's loan portfolio at all times throughout the Class Period. Cplt. ¶ 56.

Defendants then utilized their extensive knowledge of SunTrust's nonperforming loans to defraud Class members and financial market participants by actively and fraudulently manipulating the nonperforming loan balance that was publicly reported in SunTrust's financial statements and SEC filings throughout the Class Period. Cplt. ¶ 57. According to Confidential Witness #2 ("CW #2"), **the Individual Defendants personally directed other high ranking SunTrust Officers,** including SunTrust Vice President, Neil Clerico and SunTrust Vice President of the Special Assets Group, Kris Anderson, **to temporarily transfer specific nonperforming loans in SunTrust's loan portfolio into an "In-Process" or "Pass-Through" account with an account number in the "17-300" series**. Cplt. ¶ 58. (Emphasis added).

CW #2 explained that by temporarily transferring specific nonperforming loans – many of which had outstanding balances in excess of $1 million – out of SunTrust's loan portfolio and into an "In-Process" or "Pass-Through" account, Defendants were able to fraudulently avoid: (i) classifying these loans as "Nonperforming Loans" for financial statement and SEC reporting purposes, despite the fact that these loans were, indeed, nonperforming loans in SunTrust's loan portfolio; and (ii) charging these loans off, thereby artificially understating SunTrust's actual loan losses and artificially inflating SunTrust's reported earnings throughout the Class Period. Cplt. ¶ 58. According to CW #1, **the Individual**

**Defendants personally directed and supervised, and therefore had actual knowledge of, the fraudulent scheme involving the deliberate misclassification of nonperforming loans as "In-Process" loans** that caused SunTrust's SEC filings to be materially false and misleading throughout the Class Period. Cplt. ¶ 58. (Emphasis added).

**Defendants' Fraud Is Revealed**

Defendants' fraud was finally revealed on January 22, 2009, when SunTrust announced its financial results for the fourth quarter of 2008. On that date, SunTrust revealed the full extent of its financial troubles. In the fourth quarter of 2008, SunTrust's provision for loan losses increased by an astounding $962.5 million, which was $454.6 million greater than the increase in the third quarter. Cplt. ¶ 114. The jump in loan loss provisions and corresponding spike in ALLL was particularly shocking because in the previous three quarters SunTrust's provision for loan losses had increased by only $560 million, $448 million, and $503.7 million, respectively. *Id*. Net Loan Charge-Offs likewise increased to $598.1 million from $392.1 million. *Id*. As a result, SunTrust reported that it had incurred a net operating loss of $236.1 million, (*id*. ¶ 111), which Defendant Wells admitted was "driven primarily by increased reserves for credit, fraud, and mortgage reinsurance losses." *Id*. ¶ 112. With Defendants' fraud at an end and the truth concerning SunTrust's dire financial condition finally having been revealed,

SunTrust's stock plunged by an additional 11% the day following the January 22, 2009 announcement.  *Id.* ¶ 115.

On the basis of the foregoing, it is clear that Plaintiff has satisfied the heightened pleading standard of both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and that Defendants' Motion to Dismiss must be denied in its entirety.

## ARGUMENT

### I.    Pleading Requirements under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Under this standard, Plaintiff need only provide "fair notice of the plaintiff's claim and the grounds upon which it rests."  *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1194 (N.D. Ga. 2007) ("*CCE*").

### II.    Plaintiff Has Stated a Claim for Violations of Section 10(b)

"[A] securities fraud claim based on failure to reveal information to investors … has six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss,

commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008). The Complaint alleges facts sufficient to state a claim for relief under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Defendants incorrectly argue that Plaintiff fails to plead facts sufficient to establish three of the six elements of a Section 10(b) claim because: (i) Plaintiff fails to allege any actionable false statements as required by Rule 9(b) of the Federal Rules of Civil Procedure; (ii) Plaintiff fails to allege scienter and Plaintiff fails to establish loss causation; and (iii) Defendants' misstatements are "forward-looking."[4]

### A. **Plaintiff Has Satisfied the Pleading Requirements of Rule 9(b)**

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The United States Court of Appeals for the Eleventh Circuit has stated that "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in

---

[4]    Defendants also contend that Plaintiff cannot prevail under § 20(a) because Plaintiff fails to state an actionable claim under Rule 10b-5. *See* Def. Br. at 45. Defendants do not dispute that Defendants Chancy and Wells are "control persons" for purposes of this section. Because the FAC alleges facts sufficient to state a claim for relief under Rule 10b-5 and Defendants do not otherwise dispute their liability under § 20(a), the Court should also deny Defendants' Motion to Dismiss with respect to Plaintiff's § 20(a) claims.

the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citations omitted).

