IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WATERFORD TOWNSHIP
GENERAL EMPLOYEES
RETIREMENT SYSTEM,
INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY
SITUATED,
  Plaintiff,

    v.

SUNTRUST BANKS, INC., et al.,
  Defendants.

CIVIL ACTION FILE
NO. 1:09-CV-617-TWT

ORDER

This is a securities fraud class action. It is before the Court on the Defendants' Motion to Dismiss [Doc. 27], which is GRANTED.

I. Introduction

SunTrust, Inc. is a financial holding company headquartered in Atlanta, Georgia. It offers retail and commercial banking services through its wholly-owned subsidiary, SunTrust Bank. The Plaintiff purchased SunTrust stock in late 2008, during a financial crisis that hit the financial services industry particularly hard. During the financial crisis, SunTrust, like other banks, experienced an increased

number of nonperforming loans in its loan portfolio. The Plaintiff says that SunTrust tried to hide the extent of this increase by classifying some of its nonperforming loans as "in-process" loans during the second and third quarters of 2008. That way, its second and third quarter financial reports showed better results than they should have. The Plaintiff also says that SunTrust executives, including CEO James Wells and CFO Mark Chancy, made misleading statements about SunTrust's financial health around this time. According to the complaint, these misrepresentations artificially inflated SunTrust's stock price in 2008.

The Plaintiff says that SunTrust reclassified the affected loans during the fourth quarter of 2008. Therefore, its fourth quarter financial report showed a dramatic increase in the number of nonperforming loans in its loan portfolio. The Plaintiff says that this caused SunTrust's stock to drop nearly eleven percent in a single day. Based on this loss, the Plaintiff sued SunTrust on behalf of itself and all other investors who purchased SunTrust stock between June 22, 2008, and January 21, 2009. SunTrust now moves to dismiss the complaint.

## II. Motion to Dismiss Standard

A complaint should be dismissed if, even accepting all well-pleaded factual allegations as true, it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Complaints that

allege fraud under federal securities law must satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act of 1995. Rule 9(b) requires a complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

### III.  Discussion

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j. Pursuant to § 10(b), the Securities Exchange Commission promulgated Rule 10b-5, which prohibits, among other things, the making of any "untrue statement of material fact." 17 C.F.R. § 240.10b-5. In a typical § 10(b) private action, the plaintiff must show (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

on the misrepresentation or omission; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008); Robbins v. Koger Properties, 116 F.3d 1441, 1447 (11th Cir. 1997).

    A.  Misrepresentations

In its First Amended Complaint, the Plaintiff relies upon two alleged types of misrepresentations. The first is that the Defendants "defrauded members of the Class and financial market participants alike by deliberately hiding nearly half a billion dollars of nonperforming loans in SunTrust's loan portfolio by intentionally misclassifying these nonperforming loans as 'In-Process' loans in order to artificially decrease the number and amount of the nonperforming loans and net-charge offs reported by Suntrust in its filings with the United States Securities and Exchange Commission ('SEC') during the Class Period." (First Amended Complaint ¶ 7). After the close of a reporting period, these nonperforming loans would then be transferred back into a nonperforming loan account. (Id. ¶¶ 59-60).

The Plaintiff never explicitly alleges facts that would support its claim of "half a billion dollars" of misclassified nonperforming loans. The figure seems to be plucked out of thin air. Repeating the figure and underlining it do not satisfy the requirement of the Private Securities Litigation Reform Act that the reasons for the statement's falsity must be given with particularity. 15 U. S. C. § 78u-4(b)(1). More

significantly, this theory collapses when the Defendants point out that SunTrust reported the average <u>daily</u> balance of nonperforming loans for each quarter, and that its nonperforming balance at the end of each quarter was larger than at the beginning of the quarter. This is entirely consistent with the continuing deterioration of SunTrust's loan portfolio over the course of the financial crisis. It is entirely inconsistent with the Plaintiff's theory of large scale misclassification of nonperforming loans at the end of each quarter.