Defendants contend that Plaintiff has failed to satisfy the pleading requirements of Rule 9(b) because: (i) Plaintiff fails to allege specific facts that nonperforming loans were materially understated; (ii) Plaintiff's allegations regarding the misclassifications are inconsistent with SunTrust's reported nonperforming loans; and (iii) Plaintiff has failed to allege the precise amount by which Defendants' fraud impacted SunTrust's financials.[5]

---

[5]     Defendants also suggest that Plaintiff has failed to allege that the "approximately half a billion dollars" is material because it amounts to ".4% of SunTrust's loan portfolio." Def. Br at 16, n. 10. Defendants' materiality analysis, however, is fatally flawed, as Defendants are comparing the amount of misclassified nonperforming loans against SunTrust's total loan portfolio. Instead, the proper analysis requires that the Court consider the misclassified loans' affect on SunTrust's *income. See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir. 1996) ("*Westinghouse*") ("'In order to determine the materiality of allegedly inadequate loan loss reserves, the focus then must be the amount of loan loss reserves alleged to have been wrongfully not posted as a percentage of income during the relevant period, rather than as a percentage of assets.'") (quoting *In re Westinghouse Sec. Litig.*, 832 F. Supp. 948, 973 (W.D. Pa. 1993)). The recognition of the misclassified loans caused SunTrust to increase its provision for loan losses by over $450 million. Cplt. ¶ 114. An increase in SunTrust's provision for loan losses results in a direct charge to its net interest income, which in the third quarter of 2008, for instance, was $1,146,213. *See* Def. Br. Ex. O at 3. Thus if Defendants would have increased SunTrust's provision for net loan losses by $450 million in the third quarter – which Defendants would have done had they not fraudulently concealed certain nonperforming loans – SunTrust's third quarter 2008 net interest income would have decreased by an astounding 40%. A $450 million understatement in loan reserves and a corresponding 40% inflation to income clearly would assume actual significance in the deliberations of a reasonable shareholder. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (finding materiality when "[t]he alleged manipulation of reserves and inappropriate accounting for the Aames acquisition caused Accredited to overstate its pre-tax income during the class period by

Defendants' first argument, however, ignores the detailed factual allegations in the Complaint and attempts to require Plaintiff to satisfy a pleading standard that the case law simply does not support. The latter two arguments are belied by the allegations set forth in the Complaint and thus also fail.

### 1. The Complaint Alleges Particularized Facts Detailing Defendants' Fraud

The Complaint sets forth particularized facts detailing SunTrust's scheme to understate the number and dollar amount of nonperforming loans in SunTrust's loan portfolio and thereby artificially inflate SunTrust's earnings during the Class Period.

According to CW #2, Defendants Wells and Chancy routinely instructed SunTrust Senior Vice President Neil Clerico and Kris Anderson, Vice President of SunTrust's Special Assets Group, to temporarily transfer nonperforming loans into the 17-300 'In-Process' Account. Cplt. ¶¶ 58, 61. VP Anderson would, in turn, direct other employees to carry out these instructions, and CW #2 stated that VP Anderson gave the same or similar instructions to CW #2 "on several occasions" and "always … towards the end of the quarter." *Id*. at ¶¶ 58, 60. Many of the loans that Defendants Wells and Chancy instructed be temporarily transferred out

millions of dollars"); *In re New Century*, 588 F. Supp. 2d 1206, 1215, 1226-27 (C.D. Cal. 2008) ("*New Century*") (concluding that an understatement in reserves of "tens of millions of dollars" was material).

of the "non-performing" loan category and into the "in-process" account "had outstanding balances in excess of $1 million" according to CW #2.  *Id*. ¶ 58.

CW #2's statements are corroborated by CW #1, who stated that "no one would question Neil [Clerico]'s decisions to temporarily move nonperforming loans into the In-Process accounts."  *Id*. ¶ 58.  Following the close of each financial reporting period, CW #1 stated that employees were directed to re-classify the loans as nonperforming.  *Id*. ¶ 59.  After Defendants' fraudulent scheme was up-and-running and employees in the accounting department, such as CW #2, began to question Defendants' decisions, Defendants transferred the day-to-day responsibilities of the general ledger reconciliation section of the non-accrual department to SunTrust's Florida office, where most of the employees were not experienced accountants and were less likely to detect or blow the whistle on Defendants' fraud.  *Id*. ¶ 63.

As a consequence of these fraudulent misclassifications, SunTrust avoided classifying hundreds of millions of dollars in nonperforming loans as such for financial and SEC reporting purposes. *Id*. ¶ 58.  The misclassifications allowed SunTrust to keep its ALLL artificially low, which inflated SunTrust's quarterly earnings.  *Id*.  As such, the statements made by Defendants during the Class Period regarding SunTrust's nonperforming loans, net charge offs, ALLL, net income, capital position, asset and credit quality, and loan delinquencies were materially

misleading. The truth was only revealed when Defendants reported a massive increase in SunTrust's provision for loan losses and ALLL in the fourth quarter of 2008, which caused SunTrust's stock to plummet by 11% the next day.

In several recent district court decisions arising out of allegations that defendants violated Section 10(b) by making misleading statements regarding the adequacy of loan-loss reserves, courts have concluded that allegations similar to Plaintiff's satisfy Rule 9(b). *See*, *e.g.*, *Atlas*, 556 F. Supp. 2d at 1150 (Rule 9(b) satisfied where "[t]he Complaint contains the allegations of several confidential witnesses who detail pervasive, widespread exceptions to the Company's underwriting policies and substantial pressures to approve such loans at the end of reporting periods in an effort to meet financial projections"); *New Century*, 588 F. Supp. 2d at 1225 (Rule 9(b) satisfied where "[t]he Complaint ushers an array of confidential witness statements that attest to New Century's progressively riskier loan origination practices leading up to and throughout the Class Period …").