In its response to the Motion to Dismiss, the Plaintiff virtually abandons the theory of end of quarter misclassification of nonperforming loans. It shifts emphasis entirely to the second type of alleged misrepresentation, that is, violation of Generally Accepted Accounting Principles by understating reserves for nonperforming loans. The general and conclusory allegations of the First Amended Complaint are insufficient to satisfy Rule 9(b). <u>See</u> <u>In re Coca-Cola Enterprises Inc. Securities Litigation</u>, 510 F. Supp. 2d 1187, 1198-99 (N.D. Ga. 2007). The fact that SunTrust substantially increased its reserves for nonperforming loans in the fourth quarter of 2008 is not evidence of fraudulent accounting practices in earlier periods. The Plaintiff does not allege that anyone – other than the Plaintiff – has said that SunTrust should restate its financial reports from the first three quarters of 2008. <u>Compare</u> <u>Atlas v. Accredited Home Lenders Holding Co.</u>, 556 F. Supp. 2d 1142, 1156 (S.D.

Cal. 2008)("The Court also notes that Accredited's auditor during the class period refused to approve the company's 2006 financial statements before the deadline to file the company's Form 10-K, and that the company's new auditor required the reserves for loan losses to be retroactively increased by over $30 million."). Life is too short to say more about this. The First Amended Complaint fails to state a plausible case of material misrepresentations by the Defendants.

    B.    <u>Scienter</u>

To state a § 10(b) claim, the Plaintiff must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1238 (11th Cir. 2008). A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 310 (2007). Here, the Plaintiff attempts to plead scienter by alleging that (1) the individual defendants intentionally directed others to misclassify loans; (2) the individual defendants acted recklessly by overlooking loan reports disclosing the fraud; and (3) the individual defendants stood to gain if a larger bank acquired SunTrust. However, these facts, even when taken together, do not give rise to a strong inference of scienter. This is particularly true in light of the Plaintiff's

virtual abandonment of its theory of end of quarter misclassification of nonperforming loans.

### 1. Intentional Wrongdoing

The Plaintiff says that Defendants James Wells and Mark Chancy directed SunTrust Vice President Neil Clerico and SunTrust Vice President of Special Assets Kris Anderson to misclassify nonperforming loans in order to misrepresent SunTrust's financial position. This allegation is based entirely on paragraph 58 of the First Amended Complaint, which states:

> According to CW#2, acting at the direction of the Individual Defendants, [Clerico and Anderson] routinely directed SunTrust employees in the Special Asset Group to temporarily transfer specifically pre-identified nonperforming loans in SunTrust's loan portfolio into an "In-Process" or "Pass-Through" account.

(Am. Compl. ¶ 58.) The complaint says that Confidential Witness #2 was the First Vice President of Commercial Loan Operations at SunTrust's Richmond office between 2000 and 2006. It does not, however, give any basis for the witness's knowledge about SunTrust's 2008 loan classification practices. Moreover, it does not explain how the witness learned that Wells and Chancy directed Clerico and Anderson to misclassify loans between 2000 and 2006. Instead, it simply alleges that Wells and Chancy were friends with Clerico and Anderson and had offices in the same area.

This is not enough to create a strong inference that Wells and Chancy directed others to defraud shareholders.

    2.    <u>Access to Information</u>

The Plaintiff next says that Wells and Chancy acted recklessly by overlooking internal reports that touched upon the alleged fraud. According to the complaint, Wells and Chancy had access to four types of reports relating to SunTrust's loan portfolio: (1) past due reports; (2) nonperforming loan reports; (3) analysis reports; and (4) forecasting binders. The complaint alleges that Wells and Chancy reviewed the past due reports and nonperforming loan reports on a weekly basis and reviewed and discussed the analysis reports and forecasting binders on a monthly basis. The Plaintiff argues that this creates a strong inference of scienter because Wells and Chancy should have realized upon reviewing these reports that nonperforming loans were being transferred to in-process accounts near the end of the second and third quarters. However, access to information, even when accompanied by a duty to monitor that information, is not enough to create a strong inference of scienter. <u>See</u> <u>In re Coca-Cola Enterprises Inc. Securities Litigation</u>, 510 F. Supp. 2d 1187, 1200-01 (N.D. Ga. 2007); <u>see also</u> <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1264 (11th Cir. 2006).