Moreover, Plaintiff's allegations are far more specific than the allegations made in the cases cited by Defendants. In *CCE*, the court concluded that plaintiffs' fraud allegations were insufficient under 9(b) because "[t]heir allegations invite speculation and conjecture rather than providing any specific examples of widespread channel stuffing activity within CCE." 510 F. Supp. 2d at 1199. Likewise, in *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1263 (11th Cir. 2006),

the 11th Circuit affirmed the district court's dismissal of the complaint where plaintiff did "not specify when the improper accounting occurred" and failed "to allege how and what products were improperly capitalized and amortized."

In contrast, here, Defendants are forced to admit that Plaintiff has alleged specific instances of an improper classification. Cplt. ¶¶ 58, 60. Additionally, the Complaint clearly states that the fraud was personally conceived, directed and overseen by SunTrust's own CEO and CFO and specifies the business division within SunTrust responsible for the loans, the approximate value of the misclassified loans, and even the specific account number of the account into which the loans were transferred.

Plaintiff's allegations more closely resemble those in *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008), in which the court noted that allegations of specific instances of misconduct described by the lower-level employees involved in the improper conduct satisfied Rule 9(b)'s particularity requirement. *See Mizzaro*, 544 F.3d at 1247.[6]

---

[6]    Further, although Defendants imply that Plaintiff must allege an exact dollar amount attributable to the fraud (Def. Br. at 15), nothing in the case law suggests that Plaintiff needs to plead the exact dollar amount of misclassified loans in order to satisfy Rule 9(b).    *See In re 3Com Sec. Litig.*, 761 F. Supp. 1411, 1415 (N.D. Cal. 1990) ("The exact dollar amount of each error does not have to be alleged in order to state a claim"); *In re Mesa Airlines, Inc. Sec. Litig.*, Master File No. 94-690 JC/WWD, 1996 U.S. Dist. LEXIS 22820, at *21 (D.N.M. May 31, 1996) ("A plaintiff is not required to plead the exact amount of each financial error").

### 2.   SunTrust's Reported Loan Balances Are Wholly Consistent with Plaintiff's Theory

Defendants next contend that Plaintiff has not satisfied the pleading requirements of Rule 9(b) because Plaintiff's allegations that Defendants temporarily removed nonperforming loans from SunTrust's nonperforming account "towards the end of the quarter" is allegedly contradicted by the fact that SunTrust's nonperforming account balance at the quarter end was greater than SunTrust's average account balance during the quarter.   Defendants' over-simplified analysis is flatly incorrect.   At no point does Plaintiff argue that Defendants removed all or even most of SunTrust's nonperforming loans to "In-Process" accounts such that it would cause the quarter-end total to dip below the monthly average.   SunTrust's loan portfolio was deteriorating at a dramatic pace during the Class Period.   Cplt. ¶ 54.   The facts alleged in the Complaint – in particular, the dramatic increase to SunTrust's loan-loss reserves in the fourth quarter of 2008 -- establish that the month end total of nonperforming loans would have been much higher, and thus provided Class members with a true picture of SunTrust's actual financial condition, if Defendants had not fraudulently directed

employees to temporarily misclassify nonperforming loans at the end of each quarter.[7]

Significantly, Defendants completely ignore the core of Plaintiff's allegations which are consistent with Plaintiff's theory, and completely fail to explain SunTrust's sudden and drastic need for $3.5 billion in new capital and a nearly $1 billion increase in loan loss reserves in the fourth quarter of 2008.

Specifically, Defendants ignore the following: On October 23, 2008 – three weeks into SunTrust's fourth quarter – SunTrust Chief Risk Officer Thomas Freeman stated that SunTrust "remain[s] comfortable with our allowance relative to non-performers" and that the "flat trend in early stage delinquencies … continued in the third quarter." *Id*. ¶ 85.  On that same date, Defendant Wells stated, "we believe that we are appropriately capitalized." Cplt. ¶ 83.  At the time CRO Freeman and Defendant Wells made these statements, they had reviewed the 30, 60, and 90 day delinquency statistics reported in SunTrust's weekly "Past Due Reports," and therefore had at least 90 days visibility into the potential number of nonperforming loans in SunTrust's loan portfolio.  Cplt. ¶ 48.  As a result, they knew that SunTrust was not "appropriately" capitalized and that SunTrust's capital was so materially impaired that SunTrust was in the process of applying for a

---

[7] Furthermore, the "average" balance is affected by many factors including the existence of certain charge-offs and the time of charges.  Accordingly, the average balance is, in this context, a meaningless metric and provides no basis for Defendants' analysis.

massive $3.5 billion capital infusion from the TARP Program (which was later increased to $4.9 billion).

Incredibly, just four days after Defendants made these statements, SunTrust applied for and received the $3.5 billion capital injection. The simple fact is that, even assuming arguendo that SunTrust's financial condition was changing rapidly during this time period, SunTrust simply could not have gone from being "appropriately capitalized" on October 23, 2008, to being in need of a massive $3.5 billion injection just four days later on October 27, 2008. In fact, the only explanation for this drastic change is that Defendants deliberately lied to Class members when they falsely represented that SunTrust was "appropriately capitalized" on October 23, 2008. Cplt. ¶ 83.