### 3. Motive

The Plaintiff also says that Wells and Chancy had a motive to conceal SunTrust's financial problems and that this motive supports a strong inference of scienter. According to the complaint, Wells and Chancy wanted to attract a merger partner in order to trigger their change-in-control agreements, which provided that the Defendants would receive a large lump sum payment if they were terminated without cause after a qualifying merger. However, allegations of motive, without more, do not create a strong inference of scienter. In re Coca-Cola Enterprises Inc. Securities Litigation, 510 F. Supp. 2d 1187, 1201 (N.D. Ga. 2007). The Plaintiff offers nothing other than speculation and conjecture to support this unlikely motive.

### 4. Competing Inferences

Although motive and access to documents do not create a strong inference of scienter when standing alone, they may when considered together. Here, however, competing inferences totally overwhelm any inference of scienter that may be drawn from change-in-control agreements and internal reports. First, no suspicious insider trading occurred. In Mizzaro v. Home Depot, Inc., 544 F.3d 1230 (11th Cir. 2008), the Eleventh Circuit held that the absence of suspicious stock sales by individual defendants "weighs against inferring scienter." Id. at 1253. Second, the Defendants' change-in-control agreements provided no benefit if the Defendants were terminated

for cause. Accordingly, the Plaintiff's allegation that Wells and Chancy stood to benefit from fraudulently attracting a merger partner rests on the unlikely assumption that a large bank such as J.P. Morgan or Wells Fargo would not discover the alleged fraud during due diligence before or after the merger. See In re Stone & Webster, Inc., Securities Litigation, 253 F. Supp. 2d 102, 128 (D. Mass. 2003) ("It is inconsistent with the plaintiffs' theory to suppose that a purchaser would not recognize the fraud . . . . The significant gamble inherent in a scheme that would only succeed if a careless buyer acquired S&W at just the right moment is enough to negate any strong inference of scienter on the basis of motive and opportunity.") This undermines the Plaintiff's allegations of motive. Together, these facts overwhelm any inference of scienter arising from the totality of the facts alleged by the Plaintiff.

    C.    Loss Causation

The Plaintiff also fails to adequately plead loss causation. Loss causation is the causal link between the alleged misrepresentation and the economic loss suffered as a result. In effect, this element requires the Plaintiff to allege that the security's share price "fell significantly after the truth became known." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005). However, because share price movements may also be caused by other factors, courts typically require the plaintiff to also "allege facts sufficient to support an inference that it was defendant's fraud – rather than other

salient factors – that proximately caused" a drop in share price.  <u>Lentill v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 177 (2d Cir. 2005); <u>see also</u> <u>HomeBanc Corp. Sec. Lit.</u>, 1:08-cv-1461-TCB, 2010 WL 1524836, at *21 (N.D. Ga. Apr. 13, 2010).  It is not necessary to show that the defendant's fraud was the exclusive cause of the plaintiff's loss; however, when multiple factors are at play, the plaintiff should allege "facts sufficient to apportion the losses between the [factors] that ultimately destroyed an investment."  <u>Id.</u> at 177.   Here, the Plaintiff has not done so.

The Plaintiff says that SunTrust made two corrective disclosures.  The first was a December 9 press release announcing that SunTrust planned to borrow an additional $1.4 billion in TARP funds from the U.S. Treasury.  The Plaintiff says that this is "corrective" because it shows that SunTrust's initial application for $3.5 billion in TARP funds misrepresented its capitalization needs.  However, the press release does not amount to a corrective disclosure.  The Plaintiff explained in the December 9 press release:

> As we now know from the most recent data, the economic situation is decidedly bleaker than was the case when we announced our initial, partial regulatory capital transaction under the Treasury program. . . . Given the increasingly uncertain economic outlook, we have concluded that further augmenting our capital at this point is a prudent step, especially if the current recession proves to be longer and more severe than previously expected.