### 3.    Plaintiff Need Not Allege The Exact Amount By Which Defendants' Fraud Impacted SunTrust's Financials

Defendants further argue that Plaintiff fails to meet Rule 9(b) because Plaintiff has failed to allege the exact amount by which Defendants' fraud (as opposed to existing market conditions) impacted SunTrust's financials. Despite Defendants' persistent argument, again, nothing in the case law suggests that Plaintiff must plead the precise amount by which Defendants' fraud impacted SunTrust's performance. *See, e.g., In re 3Com Sec. Litig.*, 761 F. Supp. at 1415. Judge Evans of this Court has noted that "[i]t is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendant

26

transgressed, by customer, amount, and precise method." *In re World Access Sec. Litig.*, 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000). Rather, "for purposes of Rule 9(b) … allegations of specific problems undermining Defendants' optimistic claims coupled with allegations of dissemination of materially false statements are sufficient." *Id*. The Complaint does just that.

CW #1 and CW #2 stated that beginning in 2007 and continuing into 2008 SunTrust experienced massive deterioration in its loan portfolio. *See*, *e.g.*, Cplt. ¶ 54. Despite this rapid deterioration, Defendants' provision for loan losses increased at an even rate throughout the Class Period and Defendants repeatedly claimed that these provisions were adequate. *See*, *e.g.*, Cplt. ¶¶ 71, 114. Defendants touted the adequacy of SunTrust's loan-loss reserves even well into the fourth quarter of 2008 as late as November 13, 2008. *Id*. ¶ 97. Less than 90 days later, however, SunTrust revealed the need to increase its provision for loan losses by nearly half a billion dollars. *Id*. ¶ 114. Other than Defendants having defrauded Class members by deliberately misrepresenting that SunTrust's provision for loan loss reserves were adequate and loan delinquencies were steady throughout the Class period, the sudden need for reserves is inexplicable given the high degree of monitoring and visibility that Defendants had into SunTrust's pipeline of nonperforming loans.

*In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1372 (N.D. Ga. 2005) ("*BellSouth*"), on which Defendants rely, is completely inapposite. In *BellSouth*, plaintiffs made "broad, unspecific, and conclusory claims" that attributed bad debt on the company's financial statement to a host of improper billing activities by low-level BellSouth employees. *Id*. Most of the alleged improprieties involved the overbilling of residential customers, and plaintiffs made no attempt to explain how this small-scale, attenuated conduct resulted in the recognition of a bad debt expense on defendant's financials. *Id*. Accordingly, the court dismissed the claim. *Id*. Rather than the attenuated, small-scale fraud alleged in *BellSouth*, Plaintiff, here, points to one specific set of pervasive, and large scale acts that had a direct impact on SunTrust's provision for loan losses and, consequently, net income. The value of the misclassifications to SunTrust's balance sheet totaled approximately $450 million, as evidenced by the increase in loan-loss provisions in the fourth quarter of 2008.[8]

---

[8]    The plaintiffs in *In re Coca-Cola Enters. Sec. Litig.*, C.A. No. 1:06-CV-0275-TWT, 2007 U.S. Dist. LEXIS 74227, at *5 (N.D. Ga. Oct. 3, 2007) ("*CCE II*"), a case on which Defendants also rely, alleged that defendants' acts of stuffing the channel with a small amount of product resulted in violations of the securities laws. As in *BellSouth*, the plaintiffs in *Coca-Cola* failed to demonstrate how the alleged small-scale, fraudulent acts had any impact on the company's balance sheet. *See CCE II*, 2007 U.S. Dist. LEXIS 74227, at *6. Because Plaintiff alleges that Defendants' acts of misclassifying large numbers of nonperforming loans directly impacted SunTrust's financials, Defendants' reliance on *BellSouth* and *Coca-Cola* is wholly without merit.

### B. Plaintiff Alleges Facts Creating a
### Strong Inference that Defendants Acted with Scienter

Defendants next argue that Plaintiff's allegations fail to create a strong inference of scienter. The PSLRA requires that a plaintiff alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus to survive a motion to dismiss, a plaintiff must plead "'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly false or incomplete statements." *Mizzaro*, 544 F.3d at 1238 (quoting 15 U.S.C. § 78u-4(b)(2)). When making the strong-inference inquiry, "courts must consider the complaint in its entirety" and determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009).

Defendants attack Plaintiff's allegations regarding scienter on a piecemeal basis. Specifically, Defendants' argue that: (i) Plaintiff's allegations regarding motive and opportunity do not establish a strong inference of scienter; (ii) Plaintiff should not be allowed to rely on confidential witness statements because the basis for their knowledge is not alleged; (iii) any inference of scienter is mitigated by the absence of insider trading; and (iv) other competing inferences are more

29

compelling than an inference of scienter. All of Defendants' arguments fail, however because Defendants miss the big picture. The Complaint cites multiple sources confirming that the Individual Defendants directly participated in the fraud by routinely instructing senior SunTrust officers Clerico and Anderson to misclassify SunTrust's nonperforming loans.

### 1.    Plaintiff Has Alleged That Defendants Directly Participated in the Scheme to Defraud

Defendants inexplicably devote much of their argument to rebutting Plaintiff's factual allegations regarding motive and opportunity but the vast majority of Plaintiff's allegations are not based on motive and opportunity. Plaintiff's allegations are based on Defendants' actual knowledge of the scheme to defraud and Defendants' direct participation therein. Cplt. ¶¶ 58, 64.

Courts have routinely held that "[s]cienter may be shown by detailing either direct *or* circumstantial evidence of Defendants' actual knowledge and/or reckless state of mind." *In re Premiere Techs., Inc. Sec. Litig.*, C.A. No. 1:98-CV-1804-JOF, 2000 U.S. Dist. LEXIS 19207, *26-27 (N.D. Ga. Dec. 8, 2000) The Complaint contains overwhelming evidence that the Individual Defendants were directly involved in the fraudulent scheme. Cplt. ¶¶ 58, 64.

In *Atlas*, a case strikingly similar to this one, plaintiffs asserted that defendants fraudulently manipulated earnings by maintaining inadequate loan-loss reserves, the court concluded that plaintiffs alleged scienter where "the Complaint

allege[d] with specificity that Defendants actually directed these deviations from company policy." 556 F. Supp. 2d at 1156. In another case involving fraudulent statements regarding a loan originator's underwriting standards, the court in *New Century* concluded that plaintiff's allegations created a strong inference of scienter where the complaint included allegations that corporate officers instructed lower-level managers to ignore loan underwriting standards. 588 F. Supp. 2d at 1230.

As in *Atlas* and *New Century*, the Complaint sets forth detailed facts regarding the Individual Defendants' direct involvement in the fraudulent scheme. As alleged in the Complaint, CW #2, a former SunTrust employee, stated that Individual Defendants Wells and Chancy directed two senior SunTrust employees -- Kris Anderson, SunTrust's Vice President of the Special Assets Group, and Neil Clerico, a SunTrust Vice President – to order employees in the Special Assets Group to temporarily transfer nonperforming loans to an "In-Process" account for the specific purpose of inflating earnings. Cplt. at ¶ 60. CW #2's statements are corroborated by CW #1, who stated that the Individual Defendants supervised and directed the SunTrust employees ordering the misclassifications, and therefore had actual knowledge of the fraudulent scheme. *Id*. ¶ 58. Accordingly, the Complaint alleges with specificity that the Individual Defendants directed SunTrust employees to misclassify nonperforming loans and thus knew their statements regarding SunTrust's nonperforming loans, loan charge-offs, ALLL and net

income were misleading.  These allegations satisfy the requirement of scienter.[9]

### 2.    Plaintiff's Allegations Regarding Confidential Witnesses Establish A Strong Inference Of Scienter

Contrary to Defendants' assertions, Plaintiff's allegations based on the statements of confidential witnesses establish a strong inference of scienter.  In *Mizzaro*, the court determined that statements by confidential witnesses are adequate to support allegations of securities fraud "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge."   544 F.3d at 1239-40.   Plaintiff must allege "position(s) held, the proximity to the offending conduct, and the relevant time frame."  *Id*. at 1240.  Plaintiff does exactly that, here.

The Complaint alleges that CW #1 worked for SunTrust from approximately 1998 to October 2009.  Cplt. ¶ 48.  CW #1 was responsible for running operations for SunTrust's non-accrual department until sometime in 2007, when he was reassigned to the position of Monetary Manager (*id*. ¶62) and was familiar with the

---

[9]    Although Defendants rely heavily on *Mizzaro* in support of their contention that Plaintiff fails to create a strong inference of scienter, *Mizzaro* actually supports the denial of Defendants' motion.  In *Mizzaro*, the court concluded that plaintiffs' allegations failed to create a strong inference of scienter because plaintiffs' allegations concerning the degree and widespread nature of the fraud were not strong enough to overcome competing inferences.  544 F.3d at 1249.  The court concluded that plaintiffs did not create a strong inference of scienter, in part, because "there are no claimed e-mails or letters from any of the individual defendants expressly ordering or even suggesting that Home Depot employees" engaged in fraudulent activity.  *Id*. at 1247-48.  Here, however, Plaintiff's allege exactly what the plaintiffs in *Mizzaro* could not – direct evidence in the form of confidential witness statements that the Individual Defendants knew about -- and personally directed -- the fraud.

responsibilities of Clerico, Anderson and the Individual Defendants in relation to the non-accrual department. *See id*. ¶ 58. CW #2 was the First Vice President of Commercial Loan Operations at SunTrust's Richmond, VA office between 2000 and 2006 and worked with Anderson and the non-accrual department monitoring "In-Process" accounts. *Id*. ¶61. CW #2 and his staff were trained in accounting. *Id*. ¶ 63. As a result of their positions within the non-accrual department, CW's #1 and #2 were intimately familiar with SunTrust's treatment of nonperforming loans and accounting practices. CW #3 was a Senior Financial Analyst in SunTrust's Corporate Reporting and Forecasting Department in Atlanta from February 2005 to June 2008. *Id*. ¶51. SunTrust's monthly Analysis Reports and Forecasting Binders were distributed by CW #3's group, and thus CW #3 was familiar with the contents of these reports and to whom they were distributed.

The information provided about the three confidential witnesses evidences their familiarity with: (i) SunTrust's loan portfolio and financial reporting mechanisms; and (ii) the Individual Defendants' job responsibilities. Such detail is sufficient to support Plaintiff's allegations of scienter.

### 3.    Defendants' Positions at SunTrust Further Demonstrate That They Possessed Knowledge of the Fraudulent Scheme

Courts have held that "[i]n some circumstances it is appropriate to use a defendant's position and responsibilities within the company to support a strong inference of scienter. This is especially appropriate when the alleged

misrepresentations relate to a company's 'core operations.'" *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1189 (C.D. Cal. 2008).[10]

In *Countrywide*, the court concluded that plaintiffs alleged facts creating a strong inference of scienter regarding Countrywide's CEO because the complaint contained extensive allegations regarding the CEO's "understanding of Countrywide's day-to-day operations – his self-proclaimed 'hands on' approach, his long career with Countrywide, and the detailed loan and exception statistics." *Id*. 1193. Here, Plaintiff alleges similarly detailed facts regarding the Individual Defendants' knowledge of SunTrust's reserves and nonperforming loans.

The Complaint cites four distinct internal reports utilized by Defendants to monitor the health of SunTrust's loan portfolio, including the payment status and delinquencies of the loans contained therein. These reports included the: (i) "Past Due Reports"; (ii) "Nonperforming Loan Reports"; (iii) "Analysis Reports"; and (iv) "Forecasting Binders." *See, e.g.*, Cplt. ¶¶ 47-52. Additionally, Plaintiff has alleged that Defendants discussed these reports at meetings on a regular basis.

Specifically, Plaintiff has alleged that the Individual Defendants received "Nonperforming Loan Reports" on a weekly basis and discussed the results of the weekly "Nonperforming Loan Reports" during meetings with Anderson and C.T.

---

[10]    *See also Mizzaro* at 1249 ("Likewise, certain types of fraud, such as sophisticated, Enron-style accounting frauds, undeniably require the participation of senior management – these frauds simply cannot be carried out by low-level employees acting on their own").

Hill, SunTrust's Mid-Atlantic Banking Group and Retail Business Line Executive. *Id*. ¶ 50. Further, the Individual Defendants received "Analysis Reports" and "Forecasting Binders" on a monthly basis which, according to CW #3, contained detailed information concerning the nonperforming loans and "In-Process" loans in SunTrust's loan portfolio. *Id*. ¶¶ 51-52. Additionally, every Monday, Defendants received a "Past Due Report," which specifically informed Defendants of the number and outstanding balances of all loans that were either 30, 60, or 90 days delinquent. Cplt. ¶ 48.

Thus, Defendants were intimately familiar with and constantly updated on SunTrust's loan portfolio and the status of its delinquent loans by virtue of their positions at SunTrust. Given this familiarity, Defendants clearly knew that the number of nonperforming loans increased dramatically during the Class Period and were on notice of obvious gaps between the true number of SunTrust's nonperforming loans and the number that SunTrust reported in financial statements. The most plausible inference from these facts, however, is that Defendants had direct knowledge of SunTrust's fraudulent concealment of loans.[11] *See Atlas*, 556 F. Supp. 2d 1142, 1156 (finding that plaintiffs had adequately alleged scienter where "the five individual defendants who were

---

[11] At a minimum, these facts demonstrate that the Individual Defendants were reckless with respect to their statements when they ignored obvious red flags in these weekly and monthly reports. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999).

executives of Accredited had access to periodic reports that included detailed information regarding widespread deviations from company policy and the adverse effect such practices were beginning to have on Accredited").

### 4. Defendants' Motive Further Corroborates a Strong Inference of Scienter

Finally, Plaintiff's allegations regarding the Individual Defendants' motive for perpetrating the fraudulent scheme further corroborates a strong inference of scienter. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689-90 (6th Cir. 2004). As demonstrated in the Complaint, Defendants had a strong motive for perpetrating the fraudulent scheme; namely attracting a larger bank with whom SunTrust could merge. Cplt. ¶ 54. An acquisition by a larger bank, such as JP Morgan or Wells Fargo, would accomplish three very important things: (i) subsume SunTrust's deteriorating loan portfolio within a larger bank that was better capitalized than SunTrust; (ii) absolve the Individual Defendants of any responsibilities associated with the massive loan losses incurred by SunTrust; and (iii) trigger the control provisions in the Individual Defendants' Change In Control Provisions ("CICs"). *Id*. ¶¶102, 104. Because a merger with a larger bank could accomplish these things, Defendants were highly motivated to make SunTrust

appear an attractive acquisition target, which Defendants did by misclassifying hundreds of millions of SunTrust's nonperforming loans.[12]

It is no coincidence that SunTrust did not unveil the true extent of its financial troubles until it was clear that an acquisition was off the table. *Id.* ¶ 110. The timing of the revelation coupled with the Individual Defendants' motive for inflating SunTrust's stock price further strengthens the inference of scienter.

## C. Plaintiff Alleges Facts Sufficient to Establish Loss Causation

In order to allege loss causation, Plaintiff need only "provide … a 'short and plain' statement adequate to give defendants some indication of the loss and causal connection that the plaintiff has in mind." *CCE*, 510 F. Supp. 2d at 1203.[13]

Plaintiff has alleged that over the course of the Class Period, Defendants artificially inflated SunTrust's stock by misrepresenting the number of nonperforming loans in SunTrust's loan portfolio and keeping SunTrust's provision for loan losses and ALLL artificially low. Each announcement boasting these manipulated financial statistics resulted in either a dramatic increase in the

---

[12]    Defendants attempt to sweep these allegations under the rug by characterizing the potential acquisition of SunTrust as a mere "rumor." The possibility of an acquisition, however, was more than just a rumor. Wall Street banks had swallowed many other regional banks during this period, and analysts believed that the acquisition of SunTrust by either JP Morgan Chase or Wells Fargo was "highly probable." *See id.* ¶ 103.

[13]    Essentially, Plaintiff need only allege that "a misrepresentation cause[d] economic harm by (1) artificially inflating a stock's price, and thus leading an investor to pay a price for the stock that is greater than its actual value, and (2) causing a deflation in the price of the stock when the truth of the misrepresented facts become known to the market." *In re Witness Sys., Inc., Sec. Litig.*, 2008 U.S. Dist. LEXIS 109173, at *22 (N.D. Ga. Mar. 31, 2008).

price of SunTrust's common stock or pulled SunTrust's common stock out of a sustained decline. *See*, *e.g.*, Cplt. ¶¶ 69, 95. In addition, SunTrust's January 22, 2009 press release announced an increase in provision for loan losses that was double the increase of the previous quarter and a net operating loss of $236.1 million. *Id*. ¶ 111. The day after each announcement, SunTrust's share price fell 11%. *Id*. ¶¶ 108, 115. District courts in the Eleventh Circuit have concluded that similar disclosures followed by subsequent drops in stock price were sufficient to plead loss causation. *See*, *e.g.*, *In re Choicepoint, Inc., Sec. Litig.*, C. No. 1:05-CV-00686-JTC, 2006 U.S. Dist. LEXIS 97903 at *20-22 (N.D. Ga. Nov. 19, 2006).

Defendants contend that Plaintiff has failed to plead loss causation because, according to Defendants, SunTrust's stock declined "in tandem with the economic tailspin of late 2008." Def. Br. at 43. This argument fails because courts have found that plaintiffs have adequately alleged loss causation involving similar claims against lending institutions that concealed and then disclosed damaging financial information during the most recent economic downturn. *See*, *e.g.*, *Atlas*, 556 F. Supp. 2d at 1157; *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009). Moreover, even relative to the general decline of SunTrust's share price over the Class Period, Defendants' damaging disclosures on December 9, 2008 and January 22, 2009 resulted in conspicuous

drops in SunTrust's share price. *See*, *e.g.*, Cplt. ¶ 11.  The timing and magnitude of these one day plunges coupled with Defendants' admissions that the disappointing results were due primarily to the increased loan loss reserves "distinguish[es] the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008).

Here, the revelation that SunTrust needed to increase its loan reserves due to the significant deterioration in its loan portfolio was the first of its kind and in direct contrast to SunTrust's previous statements that loss reserves were adequate and that loan delinquencies were stable.  Accordingly, Plaintiff alleges facts that establish that Defendants' fraud contributed significantly to the class's economic loss and satisfy the pleading standard for loss causation.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (noting that plaintiff need not show that the entire drop was attributable to the fraud, but only that the fraud was "a significant contributing cause").

### D. The Complaint Alleges Defendants' GAAP Violations with Particularity

Further, Plaintiff pleads Defendants' violations of Generally Accepted Accounting Principles ("GAAP") with particularity.  In the case of accounting fraud, courts have noted that "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the

defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760, at *24-25 (N.D. Ill. Nov. 2, 1998).  Plaintiff need only "state what the unreasonable accounting practice was and how the defendants distorted the disclosed data."  *In re Scientific Atlanta, Inc., Sec. Litig.*, 239 F. Supp. 2d 1351, 1364 (N.D. Ga. 2002).

Plaintiff here satisfies these particularity requirements.  GAAP requires that SunTrust maintain adequate reserves for estimated credit losses specifically identified as impaired.  *See* Cplt. ¶ 118 (citing Staff Accounting Bulletin ("SAB") No. 102).  Statement of Financial Accounting Standards ("SFAS") No. 114, ¶ 13 requires a creditor to recognize an impairment "if the present value of expected future flows … is less than the recorded investment in the loan."  Cplt. ¶ 121.  A loan is impaired if it is "probable" that one "be unable to collect all amounts due according to the contractual terms of the loan agreement."  *Id*. ¶120-21.  Even if a loan is not impaired individually, the creditor should recognize an impairment to a loan if the loan has "specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics."  *Id*. ¶124 (citing Emerging Issues Task Force Topic No. D-89).[14]

---

[14]    Further, GAAP requires a creditor to accrue for all loss contingencies, which GAAP defines as an existing condition, situation or set of circumstances involving uncertainty as to possible loss.  Cplt. ¶ 128 (citing SFAS No. 5, ¶1).  A loss contingency must be accrued for

As set forth in the Complaint, and corroborated by former SunTrust employees, Defendants concealed approximately half a billion dollars worth of nonperforming loans from SunTrust's balance sheet. A "nonperforming" loan is over 120 days past due and, by definition, is "probably" impaired. As evidenced by the drastic jump in ALLL, provision for loan losses, and net loan charge-offs in the fourth quarter of 2008, Defendants did not account for the concealed loans in SunTrust's provision for loan losses and ALLL during the second and third quarters of 2008 and underreported net loan charge-offs. Cplt. ¶114. As such, Plaintiff has adequately alleged that Defendants violated both SFAS 114 and 5 by not recognizing impairments to these loans and not maintaining adequate loss reserves during the Class Period.

Courts have concluded that allegations very similar to Plaintiff's satisfy the pleading requirements for GAAP violations. In *Westinghouse*, for instance, the court concluded that plaintiffs pled a GAAP violation with particularity when they alleged that defendants failed to maintain adequate reserves under GAAP because defendants improperly moved loans from non-earning to earning status and thereby concealed loan losses. 90 F.3d at 711. The court stated "plaintiffs are not merely

---

when "it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statement" and "[t]he amount of the loss can be reasonably estimated." Cplt. ¶ 128 (citing SFAS No. 5, ¶8). Even if these conditions are not met, the creditor still must accrue for the loss contingency if there is a "reasonable probability" that the creditor will incur a loss. Cplt. ¶¶ 128-29. SFAS 5, ¶ 126 states that "accrual shall be made even though the particular receivables that are uncollectible may not be identifiable." *Id.* ¶ 126.

challenging defendants' judgment regarding when collectibility became doubtful; instead, plaintiffs allege that defendants changed the classification of the loans when nothing regarding collectibility had occurred." *Id*.

As in *Westinghouse*, Plaintiff here does not merely question Defendants' judgment regarding the probability of potential losses. Rather, Plaintiff alleges that Defendants fraudulently concealed certain nonperforming loans and consequently did not provision for the losses that it would almost certainly incur as a result of the concealed loans. Accordingly, Plaintiff has alleged Defendants' GAAP violations with particularity.

### E. Defendants' Cannot Avail Themselves of the PSLRA's Safe Harbor or the "Bespeaks Caution" Doctrine

Finally, neither the PSLRA's "safe harbor" provision nor the "bespeaks caution" doctrine shield Defendants' fraudulent statements from liability under the Exchange Act. In order to qualify for the PSLRA's "safe harbor," the allegedly misleading statement must be "forward-looking." 15 U.S.C. § 78u-5(c)(1). *See also Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). Defendants cannot cure statements of historical or current facts "by reference to future difficulties and undetected problems." *In re Premiere Techs., Inc. Sec. Litig.*, C.A. No. 1:98-CV-1804-JOF, 2000 U.S. Dist. LEXIS 19207, at *56 (N.D. Ga. Dec. 8, 2000). Nor can Defendants cure fraudulent statements of historical fact through use of cautionary

language. *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1179 (S.D. Fla. 2005).

The fraudulent statements alleged in the Complaint (*see*, *e.g.*, ¶¶ 65, 66, 72) are all based on historical fact and current circumstance such that neither the PSLRA's Safe Harbor nor the "bespeaks caution" doctrine apply. Defendants further contend that the alleged misrepresentations were accompanied by "meaningful cautionary language," and are, therefore, protected by the PSLRA's Safe Harbor and the "bespeaks caution" doctrine. Def. Br. at 39. The cautionary statements upon which Defendants rely do not cure any of Defendants' misstatements. Neither the PSLRA's Safe Harbor nor the "bespeaks caution" doctrine apply if "the Complaint avers that Defendants had actual knowledge of the falsity of these statements at the time they were made." *In re Scientific Atlanta, Inc., Sec. Litig.*, 239 F. Supp. 2d at 1362. Here, Plaintiff unambiguously alleges that Defendants knew that their statements regarding SunTrust's nonperforming loans, net charge-offs, ALLL, and net income, among other things, were false when made. *See*, *e.g.*, Cplt. ¶¶ 70, 74, 76. Thus, Defendants' knowledge rendered any cautionary language accompanying the false statements ineffective. *See Westinghouse*, 90 F.3d at 710.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court

deny Defendants' Motion to Dismiss in its entirety.


DATED:  April 26, 2010             */s/ Steven J. Estep*

                                   STEVEN J. ESTEP
                                   Georgia Bar No. 250450
                                   **Cohen Cooper Estep & Allen**
                                   3350 Riverwood Parkway, Ste. 2220
                                   Atlanta, GA 30339
                                   Telephone: 404-814-0000
                                   Facsimile: 404-616-8900

                                   *Liaison Counsel for Class*

                                   Paul O. Paradis
                                   Gina M. Tufaro
                                   Justin Shane
                                   **Horwitz, Horwitz & Paradis**
                                   Attorneys at Law
                                   405 Lexington Avenue, 61st Floor
                                   New York, NY 10174
                                   Telephone: 212-986-4500
                                   Facsimile: 212-986-4501

                                   *Lead Counsel for Class and Attorneys for*
                                   *Lead Plaintiff Waterford Township General*
                                   *Employees Retirement System*

44

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D</u>

I hereby certify that the foregoing brief has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the court in Local Rule 5.1B.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS was electronically filed with the Clerk of the Court using the CM/ECF system, which serves notification of such filing to all CM/ECF participants.

This 26th day of April, 2010.

<div align="right">

*/s/ Steven J. Estep*
Steven J. Estep
Georgia Bar No. 250450

</div>