(Am. Compl. ¶ 107.) This statement may have revealed previously unknown risks, but it did not touch on, much less disclose, the underlying fraud alleged by the Plaintiff. Therefore, it does not qualify as a corrective disclosure for which the Plaintiff can plead loss causation.

The second corrective disclosure was SunTrust's fourth quarter financial report, which the company released on January 21, 2009. According to the Plaintiff, this report disclosed previously misrepresented figures relating to SunTrust's nonperforming loans. The Plaintiff says that it has sufficiently pled loss causation because it alleged that the price of Sun Trust's stock fell nearly eleven percent after this disclosure. The Court disagrees.

The eleven percent drop occurred during a financial crisis that hit the financial services industry particularly hard. At least two factors indicate that the financial crisis, rather than SunTrust's misrepresentations, was likely the primary cause of the January 22 drop. First, SunTrust's stock had already lost most of its value prior to the January 22 corrective disclosure. The stock price dropped 66% over the course of the class period and fell nearly 75% from its class period high to its January 21 closing price. This indicates that the loss in value was caused by other factors. See In re Merrill Lynch & Co., 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008) (dismissing a securities fraud case for lack of loss causation where the defendant's stock fell 78%

before the corrective disclosure); 60223 Trust v. Goldman, Sachs & Co., 540 F. Supp. 2d 449, 460 (S.D.N.Y. 2007) (dismissing a securities fraud case for lack of loss causation where the defendant's stock fell 79% before the corrective disclosure).

Second, other banks suffered similar losses on January 22, 2009. For example, the price of Bank of America stock fell 14.52%, the price of Citibank stock fell 15.26%, the price of Regions Bank stock fell 14.14%, the price of US Bancorp stock fell 13.7%, the price of Wells Fargo stock fell 6.66%, and the price of Fifth Third Bancorp fell 28.57%.[1] This suggests that SunTrust's 10.91% drop was caused by general market conditions instead of anything specific to SunTrust. See Law v. Medco Research, Inc., 113 F.3d 781 (7th Cir. 1997) (affirming the dismissal of a securities fraud case on loss causation grounds where the defendant showed that its stock prices had moved in tandem with those of its competitors).

Absent some other explanation, which the Plaintiff does not offer, the facts alleged in the complaint cannot support an inference that SunTrust's misstatements – rather than general market conditions – proximately caused the Plaintiff's loss. Nor are they sufficient to apportion the loss among competing causes. See Lentill, 396 F.3d at 177; see also HomeBanc Corp. Sec. Lit., 1:08-cv-1461-TCB, 2010 WL

---

[1]The Court may take judicial notice of stock prices on a motion to dismiss a § 10(b) claim. La Grasta v. First Union Sec., 358 F.3d 840, 842 (11th Cir. 2004).

1524836, at *21 (N.D. Ga. Apr. 13, 2010) ("Although the Court is mindful that issues of causation are typically not susceptible to resolution at the motion to dismiss stage, the complaint here fails to make any allegations that would allow the Court to distinguish between any losses caused by the Defendants' alleged misrepresentations and the collapse of the mortgage industry as a whole."). Therefore, the Plaintiff's allegations of loss causation are insufficient to state a claim. Because the Plaintiff has not adequately pled false representations or scienter or loss causation, the Court need not decide whether the Plaintiff has adequately pled the remaining elements of a § 10(b) claim or the elements of a § 20(a) claim, which depends on the existence of an underlying § 10(b) claim.

## IV. Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss [Doc. 27] is GRANTED.

SO ORDERED, this 19 day of August, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge